**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| BP EXPLORATION & PRODUCTION, INC., ET AL. | § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. 4:10-CV-01162 *consolidated with* NO. 4:09-CV-03360 |
| v. | § § | |
| NATIONAL OILWELL VARCO, L.P., ET AL. | § § | HON. VANESSA GILMORE |
| Defendants. | § | PRESIDING |

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**
**ON COUNTERCLAIM FOR CONTRACTUAL INDEMNITY**

## Introduction

BP and its insurer filed suit against NOV to recover for damage incurred on BP's "Mad Dog" offshore drilling platform during Hurricane Ike. NOV has filed a counterclaim for full indemnity and defense under the provisions of the Operation Contract in effect at the time of the loss. The Operation Contract obligates BP to indemnify and defend NOV with respect to the damages at issue in this action in excess of $100,000. NOV asks the Court to interpret the unambiguous indemnity provisions of the Operation Contract and hold as a matter of law that:

- the Operation Contract governs the indemnity obligations with respect to BP's claims against NOV;

- under the Operation Contract, NOV is an indemnitee and BP is an indemnitor; and

- NOV is entitled to indemnity from BP for all damages and expenses in this action over $100,000, exclusive of damages caused by NOV's gross negligence.

This is a motion for *partial* summary judgment.  Interpretation of the contract will not dispose of all issues with respect to NOV's indemnity counterclaims because BP has pled an affirmative defense – that NOV committed gross negligence, which BP asserts invalidates BP's indemnity obligations under the contract.  Although NOV expects to seek summary judgment on BP's gross negligence affirmative defense at a later time, NOV proceeds first with this partial summary judgment for two reasons:

- resolution of the parties' dispute over the interpretation of the contract will facilitate prompt resolution of the case; and

- absent ambiguity, interpretation of a contract is a pure legal question on which no extrinsic evidence may be considered.

Interpretation of an unambiguous contract is an issue of law that the Court must decide.  Where interpretation of the contract will not fully dispose of all claims in the case, partial summary judgment is a proper procedure for the Court to interpret the unambiguous provisions of a contract.

# Table of Contents

Page:

Introduction ........................................................................................................ i

Table of Contents ............................................................................................ iii

Index of Authorities ........................................................................................ v

Summary of Argument .................................................................................... 1

Factual Background ......................................................................................... 1

   I.   BP Sued NOV Based on NOV's Work on the Parking Brake System
       for the Mad Dog Drilling Rig ................................................................. 1

   II.  BP Contracted with Pride to Build and Operate the Mad Dog
       Facility, Pride Subcontracted with NOV to Design and Construct the
       Parking Brake System ........................................................................... 2

   III. Under the Contracts, BP and Pride Allocated, and Agreed to Insure
       Against, the Risks Associated with the Project ...................................... 4

Applicable Legal Standards ............................................................................. 7

   I.   Applicable Substantive Law ................................................................... 7

   II.  The Court Should Interpret the Indemnity Provisions of the
       Operation Contract as a Matter of Law in Partial Summary Judgment ... 7

       A.   Interpretation of an Unambiguous Contract Is a Question of
             Law, Properly the Subject of Summary Judgment ......................... 7

       B.   Where Interpretation of an Unambiguous Contract Will Not
             Dispose of All Issues, Partial Summary Judgment Is Proper .......... 8

Argument & Authority ..................................................................................... 9

   I.   The Operation Contract Governs BP's Indemnity Obligations ............... 9

       A.   While Both Contracts Were in Effect at the Time of the Loss,
             the Operation Contract Controls After Provisional Acceptance ...... 9

       B.   BP's Subsequent Termination of the Operation Contract Does
             Not Excuse Performance of Its Indemnity Obligations ................. 11

II.   Under the Operation Contract, NOV Is an Indemnitee, and BP Is Obligated to Indemnify NOV for All Claims and Expenses in Excess of $100,000 ............................................................................................................. 11

    A.   Section 14.03.02 Identifies NOV as an Indemnitee and Covers BP's Claimed Losses in This Suit ................................................................ 12

    B.   In Section 14.03.01, BP Expressly and Unequivocally Promises to Indemnify NOV for Its Own Negligence.................................................. 14

    C.   Section 14.03.01's Warranty Exception Is Not Implicated Here .................. 15

III.  NOV Is Entitled to Indemnity from BP on All Damages Over $100,000, Exclusive of Damages Caused by Gross Negligence on the Part of NOV ...................................................................................................... 16

Conclusion & Prayer ..................................................................................................... 19

# Table of Authorities

## Cases

*All Metals, Inc. v. Liberty Mut. Fire Ins. Co.*,
2010 WL 3027045 (N.D. Tex. July 29, 2010) ................................................. 8

*Avondale Indus., Inc. v. Int'l Marine Carriers Inc.*,
15 F.3d 489 (5th Cir. 1994) ......................................................................... 13

*Banner Chevrolet v. Wells Fargo Guard Servs.*,
508 So.2d 966 (La. App. 4th Cir. 1987) ................................................. 17, 18

*Beauregard Parish Sch. Bd. v. Honeywell Inc.*,
2007 WL 2811638 (W.D. La. 2007) ...................................................... 17, 18

*Berry v. Orleans Parish Sch. Bd.*,
830 So.2d 283 (La. 2002) ............................................................................ 15

*Bolton v. Tulane Univ. of La.*,
692 So.2d 1113 (La. App. 1st Cir. 1997) ...................................................... 8

*BP Products N.A., Inc. v. J.V. Industrial Co., Ltd.*,
2010 WL 1610114 (S.D. Tex. April 21, 2010) ............................................ 8, 9

*Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*,
589 F.3d 778 (5th Cir. 2009) ........................................................................ 7

*Houston Exploration Co. v. Halliburton Energy Serv., Inc.*,
269 F.3d 528 (5th Cir. (La.) 2001) ......................................................... 17, 18

*Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ.*,
579 F.3d 546 (5th Cir. (La.) 2009) .............................................................. 13

*Losavio v. Kansas City Southern Ry. Co.*,
675 So. 2d 821 (La. App. 4th Cir. 1996) ....................................................... 7

*Mariner Energy, Inc. v. Devon Energy Production Co.*,
690 F. Supp. 2d 558 (S.D. Tex. 2010) ........................................................... 8

*Millennium Petrochems., Inc. v. Brown & Root Holdings, Inc.*,
    390 F.3d 336 (5th Cir. 2004) ....................................................................... 11

*Mobil Exploration & Producing U.S. Inc. v. Certain Underwriters*
    *Subscribing to Cover Note 95-3317(A)*,
    837 So. 2d 11 (La. App. 1st Cir. 2002)......................................................... 17

*Pellerin Const., Inc. v. Witco Corp.*,
    169 F.Supp.2d 568 (E.D. La. 2001)............................................................... 17

*Perkins v. Rubicon, Inc.*,
    563 S.2d 258 (La. 1990) .......................................................................... 14, 15

*Polozala v. Garlock, Inc.*,
    343 So.2d 1000 (La. 1977) ...................................................................... 14, 15

*Texas E. Transmission Corp. v. Amerada Hess Corp.*,
    145 F.3d 737 (5th Cir. 1998) ......................................................................... 7

*Yturria v. Kerr-McGee Oil & Gas Onshore, LLC*,
    291 Fed. Appx. 626 (5th Cir. 2008)............................................................... 8

*Zeigler v. BP America Production Co.*,
    2006 WL 2850163 (E.D. La. Oct. 4, 2006) .................................................... 9

## Statutes

43 USC § 1333 ................................................................................................. 7

La. Civ. Code art. 2004....................................................................... 16, 17, 18

**Summary of Argument**

At the time BP's claimed losses occurred, the Operation Contract governed BP's indemnity obligations with respect to damages to the Mad Dog production facility.  BP promised in Section 14.03.01 of the Operation Contract to indemnify and defend Pride's subcontractors and vendors for all claims, losses, or expenses for damage to the Mad Dog facility in excess of $100,000.  NOV is one of Pride's subcontractors and vendors under the contract.  BP's indemnity and defense obligation extends to damage caused by NOV's putative negligence or fault.  Thus, the claims BP brings against NOV in this lawsuit fall exclusively within the claims for which BP is contractually obligated to indemnify NOV under the Operation Contract.  NOV is therefore entitled to partial summary judgment that:

> (1)   the Operation Contract governs the indemnity obligations with respect to BP's claims against NOV;

> (2)   under the Operation Contract, NOV is an indemnitee and BP is an indemnitor; and

> (3)   NOV is entitled to indemnity from BP for all damages and expenses in this action over $100,000, exclusive of damages caused by NOV's gross negligence.

**Factual Background**

**I.     BP Sued NOV Based on NOV's Work on the Parking Brake System for the Mad Dog Drilling Rig**

BP America Production Company and BP Exploration & Production, Inc. (collectively, "BP") and their insurer, American Home Assurance Company ("American Home"), filed this suit against National Oilwell Varco, LP, National Oilwell Varco, Inc.,

National Oilwell Norway AS, Hydralift AS, Hydralift Amclyde, Inc., and Hydralift, Inc. (collectively, "NOV") to recover for property damages to BP's "Mad Dog" offshore drilling facility during Hurricane Ike.  BP and American Home allege that, during the hurricane, the drilling rig on the Mad Dog platform slid over the side of the platform into the Gulf of Mexico, resulting in the loss of the rig and damage to various items of equipment located on the platform.  BP and American Home blame this event on a failure of the drilling rig's parking brake system and seek reimbursement from NOV.  They assert claims against NOV on the basis of NOV's: (1) design and construction of the parking brake system; (2) provision of training, instructions, and warnings relating to the parking brake system; (3) express and implied warranties for the parking brake system; and (4) installation, maintenance and/or repair of the parking brake system.[1]

## II.   BP Contracted with Pride to Build and Operate the Mad Dog Facility, Pride Subcontracted with NOV to Design and Construct the Parking Brake System

At the time the Mad Dog project was initiated, BP entered into two coordinated contracts with Pride Offshore, Inc. ("Pride"): (1) BP contracted with Pride for the construction and purchase of the drilling rig under the Drilling Rig Construction and Purchase Contract (the "Construction Contract"),[2] and (2) BP contracted with Pride for operation and maintenance of the rig once it had been built under the Drilling Rig Operation and Maintenance Services Contract (the "Operation Contract").[3]   Both contracts contain indemnity obligations running from BP to Pride and Pride's

---

[1] Plaintiffs' Complaint [Doc. No. 1].

[2] A copy of the Drilling Rig Construction and Purchase Contract is attached as Exh. B.

[3] A copy of the Drilling Rig Operation and Maintenance Services Contract is attached as Exh. A.

subcontractors and vendors on the project.  Pride subcontracted with NOV for the design and manufacture of the drilling rig's parking brake system.[4]

The Mad Dog facility was built for the exploration and production of hydrocarbons in the deep water on the Outer Continental Shelf off the coast of Louisiana. The main structure is a truss spar permanently moored in 4,500 feet water depths in the Green Canyon area, about 180 miles south of New Orleans.[5]  The Drilling Rig structure on top of the spar consisted of a skid base structure (the "SBS") and the derrick equipment set (the "DES").  The SBS was placed on two parallel ski beams running in the north/south direction.  The SBS was held to these skid beams by four brake shoes, each shoe having two brake units.[6]  The DES was placed on top of the SBS in a similar fashion, on two parallel skid beams running in the east/west direction.  The DES was held to these skid beams by four more break shoes, each having two brake units.[7]

Below are picture of the spar (left) and the DES (right) being transported out to the Green Canyon area in the Gulf of Mexico.



---

[4]  Plaintiffs' Complaint [Doc. No. 1] at ¶¶14-19.

[5] Specifics available at https://www.offshore-technology.com/projects/mad_dog.

[6] Exh. C, Hydralift Doc. T3695-Z-MA-001, User Manual-Skidbase Fail Safe Parking Unit, § 1.1.

[7] Exh. D, Hydralift Doc. T3699-Z-MA-001, User Manual-DES Fail Safe Parking Unit, § 1.1.

Below, the picture on the left shows the Mad Dog facility after the DES was built and attached to the top of the spar structure; the picture on the right depicts how the DES sat on the skids on top of the spar.



### III.    Under the Contracts, BP and Pride Allocated, and Agreed to Insure Against, the Risks Associated with the Project

The Construction Contract and the Operation Contract between BP and Pride each contain a comprehensive risk allocation, accomplished through indemnity obligations and insurance provisions.  These contracts were drafted to operate together seamlessly from the construction phase of the project into the operation phase of the project.[8]

The indemnity obligations assumed by BP (called "Company" in the contracts) and Pride (called "Contractor" in the contracts) are owed to groups of entities that would

---

[8] Both the Construction Contract and the Operation Contract have an effective date of March 15, 2002.   Exh. A, Operation Contract at §7.01; Exh. B, Construction Contract at Preamble, p. 1.  The Construction Contract has no express limitation on its term.  The Operation Contract commenced upon Provisional Acceptance of the drilling rig in September of 2004; absent notice of termination, its term, with renewals, extends for a period of seven years after Provisional Acceptance (through September 24, 2011).  Exh. A, Operation Contract at §§7.02-.03, 8.01-.04.  *See also Zeigler v. BP America Production Co.*, 2006 WL 2850163, *1 (E.D. La. Oct. 4, 2006) (discussing the Operation Contract and identifying the date of Provisional Acceptance as September 24, 2004).

be involved in the project.[9]  In this regard, the contracts define BP and entities involved on its side of the project, such as BP's co-venturers and co-lessees, as the "Company Group."[10]  They define Pride and the entities involved on its side of the project, such as Pride's vendors and subcontractors, as the "Contractor Group."[11]  BP's indemnity obligations under the contracts are generally owed to the Contractor Group, and Pride's indemnity obligations are generally owed to the Company Group.

The contracts allocate both risk of injury to persons and risk of damage to various categories of property.  With respect to property owned by the Company Group, the risk of damage is allocated differently during the construction phase of the project than during the operation phase.  Under the Construction Contract, BP's property is divided into two subcategories: (1) property provided by BP for incorporation into the drilling rig[12] and (2) BP's equipment.[13]  Pride assumed the risk for the first $1 million worth of damage per occurrence to property intended for incorporation into the drilling rig and agreed to indemnify the Company Group for same.  BP assumed the remaining risk (i.e., for damage to the rig in excess of $1 million[14] and for all damage to BP's equipment[15]) and agreed to indemnify the Contractor Group for same.

---

[9] Exh. A, Operation Contract at preamble and §§2.04, 2.07; Exh. B, Construction Contract at preamble.

[10] Exh. A, Operation Contract at §2.05; Exh. B, Construction Contract at §2.06.

[11] Exh. A, Operation Contract at §2.08; Exh. B, Construction Contract at §2.04.

[12] Exh. B, Construction Contract at §§14.01.02, 14.02.01(ii).  *See also* Exh. B, Construction Contract at §2.10 (defining "Items").

[13] Exh. B, Construction Contract at §14.02.01(iii).  *See also* Exh. B, Construction Contract at §2.08 (defining "Existing Equipment and Property").

[14] Exh. B, Construction Contract at §§14.01.02, 14.02.01(ii).

[15] Exh. B, Construction Contract at §14.02.01(iii).

The Operation Contract commenced in September of 2004, when BP took Provisional Acceptance of the rig.[16]   At that time, title to the rig and all other property constituting the Mad Dog facility passed to BP.[17]   Thus, under the Operation Contract, BP's property includes the entire production facility.[18]   Under the Operation Contract, BP assumed all risk of damage to the facility in excess of $100,000 per occurrence, except for damage covered by Pride's warranties under the Construction Contract, and agreed to indemnify the Contractor Group for same, regardless of negligence or fault.[19]   Pride agreed to indemnify the Company Group for the first $100,000 of damage *only if* there is negligence or fault on the part of the Contractor Group.[20]   Thus, at the time of Provisional Acceptance, the Operation Contract commenced, ownership of the rig passed to BP,[21] and BP assumed the lion's share of the risk of property damage to the facility.[22]

BP and Pride also assume insurance obligations under the Construction and Operation Contracts that further the risk allocation scheme.  These insurance obligations relate to, among other things: the parties' duty to protect their indemnity obligations with insurance, naming the indemnitee groups as additional insureds, and waiver of subrogation against the indemnitee groups.[23]   NOV has made a demand on BP and

---

[16] Exh. A, Operation Contract at §7.02 (commencement at Provisional Acceptance).

[17] Exh. B, Construction Contract at §21.01 (title passes at Provisional Acceptance).

[18] Exh. A, Operation Contract at §2.19 (defining the "Production Facility").

[19] Exh. A, Operation Contract at §14.03.01(ii).

[20] Exh. A, Operation Contract at §14.02.01(iii).

[21] Exh. B, Construction Contract at §21.01.

[22] Exh. A, Operation Contract at §7.02.

[23] Exh. A, Operation Contract at §§14.12, 15.05, 15.15; Exh. B, Construction Contract at §§ 14.07, 15.04, 15.09.

American Home for indemnity, insurance and defense under the contracts, but this demand has not been met.[24]

**Applicable Legal Standards**

## I.     Applicable Substantive Law

The Outer Continental Shelf Lands Act provides for the application of adjacent state law as surrogate federal law to certain claims arising on the outer continental shelf. 43 USC § 1333(a)(1), (2)(A); *see also Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009).  The Mad Dog platform is located on the Outer Continental Shelf adjacent to the State of Louisiana.[25]  It appears undisputed that NOV's claim for indemnity under the Operation Contract is governed by Louisiana law.

## II.     The Court Should Interpret the Indemnity Provisions of the Operation Contract as a Matter of Law in a Partial Summary Judgment

### A.     Interpretation of an Unambiguous Contract Is a Question of Law, Properly the Subject of Summary Judgment

Under Louisiana law, the interpretation of an unambiguous contract is an issue of law for the court to decide.  *Texas E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir. 1998).  Thus, contract interpretation is a proper matter for the court to decide on summary judgment: if the court determines that the contract is ambiguous, it should so hold as a matter of law, *Losavio v. Kansas City Southern Ry. Co.*, 675 So. 2d 821, 824 (La. App. 4th Cir. 1996); if the court determines that the contract is

---

[24] Exh. E, NOV's demand letter.  NOV anticipates that, if this action continues, the insurance and waiver of subrogation rights created in the contracts and in BP's insurance policies will result in a subsequent motion for summary judgment after discovery on BP's insurers and insurance policies is more substantially complete.

[25] Plaintiffs' Complaint [Doc. No. 1] at ¶¶ 7-8.

unambiguous, it should interpret the contract provisions as a matter of law, *Bolton v. Tulane Univ. of La.*, 692 So.2d 1113, 1125 (La. App. 1st Cir. 1997).  Neither party has pled that the Operation Contract is ambiguous.

### B.   Where Interpretation of an Unambiguous Contract Will Not Dispose of All Issues, Partial Summary Judgment Is Proper

Interpretation of the relevant contract terms will not always dispose of all issues in the case.   In such instances, the Court can fulfill its obligation to interpret an unambiguous contract as a matter of law through a partial summary judgment.   *E.g., Yturria v. Kerr-McGee Oil & Gas Onshore, LLC*, 291 Fed. Appx. 626 (5th Cir. 2008) (affirming partial summary judgment interpreting contract as precluding the deduction of certain expenses prior to calculation of royalty payments); *Mariner Energy, Inc. v. Devon Energy Production Co.*, 690 F. Supp. 2d 558 (S.D. Tex. 2010) (granting motion for partial summary judgment on interpretation of contract); *BP Products N.A., Inc. v. J.V. Industrial Co., Ltd.*, 2010 WL 1610114 (S.D. Tex. April 21, 2010) (same); *All Metals, Inc. v. Liberty Mut. Fire Ins. Co.*, 2010 WL 3027045 (N.D. Tex. July 29, 2010) (slip copy) (same).

BP and American Home recently obtained a partial summary judgment interpreting the indemnity provision of a contract as a matter of law in another action in the Southern District of Texas.   *BP Products N.A., Inc.*, 2010 WL 1610114 at *3-6. There, BP and American Home sought and obtained a partial summary judgment on the following three contract interpretation issues: (1) the indemnity provision was valid and enforceable, (2) the indemnity provision applied to BP's claims in the lawsuit, and (3) the

indemnity provision covered indemnity claims for consequential damages.  *Id.* at *1. Here, like in *BP Products*, the indemnity provisions are unambiguous, and the court should grant summary judgment interpreting the provisions as a matter of law.

## Argument & Authority

### I.   The Operation Contract Governs BP's Indemnity Obligations

#### A.   While Both Contracts Were in Effect at the Time of the Loss, the Operation Contract Controls After Provisional Acceptance

Both the Construction Contract and the Operation Contract have an effective date of March 15, 2002,[26] though the Operation Contract did not commence until Provisional Acceptance of the drilling rig in September of 2004.[27]   As the Eastern District of Louisiana summarized in *Zeigler v. BP Am. Prod. Co.*, BP provisionally accepted the rig from Pride on September 24, 2004, at which time the Operation Contract commenced and Pride began providing operational services on the Mad Dog platform.  *Zeigler v. BP Am. Prod. Co.*, Civ. A. 05-4138, 2006 WL 2850163, *1 (E.D. La. 2006), *aff'd* 249 Fed. App'x 999 (5th Cir. 2007).  The Construction Contract did not cease to have effect at the time of provisional acceptance but was, instead, incorporated into the Operation Contract.[28]

Because the indemnity provisions of the Construction and Operation Contracts differ, the Court must determine which provisions trump.   The contracts expressly address this issue.  When entering into these two contracts with overlapping applicability,

---

[26] Exh. B, Construction Contract at Preamble, p. 1; Exh. A, Operation Contract at §7.01.

[27] Exh. A, Operation Contract at §7.02.

[28] Exh. A, Operation Contract at §1.01 and Exhibit H to Operation Contract (the Construction Contract).  The Construction Contract does not contain a termination date; the Operation Contract is self-renewing for a period of seven years after provisional acceptance absent notice of termination.  Exh. A, Operation Contract at §§ 7.03, 8.01-.04.

the parties anticipated and provided for the possibility of inconsistency between the contracts' provisions during the post-construction phase, when both contracts were in operation. Section 1.01 of the Operation Contract incorporates the Construction Contract as Exhibit "H," and makes the Construction Contract part of the documents constituting the Operation Contract.[29] Section 1.03 of the Operation Contract then provides that, in the event of an inconsistency, the articles of the Operation Contract prevail over the terms of the Construction Contract and other contract documents incorporated as exhibits.[30] Thus, the indemnity provisions of the Operation Contract govern the claims in this action.

This resolution of any inconsistency in favor of the Operation Contract is consistent with the loss allocation scheme of the two contracts. After Provisional Acceptance, the Mad Dog production facility became the property of BP.[31] The insurance and indemnity provisions of the Operation Contract are consistent with this change of ownership. Additionally, the indemnity provisions of the Operation Contract categorize the indemnity obligations of the parties in terms consistent with the nature of property in the post-construction phase of the project.[32]

---

[29] Exh. A, Operation Contract at §1.01 and Exhibit H to Operation Contract.

[30] Exh. A, Operation Contract at §1.03.

[31] Exh. B, Construction Contract at § 21.01.

[32] *E.g., Compare* Exh. A, Operation Contract at § 14.03.01(ii) (defining BP's indemnity obligations in terms of the "Production Facility," which is owned entirely by BP in the post-construction phase of the project) *with* Exh. B, Construction Contract at §§ 2.10, 14.02.01(ii) (defining BP's indemnity obligations in terms of "Items" intended for incorporation into the drilling rig as part of its construction).

**B.     BP's Subsequent Termination of the Operation Contract Does Not Excuse Performance of Its Indemnity Obligations**

After Hurricane Ike, BP sent Pride notice that it was terminating the Operation Contract pursuant to the Force Majeure provision of the contract, with a termination date of December 31, 2008.[33]   Under the "Survival" clause of the Operation Contract, termination of the contract does not release BP of its obligations that expressly or by their nature survive or extend beyond the contract, "including without limitation all indemnity and risk allocation provisions" of the Operation Contract.[34]   BP's indemnity obligations therefore survive its post-accident termination of the Operation Contract.

**II.     Under the Operation Contract, NOV is an Indemnitee, and BP Is Obligated to Indemnify NOV for All Claims and Expenses in Excess of $100,000**

Under the Operation Contract, BP (defined as "Company")[35] agreed to indemnify Pride ("Contractor")[36] and its subcontractors, vendors, and affiliates (the "Contractor Group")[37] for all damages to the Mad Dog facility in excess of $100,000 per occurrence, except for damages covered by Pride's warranties.   Section 14.03.01 of the Operation Contract provides:

> Subject to the other provisions of this Article 14, **Company shall defend, indemnify, release and hold Contractor Group harmless from and**

---

[33] Exh. F, December 17, 2008 Notice of Termination of Operation Contract.

[34] Exh. A, Operation Contract at §34.01.   Even absent the survival clause, termination of a contract containing indemnity obligations does not terminate the indemnity obligations as to losses or damages incurred during the contract term unless otherwise provided in the contract.   *See, e.g., Millennium Petrochems., Inc. v. Brown & Root Holdings, Inc.*, 390 F.3d 336, 340-341 (5th Cir. 2004) (applying Texas law and citing consistent holdings in other circuits).

[35] Exh. B, Construction Contract at preamble and §2.04, 2.06; Exh. A, Operation Contract at preamble and §§2.04, 2.07.

[36] *Id.*

[37] Exh. A, Operation Contract at preamble and §2.08; Exh. B, Construction Contract at §2.08.

---

**against all Claims, Losses, and Expenses** for the following, when arising out of or incidental to this Contract: . . .

(ii) **all damage to the Production Facility**, including the Drilling Rig, in excess of One Hundred Thousand U.S. Dollars (US$100,000) per occurrence;

**regardless of the Negligence or Other Fault of Contractor Group** or any other entity or persons (provided that such indemnity obligations shall not apply to damage to the Drilling Rig to the extent such damage is covered under the warranty obligations undertaken by Contractor under the Drilling Rig Construction Contract)

## A. Section 14.03.01 Identifies NOV as an Indemnitee and Covers BP's Claimed Losses in This Suit

The Operation Contract defines the "Contractor Group" as including Pride and "its Affiliates, its **subcontractors** and **vendors** of every tier and their Affiliates, and the officers, directors, shareholders, employees, and representatives of all of those entities."[38] The Operation Contract defines an "Affiliate" as "a current or future person or entity directly or indirectly controlling, controlled by, or under common control with such company."[39]

BP and American Home specifically pled in their complaint that NOV is a subcontractor to Pride on the Mad Dog project:  "In connection with the Construction and Purchase Contract, Pride subcontracted to the NOV defendants the design, manufacture, and installation of the drilling rig parking brake system used to secure the rig to the Mad

---

[38] Exh. A, Operation Contract at §2.08; Exh. B, Construction Contract at §2.08 (emphasis added).

[39] Exh. A, Operation Contract at §2.01; Exh. B, Construction Contract at §2.01.

Dog platform."[40]   This judicial admission conclusively establishes NOV's status as a subcontractor.  *Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ.*, 579 F.3d 546, 550 (5th Cir. (La.) 2009) ("Factual assertions in the complaint are 'judicial admissions conclusively binding' on the plaintiff.").   Although BP and American Home expressly reference only the Construction Contract in their complaint, the Construction Contract became part of the contract documents that constitute the Operation Contract after Provisional Acceptance.[41]   Additionally, the definition of Contractor Group in both the Construction Contract and the Operation Contract is not limited to subcontractors and vendors under a particular contract.[42]

It is also evident on the face of BP and American Home's complaint that the damages alleged in this action – the loss of the drilling rig and damage to equipment on the Mad Dog platform[43] – constitute damage to the "Production Facility" under Section 14.03.01(ii).   The Operation Contract defines "Production Facility" as including the drilling rig and all tangible property on the Mad Dog platform.[44]   It is therefore clear from the pleadings and the unambiguous indemnity provisions of the Operation Contract that NOV is an indemnitee under the Operation Contract, and that the damages BP seeks in

---

[40] Plaintiff's Complaint [Doc. No. 1] at ¶14.   The Fifth Circuit has defined a "subcontractor" as "one who takes a portion of a contract from the principal contractor or another subcontractor."  *Avondale Indus., Inc. v. Int'l Marine Carriers Inc.*, 15 F.3d 489, 494 (5th Cir. 1994).

[41] Exh. A, Operation Contract at § 1.01.

[42] Exh. A, Operation Contract at §2.08; Exh. B, Construction Contract at §2.08.

[43] Plaintiff's Complaint at ¶¶20-27.

[44] The "Production Facility" is defined in the Operation Contract as BP's "production facility known as the Mad Dog Project located at Green Canyon Block 782."  Exh. A, Operation Contract at Preamble.   It is further defined to include "the Drilling Rig and all machinery, structures, equipment, gathering lines, wells, wellheads or other tangible property belonging to Company Group and located at the Production Facility." Exh. A, Operation Contract at §2.19.

this lawsuit are covered by BP's obligation to indemnity NOV for all claims, losses and expenses in excess of $100,000.

### B.    In Section 14.03.01, BP Expressly and Unequivocally Promised to Indemnify NOV for NOV's Putative Negligence

Section 14.03.01 expressly compels BP to indemnify the Contractor Group for the specified property damage "regardless of the Negligent or Other Fault of Contractor Group or any other entity or persons."   "Negligence or Other Fault" is defined in the contract to include "negligence, strict liability, . . . and breach of statutory duty, . . . and, except to the extent otherwise provided, whether or not such Negligence or Other Fault is sole, concurrent, joint, active, or passive[.]"[45]   The phrase "Regardless of the Negligence or Other Fault" is also defined in the Operation Contract:

> "Regardless of the Negligence or Other Fault" shall mean that, except to the extent expressly otherwise provided, the Parties intend for the indemnity and other obligations to apply **whether or not the Claims, Losses, and Expenses are occasioned by or the result of the Negligence or Other Fault of the person or entity seeking indemnity or any other entity or person**, . . .[46]

The Louisiana Supreme Court has held that a contract that provides for the indemnification of an indemnitee against the consequences of its own negligence will be enforced if the intention to indemnify the indemnitee against losses resulting from its own negligence is expressed in unequivocal terms.  *Polozala v. Garlock, Inc.*, 343 So.2d 1000 (La. 1977); *Perkins v. Rubicon, Inc.*, 563 S.2d 258 (La. 1990).  This "unequivocal" test is satisfied here because the Operation Contract's indemnity provisions state clearly

---

[45] Exh. A, Operation Contract at §14.01.05.

[46] Exh. A, Operation Contract at §14.01.07 (emphasis added).

that the indemnity obligations thereunder apply regardless of whether the damage is caused by the fault or negligence of the Contractor Group.  *See, e.g., Berry v. Orleans Parish Sch. Bd.*, 830 So.2d 283, 286-87 (La. 2002) (provision requiring indemnity "regardless of whether or not it is caused in part by a party indemnified hereunder" was sufficiently unequivocal); *Perkins*, 563 S.2d at 259 (provision requiring indemnity for losses "even though caused by the negligence of the [indemnitee]"); *Polozala*, 343 So.2d at 1002-03 (indemnity for losses "whether caused by [indemnitee's] negligence or otherwise").

### C.  Section 14.03.01's Warranty Exception Is Not Implicated Here

BP's indemnity obligation to NOV has two limitations.  First, it excludes the first $100,000 worth of damage per occurrence.  Second, it excludes damage covered by Pride's warranty obligations to BP under the Construction Contract.  The $100,000 limitation applies to the claims at issue here; the warranty exception does not.

The warranty exception applies to "damage to the Drilling Rig to the extent such damage is covered under the warranty obligations undertaken by Contractor under the Drilling Rig Construction Contract."[47]  Pride's warranty obligations to BP are found in Article 13 of the Construction Contract.  Section 13.01 defines the scope of Pride's warranty obligations:

> Contractor warrants and guarantees the work as provided above, irrespective of whether the Work is attributable to Contractor or any of its subcontractors or vendors during performance of the Work **up to and including twelve (12) months after Provisional Acceptance** of the Work.

---

[47] Exh. A, Operation Contract at §14.03.01.

Thus, Pride's warranties under the Construction Contract expired one year after the date of Provisional Acceptance, which occurred on September 24, 2004.  The loss claimed by BP in this litigation occurred in September of 2008 – approximately three years after Pride's warranties expired.  Because the loss occurred after the warranties expired, the loss is not covered by Pride's warranties to BP in the Construction Contract.  Pride expressly disclaimed any other or additional warranties.[48]

### III.   NOV Is Entitled to Indemnity from BP for All Damages Over $100,000, Exclusive of Damages Caused by Gross Negligence on the Part of NOV

The Operation Contract unequivocally and unambiguously obligates BP to indemnify NOV for the damages BP seeks in this lawsuit to the extent such damages exceed $100,000.  However, BP has pled an affirmative defense to enforcement of BP's indemnity obligation to NOV: "In the alternative, 'Contractor Group' committed gross fault which serves to invalidate any contractual provisions attempting to limit liability which are relied upon by the Counterclaimants."[49]  Presumably this defense relates to Article 2004 of the Louisiana Civil Code, which provides:  "Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party."  La. Civ. Code art. 2004.

NOV believes that Section 2004 does not apply to the indemnity obligations here, and that there is and will be no evidence of gross fault.  Thus, NOV does not believe that BP will be able to meet its burden on its gross fault affirmative defense.  However, those

---

[48] Exh. B, Construction Contract at §13.06.

[49] BP and American Home's Answer to Counterclaims [Doc. No. 63] at "Fourth Defense."  BP and American Home have also pled that BP's indemnity obligations do not extend to gross fault.  *Id.* at "Eighth Defense."

issues are not presented by this partial summary judgment, which only asks the Court to interpret the indemnity provisions of the Operation Contract and determine their application to damages not arising from gross negligence.

Where Article 2004 applies, it voids limitation of liability provisions only to the extent of damages arising out of intentional or gross fault by the indemnitee.   Article 2004 does not preclude limitation of liability for ordinary negligence or other non-fraudulent misconduct.   *E.g., Houston Exploration Co. v. Halliburton Energy Serv., Inc.*, 269 F.3d 528, 531 (5th Cir. (La.) 2001) (issue on appeal was whether trial court erred in finding gross negligence sufficient to preclude enforcement of contractual indemnity obligations pursuant to Article 2004);   *Beauregard Parish Sch. Bd. v. Honeywell Inc.*, 2007 WL 2811638, at *5 (W.D. La. 2007) (limitation of liability enforceable except with respect to damages arising out of bad faith misconduct of indemnitee); *Mobil Exploration & Producing U.S. Inc. v. Certain Underwriters Subscribing to Cover Note 95-3317(A)*, 837 So. 2d 11, 33 (La. App. 1st Cir. 2002) (limitation of liability enforceable in absence of evidence that negligence of defendant amounted to gross negligence); *Pellerin Const., Inc. v. Witco Corp.*, 169 F.Supp.2d 568, 585-586 (E.D. La. 2001) (same); *Banner Chevrolet v. Wells Fargo Guard Servs.*, 508 So.2d 966, 968 (La. App. 4th Cir. 1987) (same).

For example, in *Beauregard Parish*, defendant Honeywell sought partial summary judgment to enforce a waiver of consequential damages provision in the parties' contract. *Beauregard Parish Sch. Bd.*, 2007 WL 2811638 at *5.  Beauregard Parish School Board opposed the partial summary judgment on the grounds that Article 2004 prohibited any

limitation of liability for intentional or bad faith misconduct.  *Id.*  The district court granted Honeywell's partial summary judgment, holding that the waiver of consequential damages provision was void only to the extent that it excluded damages arising out of bad faith or intentional misconduct but was otherwise enforceable.  *Id.* at *5-6.

Similarly, in *Banner Chevrolet*, Wells Fargo appealed from the trial court's judgment against it, arguing that the trial court erred in failing to apply the limitation of liability provision in the parties' contract.  *Banner Chevrolet*, 508 So.2d at 967.  Banner argued that the limitation of liability was void under Article 2004.  The court of appeals agreed with Wells Fargo and reversed the trial court's judgment.  *Id.* at 968.  In reaching its decision, the court observed:

> A party may legally contract with another party to exclude liability for his negligence if the exculpatory agreement clearly expresses that intent. As long as one's negligence does not cause physical injury to another, **contractual provisions are valid to eliminate completely or to partially limit liability for losses due to negligence, but not for losses caused by intentional acts or gross fault**.

*Id.* at 967 (internal citations omitted); *see also Houston Exploration Co.*, 269 F.3d at 531.

Here, as in the cases cited above, the indemnity provisions of the Operation Contract are valid and enforceable under Louisiana law with respect to all damages not arising from gross fault on the part of NOV, even if Article 2004 applies to the indemnity provisions of the Operation Contract.

## Conclusion & Prayer

The losses that BP and American Home seek to recover in this lawsuit are the very risks that BP assumed under the Operation Contract – damage to or loss of property on the Mad Dog platform after the expiration of Pride's one-year warranties.  When the warranty period expired in 2005, all risk of damage to the Mad Dog facility in excess of $100,000 rested solely on BP and its insurers.  BP now attempts to thwart the comprehensive risk allocation scheme under the Construction and Operation Contracts by suing to recover for the very risk that BP promised to assume and insure against in the contracts.  The contracts protect against just such an aberration by obligating BP to indemnify and defend Pride and its subcontractors and vendors, like NOV, for any expense or losses incurred in a lawsuit like this one.

NOV therefore respectfully requests that the Court enter partial summary judgment holding as a matter of law that:

(1)   the Operation Contract governs the indemnity obligations with respect to BP's claims against NOV;

(2)   under the Operation Contract, NOV is an indemnitee and BP is an indemnitor; and

(3)   NOV is entitled to indemnity from BP for all damages and expenses in this action over $100,000, exclusive of damages caused by NOV's gross negligence.

Respectfully submitted,

By: /s/ _____
          Melissa M. Davis

| | |
|---|---|
| **J.D. PAGE** | **WARE, JACKSON, LEE, &** |
| *Lead Counsel* | **CHAMBERS, LLP** |
| Texas Bar No. 15406700 | Melissa M. Davis |
| 3155 Phoenix Tower | Texas Bar No.  24045756 |
| 3200 Southwest Frwy | America Tower |
| Houston, TX 77027 | 2929 Allen Pkwy, 42nd Fl. |
| Tel: (713) 840-9200 | Houston, TX 77019 |
| Fax: (713) 840-9217 | Tel: (713) 659-6400 |
| | Fax: (713) 659-6262 |
| | |
| **MAHTOOK & LAFLEUR, LLC** | **LEWIS, KULLMAN, STERBCOW** |
| Charles A. Mouton | **& ABRAMSON** |
| Louisiana Bar No.  17721 | Lawrence S. Kullman |
| P.O. Box 3089 | Louisiana Bar No. 07884 |
| 600 Jefferson St., Ste. 1000 | 2614 Pan American Life Center |
| Lafayette, LA 70502 | 601 Poydras St. |
| Tel:  (337) 266-2189 | New Orleans, LA 70130 |
| Fax: (337)266-2303 | Tel: (504) 588-1500 |
| | Fax: (504) 588-1514 |

*Counsel for National Oilwell Varco, L.P., National Oilwell Varco, Inc., National Oilwell Norway AS, Hydralift Amclyde, Inc., Hydralift, Inc., and Hydralift AS*

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of September, 2010, I electronically filed the foregoing document with the clerk of the court for the United States District Court, Southern District of Texas, using the electronic case filing system of the Court. The electronic case filing system will send a "Notice of Electronic Filing" to counsel of record who have consented in writing to accept this Notice as service of this document by electronic means; I further certify that I have served counsel of record who have not so consented to electronic service pursuant to the Federal Rules of Civil Procedure.

/s/_____
Melissa M. Davis