# APPENDIX OF AUTHORITIES

Slip Copy, 2010 WL 3027045 (N.D.Tex.)
**(Cite as: 2010 WL 3027045 (N.D.Tex.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas,
Dallas Division.
ALL METALS, INC., Plaintiff,
v.
LIBERTY MUTUAL FIRE INSURANCE COMPANY, Defendant.
No. 3-09-CV-0846-BD.

July 29, 2010.

Tina L. Nicholson, Merlin Law Group PA, Houston, TX, for Plaintiff.

Brad E. Brewer, Jennifer L. Gibbs, Shannon M. O'Malley, Zelle Hofmann Voelbel & Mason LLP, Dallas, TX, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

JEFF KAPLAN, United States Magistrate Judge.

**\*1** Plaintiff All Metals, Inc. ("All Metals") and Defendant Liberty Mutual Fire Insurance Company ("Liberty Mutual") have filed cross-motions for partial summary judgment in this insurance coverage dispute involving the interpretation of various provisions of a commercial all risk policy. At issue is whether damage to a rotary furnace at the All Metals recycling facility caused by a power outage following a thunderstorm was the result of just one "occurrence," for which Liberty Mutual has paid the policy limits of $500,000, or whether the damage was the result of multiple "occurrences." For the reasons stated herein, the court decides this threshold coverage issue in favor of Liberty Mutual.

I.

The parties have stipulated to all facts necessary for the court to interpret the relevant provisions of the insurance policy. On May 2, 2007, a thunderstorm caused a power outage at the All Metals recycling facility in Terrell, Texas. (*See* Def. MSJ App. at 1, ¶ 2). At the time of the power outage, a rotary furnace at the facility used to covert solder dross and other metal oxides into metal and slag was operating with a full charge of molten metal. (*Id.* at 1-2, ¶¶ 4 & 9). The molten metal cooled and solidified when the furnace stopped operating, thereby damaging the brick lining of the furnace. (*Id.* at 2, ¶¶ 9-11). When power was restored to the facility two days later, All Metals restarted the furnace and began reheating the metal and slag. (*Id .* at 2, ¶¶ 12 & 15). The reheating process continued until May 8, 2007-six days after the initial power outage. (*Id.* at 2, ¶ 15). However, the damaged brick lining could not sufficiently contain the heat generated by the reheating process, causing further damage to other parts of the furnace, including the shell, electrical wiring, and grease line. (*Id.* at 2-3, ¶¶ 17-19). On May 19, 2007, All Metals installed new refractory bricks in the furnace to replace the brick lining damaged as a result of the power outage. (*Id.* at 3, ¶ 20). Within days after the furnace was heated to cure the new bricks, All Metals noticed cracks in the furnace shell and damage to the "tires" that supported the shell. (*Id.* at 3, ¶¶ 21-22). Subsequent investigation revealed that damage to the furnace shell from the May 4-8, 2007 reheating process prevented the shell from expanding with heat and rendered the furnace unsuitable for continued safe use. (*Id.* at 3, ¶¶ 23-25).

At all times relevant to this suit, All Metals was insured under an "all risk" policy issued by Liberty Mutual. (*Id.* at 4, ¶¶ 27-28). The policy provides coverage for "direct physical loss or damage to **covered property** as a result of an **occurrence,** unless excluded." (*Id.* at 4, ¶ 28; Plf. MSJ Resp., Exh. B at 9) (emphasis in original). Under the policy:

**Occurrence** means all loss or damage attributable directly or indirectly to one (1) cause or series of similar causes. All such loss or damage will be added together, and the total loss or damage will be treated as one (1) **occurrence** irrespective of the amount of time or area over which such loss or damage occurs.

**\*2** (Def. MSJ App. at 5, ¶ 31; Plf. MSJ Resp. Br., Exh. B at 43) (emphasis in original). Losses due to an interruption in utility service are excluded from coverage under a general Service Interruption Exclusion

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3027045 (N.D.Tex.)
**(Cite as: 2010 WL 3027045 (N.D.Tex.))**

that provides, in pertinent part:
> We will not pay for losses caused by or resulting from any of the following, regardless of any other cause or event, including a **peril insured against,** that contributes to the loss at the same time or in any other sequence.

* * * *

> Interference with or interruption of any public or private utility or any entity providing power, heat, air conditioning, communication, water or sewer or any other service if the failure occurs away from the **covered location.**

> If a **covered loss** ensues, we will pay for that loss.

(Def. MSJ App. at 4, ¶ 29; Plf. MSJ Resp. Br., Exh. B at 24) (emphasis in original). However, a Services Interruption Coverage Extension endorsement to the policy provides limited coverage for losses arising out of an electrical power failure:
> **We** will pay for direct physical loss to **covered property,** loss of **business income and extra expense** resulting from an interruption of:

> (a) Electrical Power

* * * *

*Limit of Liability*

> **We** will not pay for more than $500,000 for any one (1) **occurrence.** This **limit of liability** does not increase any other applicable **limit of liability.**

(Def. MSJ App. at 4-5, ¶ 30; Plf. MSJ Resp. Br., Exh. B at 54, 55) (emphasis in original).

The parties agree that the furnace at the All Metals facility is "covered property" and was damaged as a result of the May 2, 2007 power outage. (*See* Def. MSJ Br. at 7; Plf. MSJ Resp. Br. at 4). Believing that damage to the furnace was the result of only one "occurrence," Liberty Mutual paid All Metals $500,000- the limit of liability under the Services Interruption Coverage Extension endorsement. (Def. MSJ App. at 5, ¶ 32). All Metals argues that two other "occurrences" resulted in additional losses totaling $3 million. (*See* Def. Not. of Rem., Exh. A). In addition to the May 2, 2007 power outage, All Metals contends that: (1) reheating the furnace on May 4-8, 2007 damaged the furnace shell, electrical wiring, grease trap, and insulating brick; and (2) the curing of new brick on May 22-24, 2007 damaged the brick and other furnace components. (*See id.; see also* Plf. MSJ Resp. Br. at 3-4). Unable to resolve this dispute, All Metals sued Liberty Mutual for breach of contract, breach of the duty of good faith and fair dealing, and violations of the Texas Deceptive Trade Practices Act and the Texas Insurance Code.[FN1] The case is before the court on cross-motions for partial summary judgment with respect to the issue of coverage. The motions have been briefed by the parties and are ripe for determination.

> FN1. All Metals originally filed this action in Texas state court. Liberty Mutual removed the case to federal court on the basis of diversity of citizenship because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(a)(1).

II.

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). A dispute is "genuine" if the issue could be resolved in favor of either party. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A fact is "material" if it might reasonably affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Cases involving the interpretation of insurance policies are particularly appropriate for summary disposition. *See Principal Health Care of Louisiana v. Lewer Agency, Inc.,* 38 F.3d 240, 242 (5th Cir.1994).

*3 The disposition of the pending motions requires the court to interpret various provisions of an insurance policy. Under Texas law, which provides the rule of decision in this diversity case, the insured has the burden to prove that coverage exists. *See Primrose Operating Co. v. National American Ins. Co.,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3027045 (N.D.Tex.)
**(Cite as: 2010 WL 3027045 (N.D.Tex.))**

382 F.3d 546, 553 (5th Cir.2004) (applying Texas law). The insurer has the burden to prove that an exclusion applies. *Id.; see also* TEX. INS.CODE ANN. § 554.002 (Vernon 2009). Once the insurer proves that an exclusion applies, the burden shifts back to the insured to show that the claim falls within an exception to the exclusion. *Primrose Operating,* 382 F.3d at 553. The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *See Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.), *cert. denied,* 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). All evidence must be viewed in the light most favorable to the party opposing the motion. *See Rosado v. Deters,* 5 F.3d 119, 122 (5th Cir.1993).

A.

The issue in this case is whether damage to the furnace at the All Metals recycling facility was the result of one "occurrence" or multiple "occurrences." Neither party contends that the policy definition of "occurrence" is ambiguous or that the determination of the number of "occurrences" hinges on the resolution of disputed facts. Thus, the interpretation of "occurrence," as used in the policy, is a question of law. *See U.E. Texas One-Barrington, Ltd. v. General Star Indemnity Co.,* 332 F.3d 274, 277 (5th Cir.2003). Texas courts use a "cause" analysis to determine whether a set of facts involves one or more "occurrences." *See Ran-Nan, Inc. v. General Accident Ins. Co. of America,* 252 F.3d 738, 740 (5th Cir.2001), *citing Goose Creek Consolidated Independent School Dist. v. Continental Casualty Co.,* 658 S.W.2d 338, 340 (Tex.App.-Houston [1st Dist.] 1983, no writ). Under this analysis, "the proper focus ... is on the events that cause the injuries and give rise to the insured's liability, rather than on the number of injurious effects." *U.E. Texas One-Barrington,* 332 F.3d at 277, *quoting Ran-Nan,* 252 F.3d at 740.

Considering the policy language and the facts stipulated by the parties, the court determines as a matter of law that all the damage to the All Metals furnace was "caused," either directly or indirectly, by the May 2, 2007 power outage. The parties agree that the integrity of the furnace was initially damaged during the power outage when the furnace stopped heating and the molten metal inside cooled and solidified, pulling the insulating brick lining away from the shell. (*See* Def. MSJ App. at 2, ¶ 11). When power was restored to the facility on May 4, 2007, All Metals reheated the furnace, but high temperatures escaped through the damaged insulating brick, reaching the shell and damaging additional components of the furnace. (*Id.* at 2-3, ¶¶ 15-19). The damaged brick was replaced and the furnace was reheated a second time on May 22, 2007 to cure the new brick. (*Id.* at 3, ¶¶ 20-24). However, the damaged shell could not handle the high temperatures of the curing process, and the new brick failed. (*See id.* at 3, ¶¶ 24-25). An engineering firm hired by All Metals to investigate the damaged furnace concluded:

> **\*4** The steel shell suffered from a series of repair events following a power outage with a full metal charge. Necessary repair from the power outage event (furnace heating, re-brick curing, temperature excursions and related pressures) severely damaged the steel shell to the point of its failure and complete uselessness. Had the furnace not gone through the power outage event, the failure would not have occurred.

(Def MSJ App. at 12). In view of these facts, it is clear that all the damage to the furnace is attributable, at least indirectly, to the May 2, 2007 power outage. Thus, under the plain language of the policy, all the loss or damage to the furnace constitutes one "occurrence."

All Metals argues that the power outage was a "distinct and discrete" event that resulted only in damage to the furnace's brick lining when the cooling metal caused the brick to pull away from the shell. (*See* Plf. MSJ Resp. at 8-11). Under its theory of recovery, subsequent events, including reheating the furnace on May 4-8, 2007 and curing the new brick on May 22-24, 2007, resulted in additional damage to the furnace and various component parts. (*Id* .). However, this argument ignores that an "occurrence," as defined by the policy, includes damages that are *indirectly* attributable to the same cause. (*See* Plf. MSJ Resp., Exh. B at 43). Even if the May 2, 2007 power outage did not directly cause the damage resulting from reheating the furnace on May 4-8, 2007 and May 22-24, 2007, the integrity of the furnace would not have been compromised had it not been for the initial power outage. (*See* Def. MSJ App. at 2, ¶ 11 & *id.* at 12). Nor would the installation or curing of new brick been required. (*See id.*). Thus, the power outage was at least an indirect cause of the loss or damage in-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 3027045 (N.D.Tex.)
**(Cite as: 2010 WL 3027045 (N.D.Tex.))**

curred on May 4-8, 2007 and May 22-24, 2007.

All Metals also cites several cases, including *U.E. Texas One-Barrington,* as authority for the proposition that Texas law focuses on the "immediate cause of damage when determining the number of occurrences." (*See* Plf. MSJ Resp. Br. at 10). However, none of those cases involved a policy that broadly defined an "occurrence" as "loss or damage attributable *directly or indirectly* to one [ ] cause or series of similar causes." (*Id.,* Exh. B at 43) (emphasis added). The insurance policy in *U.E. Texas One-Barrington* defined the term "loss occurrence" much more narrowly as "the total loss by perils insured against arising out of a single event." U.E. Texas One-Barrington, 332 F.3d at 277. *Cf.* Goose Creek, 658 S.W.2d at 340 (construing policy with identical definition of "loss occurrence"); Garza v. Allstate Texas Lloyd's Co., 284 Fed. Appx. 110, 114, 2008 WL 341577 at *3 (5th Cir. Feb.6, 2008) (construing policy that defined "occurrence" as "an accident ... which results in bodily injury or property damage during the policy period"). Here, all three "losses" claimed by All Metals resulted either directly or indirectly from the May 2, 2007 power outage. Indeed, All Metals concedes as much in its summary judgment response. (*See* Plf. MSJ Resp. Br. at 14) ("[I]t is true that 'but for' the power outage, the second and third loss events would not have occurred."). Under the plain language of the Services Interruption Coverage Extension endorsement, liability is limited to $500,000 for that single "occurrence."

**\*5** In a last ditch attempt to avoid the $500,000 policy limit, All Metals argues that the "real issue is whether the damages which resulted from the second and third of the three loss events are excluded." (Plf. MSJ Resp. Br. at 5; *see also* Plf. Reply at 2, 3-4). The Service Interruption Exclusion is fairly narrow, carving out only "losses caused by or resulting from [a service interruption] regardless of any other cause or event ... that contributes to the loss at the same time or in any other sequence." (Plf. MSJ Resp. Br., Exh. B at 24). According to All Metals, this exclusion does not apply to losses resulting from reheating the furnace on May 4-8, 2007 and curing the new brick on May 22-24, 2007, which were indirectly or remotely caused by the power outage on May 2, 2007. (*See* Plf. Reply at 6, 8-9). However, that argument presupposes that coverage for those discrete loss events otherwise exists under the policy. Regardless of whether the loss events on May 4-8, 2007 and May 22-24, 2007 resulted in additional damage to furnace, the court has determined that *all* damage to the furnace was attributable to the May 2, 2007 power outage, thereby constituting one "occurrence" under the policy. The Service Interruption Exclusion has no relevance under these circumstances.

B.

Having decided the threshold issue of coverage in favor of Liberty Mutual, the court questions whether All Metals can prevail on its claims for breach of contract, breach of the duty of good faith and fair dealing, and violations of the Texas Deceptive Trade Practices Act and the Texas Insurance Code. However, neither party has moved for summary judgment as to those claims. Nor can the court grant summary judgment on its own motion without providing the parties with adequate notice and an opportunity to respond as required by Rule 56(c). *See* Mannesman Demag Corp. v. M/V Concert Express, 225 F.3d 587, 595 (5th Cir.2000). Unless All Metals stipulates to a dismissal with prejudice or the parties otherwise resolve this case, the court will allow Liberty Mutual to file a second motion for summary judgment with respect to all remaining claims.

*CONCLUSION*

Liberty Mutual's motion for partial summary judgment [Doc. # 13] is granted, and All Metals' cross-motion for partial summary judgment [Doc. # 15] is denied. The parties shall file a joint status report by ***August 27, 2010*** advising whether they have resolved all remaining issues in this case, or whether it will be necessary for Liberty Mutual to file a second motion for summary judgment. In lieu of a joint status report, the parties may submit a stipulation of dismissal or an agreed judgment for approval and entry.

SO ORDERED.

N.D.Tex.,2010.
All Metals, Inc. v. Liberty Mut. Fire Ins. Co.
Slip Copy, 2010 WL 3027045 (N.D.Tex.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2811638 (W.D.La.)
**(Cite as: 2007 WL 2811638 (W.D.La.))**

Only the Westlaw citation is currently available.

United States District Court, W.D. Louisiana,
Lake Charles Division.
BEAUREGARD PARISH SCHOOL BOARD
v.
HONEYWELL INC.
**No. 2:05 CV 1388.**

Sept. 24, 2007.

William L. Melancon, Joseph T. Puhekekr, Melancon & Assoc., Dawn Mayeux Fuqua, Law Office of Dawn M. Fuqua, Lafayette, LA, for Beauregard Parish School Board.

Steven R. Lindemann, David G. Parry, Elizabeth A. Larsen, Minneapolis, MN, Jay M. Jalenak, Jr., John E. Heinrich, Kean Miller et al, Baton Rouge, LA, Terrence D. McCay, Kean Miller et al, Lake Charles, LA, for Honeywell Inc.

### MEMORANDUM RULING

PATRICIA MINALDI, United States District Judge.

***1** Before the court is defendant Honeywell, Inc.'s Motion for Partial Summary Judgment. The plaintiff, Beauregard Parish School Board, filed a Memorandum in Response to Honeywell's Motion for Partial Summary Judgment on April 9.

### FACTS

On April 24, 2006, Beauregard Parish School Board ("BPSB") entered into a contract with Honeywell, Inc. ("Honeywell") whereby Honeywell was to: retrofit heating, ventilation, and electrical systems at multiple schools; install new chillers; replace fixtures and light bulbs with energy efficient models; and train BPSB employees in energy reduction and maintenance techniques.[FN1] The purpose of the contract was to provide operational savings to BPSB in the amount of $107,532 over a ten-year period.[FN2] BPSB paid Honeywell $714,308 for the retrofit, as well as monthly fees which, as of June 2005, amounted to $97,458.[FN3]

FN1. Pet. ¶ 5; Def.'s Ex. 6 (BPSB-Honeywell Contract).

FN2. Pet. ¶ 6; Def.'s Ex. 6, at 18.

FN3. Pet. ¶ 10; Def.'s Ex. 6, at 3-4.

The contract also required Honeywell to perform an annual audit of energy savings and submit a report to BPSB for the ten-year guarantee period.[FN4] Honeywell admits that it did not perform audits for years two through five.[FN5] In 2001, Honeywell allegedly prepared a "catch-up" report for those years.[FN6] In December 2001, after Honeywell delivered the catch-up reports, BPSB allegedly expressed its dissatisfaction with the methodology employed by Honeywell to calculate its energy savings.[FN7] Specifically, BPSB wanted the energy savings to be calculated using its utility bills.[FN8] Honeywell alleges that BPSB had not provided Honeywell with its utility bills for three years and had not given Honeywell notice of any changes to its facilities-including the addition of numerous computers, portable buildings, etc.-both of which a utility-based audit would have required.[FN9]

FN4. Def.'s Ex. 6, at 18.

FN5. Def's Statement of Undisputed Facts ¶ 16.

FN6. *Id.*

FN7. *Id.* ¶ 18.

FN8. *Id.*

FN9. *Id.*

On January 9, 2002, Honeywell wrote to BPSB and nullified the guarantee.[FN10] On May 29, 2002, BPSB demanded that Honeywell provide a detailed accounting of Honeywell's calcuations to support the audit reports for years one through five.[FN11] In August 2002, the parties convened a conference call to discuss various matters.[FN12] On July 11, 2005, BPSB

Not Reported in F.Supp.2d, 2007 WL 2811638 (W.D.La.)
**(Cite as: 2007 WL 2811638 (W.D.La.))**

filed suit in the 36th District, Parish of Beauregard.

> FN10. *Id.* ¶ 19; Pet. ¶ 11.
>
> FN11. Def.'s Statement of Undisputed Facts ¶ 20.
>
> FN12. *Id.* ¶ 20.

Honeywell now moves for partial summary judgment on Beauregard's extracontractual claims, which include: a claim arising under the Louisiana Unfair Trade Practices and Consumer Protection Law (LUTPA), a misrepresentation claim, an unjust enrichment claim, a detrimental reliance claim, and a claim for new Trane chillers. Honeywell also asks this court to enforce the contract's consequential damage waiver clause.

### *SUMMARY JUDGMENT STANDARD*

A court should grant a motion for summary judgment when the file, including the opposing party's affidavits, demonstrates that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986). The party moving for summary judgment is initially responsible for demonstrating the reasons justifying the motion for summary judgement by identifying portions of pleadings and discovery that demonstrate the lack of a genuine issue of material fact for trial. *Tubacex, Inc. v. M/V Risan,* 45 F.3d 951, 954 (5th Cir.1995). The court must deny the moving party's motion for summary judgment if the movant fails to meet this burden. *Id.*

**\*2** If the movant satisfies this burden, however, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* In evaluating motions for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1975). There is no genuine issue for trial, and thus a grant of summary judgment is warranted, when the record as a whole "could not lead a rational finder of fact to find for the non-moving party...." *Id.*

### *ANALYSIS*

**A. Louisiana Unfair Trade Practices & Consumer Protection Law**

BPSB alleges a violation of the Louisiana Unfair Trade Practices and Consumer Protection Law (LUTPA). LA.REV.STAT. ANN. § 51:1401, *et seq.* LUTPA proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. This legislation is broadly and subjectively stated and does not specify particular violations. Rather, what constitutes an unfair trade practice is determined by the courts on a case-by-case basis." *Levine v. First Nat. Bank of Commerce,* 948 So.2d 1051, 1065 (La.2006) (citing *Jarrell v. Carter,* 577 So.2d 120, 123 (La.App. 1 Cir.1991)). "[I]t has been stated that a practice is unfair when it offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious to consumers and consumers include business competitors." *Roustabouts, Inc. v. Hamer,* 447 So.2d 543, 548 (La.App. 1 Cir.1984).

BPSB does not have a viable claim under LUTPA.[FN13] "Where the plaintiffs are not in competition with the defendants, it appears that most courts treat the claim as a breach of contract claim, which is not actionable under LUTPA." *Landreneau v. Fleet Financial Group,* 197 F.Supp.2d 551, 557 (M.D.La.2002). The Fifth Circuit has repeatedly recognized that "the statute does not provide an alternate remedy for simple breaches of contract.... There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes." *Turner v. Purina Mills, Inc.,* 989 F.2d 1419, 1422 (5th Cir.1993) (citation omitted). Because the dispute between BPSB and Honeywell is a breach of contract claim, BPSB's LUTPA claim is not actionable.

> FN13. The issue of whether the plaintiff states a claim under LUTPA is raised here *sua sponte.*

**B. Detrimental Reliance**

Honeywell argues that BPSB's detrimental reliance claim must fail because (1) BPSB cannot identify an extra-contractual representation, and (2) any reliance upon extra-contractual representations is unreasona-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2811638 (W.D.La.)
**(Cite as: 2007 WL 2811638 (W.D.La.))**

ble as a matter of law in view of the written, executed contract between the parties. BPSB does not offer any legal arguments on this issue, but suggests that dismissal of this claim is premature because the jury should be free to find for BPSB on any of several alternate theories.

The theory of detrimental reliance provides: "A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying," LA. CIV.CODE ANN. art.1967. "The doctrine of detrimental reliance is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence." *In re Ark-La-Tex Timber Co., Inc.,* 482 F.3d 319 (5th Cir.2007) (citing *May v. Harris Management Corp.,* 2004-2657 (La.App. 1 Cir. 12/22/05); 928 So.2d 140, 145). "The doctrine usually functions when no written contract or an unenforceable contract exists between the parties." *Drs. Bethea, Moustoukas and Weaver LLC v. St. Paul Guardian Ins. Co.,* 376 F.3d 399, 403 (5th Cir.2004) (citing *Jackson v. Lare,* 34-124 (La.App. 2 Cir. 11/1/2000); 779 So.2d 808, 814 n. 1).

**\*3** To recover under article 1967, a party must prove: (1) a representation by conduct or word; (2) made in such a manner that the promisor should have expected the promisee to rely upon it; (3) justifiable reliance by the promisee; and, (4) a change in position to the promisee's detriment because of the reliance. *In re Ark-La-Tex Timber Co., Inc.,* 482 F.3d at 334 (citing *Suire v. Lafayette City-Parish Consol. Government,* 907 So.2d 37, 59 (La.2005)). The Fifth Circuit recently stated that "[i]t is difficult to recover under the theory of detrimental reliance, because such a claim is not favored in Louisiana." *Id.*

Moreover, "Louisiana law recognizes certain situations where a plaintiff's reliance on a promise is unreasonable as a matter of law ." *Bethea,* 376 F.3d at 403. An example of such a situation is where a party relies upon promises made outside of an unambiguous, fully-integrated agreement. *Id.* at 403-04. "Many courts have found a plaintiff's reliance to be unreasonable as a matter of law when the parties have a valid contract defining their rights and limiting the ways in which the contract may be modified." *Id.* at 404. Here, because there exists a fully integrated contract between BPSB and Honeywell, and because BPSB has failed to identify an extra-contractual "representation by conduct or word," BPSB's detrimental reliance claim is dismissed.

**C. Unjust Enrichment**

Honeywell argues that in order to maintain an unjust enrichment claim, the plaintiff must have no other available remedy at law. Honeywell avers that because BPSB has asserted a claim for breach of contract, it has another available remedy.

The doctrine of unjust enrichment is codified by Louisiana Civil Code article 2298, which provides:

> A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.

LA. CIV.CODE ANN. art. 2298. A party seeking to recover pursuant to the theory of unjust enrichment bears the burden of proving five elements: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the resulting impoverishment; (4) an absence of "justification" or "cause" for the enrichment and impoverishment; and, (5) no other remedy at law available to plaintiff. *Moroux v. Toce,* 2006-831 (La.App. 3 Cir. 11/2/06); 943 So.2d 1263; *Baker v. Maclay Properties Co.,* 2006-1000 (La.App. 1 Cir. 5/4/07); 2007 WL 1300820, \* 1; *see also* LA. CIV.CODE ANN. art. 2298. A plaintiff has the burden of proving each element of unjust enrichment by a preponderance of the evidence. *Tandy v. Pecan Shoppe of Minden, Inc.,* 34-578 (La.App. 2 Cir. 4/1/01); 785 So.2d 111, 117.

**\*4** Here, BPSB's claims for breach of contract survive summary judgment. BPSB and Honeywell have a valid, binding contract, and BPSB has a remedy available at law via its breach of contract claims. Accordingly, BPSB's unjust enrichment claim is dismissed.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2811638 (W.D.La.)
**(Cite as: 2007 WL 2811638 (W.D.La.))**

**D. Negligent Misrepresentation**

Honeywell argues that a negligent misrepresentation claim [FN14] is delictual and therefore subject to a one-year prescriptive period. Honeywell avers that BPSB's negligent misrepresentation claim "accrued no later than January 9, 2002, when Honeywell nullified the guarantee." BPSB filed suit on July 11, 2005; thus, Honeywell asserts that any claim for negligent misrepresentation has prescribed.

> FN14. "A person commits the tort of negligent misrepresentation when (1) he has a legal duty to supply correct information; (2) he breaches that duty; and (3) his breach causes damages to the plaintiff. *Society of Roman Catholic Church of Diocese of Lafayette, Inc. v. Interstate Fire & Cas. Co.,* 126 F.3d 727, 742 (5th Cir.1997) (citing *Barrie v. V.P. Exterminators, Inc.,* 625 So.2d 1007 (La.1993)*. "This tort applies in both nondisclosure and misinformation cases." *Society,* 126 F.3d at 742 (citing *Nesbitt v. Dunn,* 28240 (La.App.2d Cir.4/3/96); 672 So.2d 226, 231).

"A person commits the tort of negligent misrepresentation when (1) he has a legal duty to supply correct information; (2) he breaches that duty; and, (3) his breach causes damages to the plaintiff. *Society of Roman Catholic Church of Diocese of Lafayette, Inc. v. Interstate Fire & Cas. Co.,* 126 F.3d 727, 742 (5th Cir.1997) (citing *Barrie v. V.P. Exterminators, Inc.,* 625 So.2d 1007 (La.1993); LA. CIV.CODE ANN. arts. 2315 & 2216). "This tort applies in both nondisclosure and misinformation cases." *Society,* 126 F.3d at 742 (citing *Nesbitt v. Dunn,* 28240 (La.App. 2 Cir. 4/3/96); 672 So.2d 226, 231).

"The action for negligent misrepresentation arises *ex delicto* ... and is subject to the one year prescriptive period of Civil Code article 3492...." *National Council on Compensation Ins. v. Quixx Temporary Services, Inc.,* 95-0725 (La.App. 4 Cir. 11/16/95); 665 So.2d 120, 122 (internal citations omitted). The one year prescription period for delictual actions commences from the date the injury or damage is sustained. *Wimberly v. Gatch,* 635 So.2d 206, 211 (La.1994) (citations omitted). This prescription statute is strictly construed against prescription and in favor of the obligation sought to be extinguished by it. *Id.*

The doctrine of *contra non valentem* is an exception to the prescription rules, and it suspends prescription when the case satisfies one of four scenarios: 1.) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action; 2.) where there was some condition coupled with a contract or connected with the proceedings which prevented the creditor from suing or acting; 3.) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and, 4.) where some cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant. *Id.* The plaintiff bears the burden of showing why the claim has not prescribed. *Id.* BPSB has not demonstrated that *contra non valentem* applies in its case such that the one-year period is suspended.

Prescription may also be suspended where the tort is continuing. A continuing tort arises when "acts or conduct are continuous on an almost daily basis, by the same actor, of the same nature, and the conduct becomes tortious and actionable because of its continuous, cumulative, synergistic nature." *Bustamento v. Tucker,* 607 So.2d 532, 542 (La.1992). In the case of a continuing tort, prescription does not commence until the last act occurs or the conduct is abated. *Id.* As to whether a tort is continuous, the Louisiana Supreme Court held:

> **\*5** A continuing tort is occasioned by [the continual] unlawful acts, not the continuation of the ill effects of an original, wrongful act." ... Addressing the requirement that there be continuous conduct by the defendant, we stated that "[t]he continuous conduct contemplated in a continuing tort must be tortious and must be the *operating cause* of the injury.... When a defendant's damage-causing act is completed, the existence of continuing damages to a plaintiff, even progressively worsening damages, does not present successive causes of action accruing because of a continuing tort.

*In re Moses,* 788 So.2d 1173, 1183 (La.2001) (quoting *Crump v.. Sabine River Authority,* 737 So.2d 720 (La.1999) (other internal citations omitted)). Honeywell's alleged unlawful acts were not continuous. Rather, the only facts that BPSB alleges are the con-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2811638 (W.D.La.)
**(Cite as: 2007 WL 2811638 (W.D.La.))**

tinuation of the ill effects of an original, wrongful act. Therefore, BPSB's negligent misrepresentation claim is barred by the one-year statute of limitations.

**E. Claim for New Trane Chillers**

Honeywell argues that the court should dismiss BPSB's claim for new Trane chillers because BPSB knowingly accepted McQuay chillers. BPSB claims that its employees and individual board members did not have authority to receive the substituted McQuay chillers. BPSB also claims that Honeywell knew that school employees or individual board members lacked the authority to modify public contracts.

Professor Litvinoff, in his Obligations treatise, writes:

> [W]hen the obligor is bound to deliver a specified and individualized thing, his performance will not extinguish the obligation unless he delivers that thing.... Nevertheless, the obligor may give a different thing if the obligee consents to receive it in performance of the obligation. This is the case of a the giving in payment, which is actually an agreement between obligor and obligee to extinguish the obligation through the rendering of a performance different from that originally contemplated.

5 LA. CIV. L. TREATISE § 13.12 (2006-07) (citing LA. CIV.CODE ANN. arts. 2655 & 2659).[FN15]

> [FN15.] Article 2655 states, "Giving in payment is a contract whereby an obligor gives a thing to the obligee, who accepts it in payment of a debt." Article 2659 explains, "The giving in payment is governed by the rules of the contract of sale, with the differences provided for in this Chapter."

BPSB does not present evidence that its employee or board member protested the installation, or that BPSB itself protested the installation of the substitute McQuay chillers. Thus, because BPSB knowingly accepted the McQuay chillers, BPSB's claim for new Trane chillers is dismissed.

**F. Enforcement of Waiver of Consequential Damages**

Honeywell asks the court to uphold the contract's consequential damage [FN16] waiver clause. This clause excludes "incidental, special, consequential, or indirect" damages. Honeywell asserts that its sole liability for a failure of energy or operational savings is limited to the contractual guarantee of Louisiana Civil Code provides, in pertinent part, "Any clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party." LA. CIV.CODE ANN. art.2004. The comment to article 2004 notes that "such clauses are against public policy because the overriding principle of good faith would be destroyed if it were possible to contract away liability for fraud." *Id.* at cmt. (a). Thus, to the extent that the contractual waiver of consequential damages excludes damages arising out of bad faith or intentional misconduct, the waiver must be void. The waiver is, however, otherwise enforceable because it is clear and unambiguous, contained in the contract, and was brought to the attention of BPSB.

> [FN16.] Consequential damages are "Losses that do not flow directly and immediately from an injurious act but that result indirectly from the act." BLACK'S LAW DICTIONARY (8th ed.2004).

**\*6** For the reasons stated in this Memorandum Ruling,

IT IS ORDERED that the Defendant's Motion for Partial Summary Judgment filed on behalf of Honeywell Corporation is hereby GRANTED;

IT IS ORDERED that Plaintiff's LUTPA claim is DISMISSED;

IT IS ORDERED that Plaintiff's detrimental reliance claim is DISMISSED;

IT IS ORDERED that Plaintiff's unjust enrichment claim is DISMISSED;

IT IS ORDERED that Plaintiff's claim that it be awarded new Trane chillers is DISMISSED;

IT IS FURTHER ORDERED that the contract's waiver of incidental, special, consequential, or indirect damages is enforceable insofar as it does not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2811638 (W.D.La.)
**(Cite as: 2007 WL 2811638 (W.D.La.))**

limit damages arising out of Honeywell's bad faith.

W.D.La.,2007.
Beauregard Parish School Bd. v. Honeywell Inc.
Not Reported in F.Supp.2d, 2007 WL 2811638 (W.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw

Page 1

Slip Copy, 2010 WL 1610114 (S.D.Tex.)
**(Cite as: 2010 WL 1610114 (S.D.Tex.))**

H Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas,
Houston Division.
BP PRODUCTS NORTH AMERICA INC., et al.,
Plaintiffs,
v.
J.V. INDUSTRIAL COMPANIES, LTD., Defendant.
**Civil Action No. H-07-2369.**

April 21, 2010.

Richard Austin Schwartz, Schwartz Junell et al., Houston, TX, for Plaintiffs.

Craig Stephen Wolcott, Michael M. Gallagher, Michael S. Hays, Hays McConn Rice & Pickering, Houston, TX, for Defendant.

*MEMORANDUM AND ORDER*

NANCY F. ATLAS, District Judge.

**\*1** This case is before the Court on the Motion for Summary Judgment on Counterclaim and Affirmative Defense ("Motion for Summary Judgment") [Doc. # 54] and the Motion for Partial Summary Judgment [Doc. # 55] filed by Plaintiffs BP Products North America Inc. ("BP") and American Home Assurance Company ("American Home"). Having carefully reviewed the record in this case, including the parties' briefing on the pending motions,<sup>FN1</sup> and having applied the relevant legal authorities, the Court **grants** the Motion for Summary Judgment and **grants** the Motion for Partial Summary Judgment.

> FN1. Defendant J.V. Industrial Companies, Ltd. ("J.V.") filed a Response to the Motion for Summary Judgment [Doc. # 62], BP filed a Reply [Doc. # 71], and J.V. filed a Sur-Reply [Doc. # 77]. J.V. filed a Response to the Motion for Partial Summary Judgment [Doc. # 67], BP filed a Reply [Doc. # 70], and J.V. filed a Sur-Reply [Doc. # 78].

**I. BACKGROUND**

On November 11, 2004, JV Industrial Companies, Ltd. ("J.V.") and BP entered into a Mechanical & Piping Turnaround Services Contract ("Turnaround Contract") for J.V. to perform mechanical and piping turnaround ("TAR") services for BP. On November 29, 2004, the parties entered into a Short Form Contract for J.V. to perform "general mechanical type services for work on piping and equipment in support of the 2005 RHU [Resid Hydrotreating Unit] TAR" at the BP refinery in Texas City, Texas. The Short Form Contract incorporates by reference the terms and conditions of the Turnaround Contract and the two contracts are referred to herein collectively as the "Contract." <sup>FN2</sup> The Contract provides that it is to be construed under Texas law. *See* Contract, Exh. A-1 to Motion for Summary Judgment, § 34.01.

> FN2. The specific provisions of the Contract will be discussed more fully as relevant to the pending summary judgment motions.

J.V. removed and reinstalled piping elbows connected to the inlet and outlet sides of certain heat exchangers at the RHU. BP alleges that J.V. reinstalled the elbows in the wrong locations, switching the inlet and outlet elbows such that a carbon elbow was placed where a 1.25% chromium steel elbow belonged.

On July 28, 2005, a fire occurred at the BP facility where J.V. had performed the work on the heat exchangers. The fire damaged the elbows and exchangers, as well as other equipment in the RHU and surrounding property. BP claims that it also lost profits in its operation of the Texas City refinery as a result of the fire.

BP alleges that the fire was caused by the failure of the carbon elbow, improperly installed where a chromium steel elbow should have been installed, which caused a release and the subsequent ignition of a mixture of hydrogen and methane. This allegation is supported by the results of investigations conducted by a BP Investigation Committee and by the U.S. Chemical Safety Board. J.V. and its insurers have refused to indemnify BP for the losses allegedly

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1610114 (S.D.Tex.)
**(Cite as: 2010 WL 1610114 (S.D.Tex.))**

caused by the fire.

On July 20, 2007, BP filed this lawsuit against J.V. for breach of contract, negligence, and breach of warranty to recover for its property damages, lost profits, and attorneys' fees. J.V. filed a counterclaim asserting that BP breached the Contract. J.V. also raised the breach of contract allegation as an affirmative defense.

After a lengthy period of discovery, BP moved for summary judgment on J.V.'s counterclaim and affirmative defense, asserting that J.V. has not presented evidence to raise a genuine issue of material fact in support of its breach of contract allegations. BP also moved for summary judgment on three isolated issues regarding the indemnity provision of the Contract. Specifically, BP seeks summary judgment that the indemnity provision is valid and enforceable, that it applies to claims by BP, and that it covers indemnity claims for consequential damages. Both motions have been fully briefed and are ripe for decision.

## II. GENERAL LEGAL STANDARDS

### A. *Summary Judgment*

**\*2** Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc* ); *see also* Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp., 289 F.3d 373, 375 (5th Cir.2002). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Celotex, 477 U.S. at 322-23; Weaver v. CCA Indus., Inc., 529 F.3d 335, 339 (5th Cir.2008).

The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact." Lincoln Gen. Ins. Co. v. Reyna, 401 F.3d 347, 349 (5th Cir.2005). The moving party, however, need not negate the elements of the non-movant's case. *See* Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir.2005). The moving party may meet its burden by pointing out " 'the absence of evidence supporting the nonmoving party's case.' " Duffy v. Leading Edge Products, Inc., 44 F.3d 308, 312 (5th Cir.1995) (quoting Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 913 (5th Cir.1992)). If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. Littlefield v. Forney Indep. Sch. Dist., 268 F.3d 275, 282 (5th Cir.2001) (internal citation omitted).

### B. *Contract Interpretation*

The Court is to interpret the terms of an unambiguous contract as a matter of law. Gonzales v. Denning, 394 F.3d 388, 392 (5th Cir.2004); CSMG Tech., Inc. v. Allison, 2009 WL 500599, \*6 (S.D.Tex.2009); MCI Telecommunications Corp. v. Texas Utilities Electric Co., 995 S.W.2d 647, 650 (Tex.1999). Texas follows the "four corners rule," where the intention of the parties is to be gathered from the instrument as a whole. Jacobson v. DP Partners Ltd. P'ship, 245 S.W.3d 102, 106-07 (Tex.App.Dallas 2008, no pet.) (quoting Calpine Producer Servs., L.P. v. Wiser Oil Co., 169 S.W.3d 783, 787 (Tex.App.-Dallas, no pet.)); Addicks Servs., Inc. v. GGP-Bridgeland, LP, 596 F.3d 286, 294 (5th Cir.2010). "To determine whether a contract contains an ambiguity, the court must consider the contract as a whole in light of the circumstances present when the parties entered the contract." Southwestern Bell Tel., L.P. v. Public Util. Comm'n of Texas, 467 F.3d 418, 422 (5th Cir.2006). "The language in an agreement is to be given its plain grammatical meaning unless to do so would defeat the parties' intent." Addicks, 596 F.3d at 294.

## III. COUNTERCLAIM AND AFFIRMATIVE DEFENSE

**\*3** As an affirmative defense and as a counterclaim, J.V. asserts that BP materially breached the Contract. In its counterclaim, J.V. does not identify any particular provision of the Contract that BP allegedly breached. In the affirmative defense, however, J.V. asserts specifically that BP breached Section 17.01 of the Contract.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1610114 (S.D.Tex.)
**(Cite as: 2010 WL 1610114 (S.D.Tex.))**

"Recovery under a breach-of-contract claim requires proof of four elements: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Eaves v. Unifund CCR Partners,* 301 S.W.3d 402, 407 (Tex.App.-El Paso 2009, no pet.) (citing *Orix Capital Mkts., L.L.C. v. Wash. Mut. Bank,* 260 S.W.3d 620, 623 (Tex.App.-Dallas 2008, no pet.)); *see also Mullins v. TestAmerica, Inc.,* 564 F.3d 386, 418 (5th Cir.2009).

It is undisputed that there exists a valid contract between J.V. and BP. J.V. alleges that BP breached Section 17.01 of the Contract, which provides:

> When Contractor [J.V.] deems the Work fully completed, including satisfactory completion of such inspections, tests and documentation as are specified in this Contract, Contractor shall, within ten (10) working days thereafter, give a written Notice of Completion of the Work to Company [BP], specifying the Work completed and the date it was completed. Within ten (10) calendar days after receipt of said Notice of Completion, Company may inspect the Work and shall either reject the Notice of Completion and specify defective or uncompleted portions of the Work, or shall give the Contractor a written Notice of Acceptance of the Work either for the purpose of final payment only, or for the purposes of final payment and final acceptance.

Contract, § 17.01. BP asserts that J.V. has no evidence that raises a genuine issue of material fact regarding its allegation that BP breached this section of the Contract.[FN3]

> FN3. J.V.'s primary argument in opposition to BP's Motion for Summary Judgment is that federal procedure does not recognize a "no evidence" motion for summary judgment. Regardless of the title given to the motion, United States Supreme Court case law establishes clearly that summary judgment is appropriate when a party fails to present evidence that raises a genuine issue of material fact regarding an element essential of the party's case and on which that party bears the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

J.V. argues that BP breached § 17.01 of the Contract by filing this lawsuit. Specifically, J.V. argues that once BP gave it a Notice of Acceptance of the work, BP was precluded by § 17.01 of the Contract from suing J.V. for any damages resulting from J.V.'s work. There is nothing in the language of § 17.01, however, that supports J.V.'s argument. Moreover, § 2.02 of the Contract provides that "[a]ny inspection and acceptance by [BP] shall not constitute a waiver of any of its rights hereunder." There is nothing in § 17.01 or any other provision of the Contract that precludes BP from suing J.V. in this case, even after BP has issued a written Notice of Acceptance pursuant to § 17.01. BP is entitled to summary judgment on J.V.'s breach of contract counterclaim and affirmative defense.

### IV. *INDEMNITY PROVISIONS*

Article 27 of the Contract establishes J.V.'s obligation to indemnify BP under the circumstances described therein. Section 27.01 provides:

> Contractor [J.V.] shall be solely responsible for all labor, materials, equipment and work until the Work is accepted by Company [BP]. Contractor shall reimburse [BP] for, defend, indemnify, and hold [BP] harmless from and against any and all liability, costs (including reimbursement of all attorney fees and other costs of defense), loss, damage, expense, claims ...., suits, fines, and penalties on account of any and all bodily injuries or death to any persons ... or damage to, or loss or destruction of any property (including without limitation, the Work and the property of [J.V. and BP] ) arising directly or indirectly out of or in connection with the performance of this Contract, whether caused or contributed to in whole or in part by the concurrent, joint, active, or passive negligent act or commission of [BP or J.V.], except that [J.V.] assumes no liability for the sole negligent acts of [BP]. [BP] reserves the right to retain sufficient funds to cover this obligation.

**\*4** Contract, Section 27.01.

BP seeks summary judgment on three issues relating to the indemnity provisions. First, BP seeks summary judgment that the indemnity provisions are valid and

Slip Copy, 2010 WL 1610114 (S.D.Tex.)
**(Cite as: 2010 WL 1610114 (S.D.Tex.))**

enforceable. Second, BP seeks summary judgment that the indemnity provision, § 27.01, applies to claims by BP against J.V., not only to claims against BP by third parties. Third, BP seeks summary judgment that the indemnity provision permits generally the recovery of consequential damages. [FN4]

> FN4. BP is not seeking summary judgment that J.V.'s negligence caused BP's damages and, therefore, that BP is entitled to recover consequential damages from J.V. in this case.

**A.** *Indemnity Provision is Valid and Enforceable*

BP seeks summary judgment that the indemnity provision in the Contract is valid and enforceable. Under Texas law, an indemnity provision is valid and enforceable only if it satisfies each of two fair notice requirements. *See Storage & Processors, Inc. v. Reyes,* 134 S.W.3d 190, 192 (Tex.2004); *Dresser Indus., Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 509-10 (Tex.1993). "One fair notice requirement, the express negligence doctrine, requires that the intent of the parties must be specifically stated in the four corners of the contract." *Storage & Processors,* 134 S.W.3d at 192 (quoting *Ethyl Corp. v. Daniel Constr. Co.,* 725 S.W.2d 705, 707 (Tex.1987)). The second fair notice requirement is conspicuousness and "mandates that something must appear on the face of the [contract] to attract the attention of a reasonable person when he looks at it." *Id.* (quoting *Dresser,* 853 S.W.2d at 508; *Ling & Co. v. Trinity Sav. & Loan Ass'n,* 482 S.W.2d 841, 843 (Tex.1972)). However, if both contracting parties have actual knowledge of the indemnity provision, the provision can be valid and enforceable even if the fair notice requirements are not satisfied. *Id.* (citing *Dresser,* 853 S.W.2d at 508 n. 2; *Cate v. Dover Corp.,* 790 S.W.2d 559, 561 (Tex.1990)).

J.V. has admitted that it had actual knowledge of the indemnity provision prior to executing the Contract. *See* Admission No. 6, Exh. B-1 to Motion for Summary Judgment. As a result, the fair notice requirements need not be satisfied. BP is entitled to summary judgment that the indemnity provision is valid and enforceable.

**B.** *Indemnity Provision Applies to Claims by BP Against J.V.*

BP seeks summary judgment that the indemnity provision allows it, as a party to the Contract, to seek indemnity from J.V. for the damages it sustained as a result of the fire. An indemnity provision is construed as any other contract. *Safeco Ins. Co. v. Gaubert,* 829 S.W.2d 274, 281 (Tex.App.-Dallas 1992, writ denied). "An indemnity agreement is a promise by the indemnitor to safeguard or hold the indemnitee harmless against existing or future loss or liability." *Kellogg Brown & Root Intern., Inc. v. Altanmia Comm. Mktg. Co., W.L.L.,* 2008 WL 5114962, *20 (S.D.Tex. Dec.3, 2008) (Rosenthal, J.) (citing *Dresser,* 853 S.W.2d at 508). Generally, an indemnity provision "does not apply to claims between the parties to the agreement but obligates the indemnitor to protect the indemnitee against claims brought by third parties." *Id.* (citing *MG Bldg. Materials, Ltd. v. Moses Lopez Custom Homes, Inc.,* 179 S.W.3d 51, 63 (Tex.App.-San Antonio 2005, pet. denied)); *see also Derr Constr. Co. v. City of Houston,* 846 S.W.2d 854, 858 (Tex.App.-Houston [14th Dist.] 1992, no writ). Nonetheless, indemnity agreements can be written to require the parties to "indemnify each other against claims they later assert against each other." *Ganske v. Spence,* 129 S.W.3d 701, 708 (Tex.App.-Waco 2004, no pet.); *see also Kellogg,* 2008 WL 5114962 at *20; *Radiant Sys., Inc. v. American Scheduling Inc.,* 2006 WL 2583266, *3 (N.D.Tex. Sept.7, 2006). In Radiant, for example, the indemnity contract required Radiant to indemnify American Scheduling Inc. ("ASI") for any losses resulting from "the breach or falsity of any covenant or agreement made by [Radiant] in this Agreement." *Id.* The court held that this language clearly contemplated indemnity for a claim by ASI against Radiant because it specifically covered losses caused by a breach or falsity by Radiant. *Id.*

*****5** Similarly, in this case the indemnity provision specifically provides for indemnity for losses caused by "damage to, or loss or destruction of any property (including without limitation, the Work and the property of [J.V. and BP] )." Contract, § 27.01. BP is the most likely, and perhaps the only, party to assert a claim for losses caused by damage to BP's property. The indemnity provision in § 27.01 is materially different from the indemnity provision at issue in *Kellogg.* In that case, the indemnity agreement simply provided for indemnity for damage "to any property" generally and without mentioning specifically the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1610114 (S.D.Tex.)
**(Cite as: 2010 WL 1610114 (S.D.Tex.))**

property of a party to the contract. In the case before this Court, however, the provision specifically covers losses caused by damages to BP's property. The clear language in the contract establishes that it was written to require J.V. to indemnify BP for BP's own claims for losses caused by damage to BP's property. As a result, the indemnity provision in § 27.01 may be asserted by BP in this case.[FN5]

> FN5. BP does not argue that it is entitled to summary judgment on the merits of its indemnity claim, only that it is entitled to assert the indemnity claim as a party to the Contract.

J.V. notes that the first sentence of § 27.01 provides that it "shall be solely responsible for all labor, materials, equipment and work until the Work is accepted by Company [BP]." Contract, § 27.01. J.V. argues that this sentence means that J.V. is required to indemnify BP only until BP accepts J.V.'s work, at which time the indemnity obligation no longer exists. J.V. cites nothing in § 27.01, in any other provision of the Contract, or in any legal authority that supports its interpretation of the indemnity agreement. The sentence relied on by J.V. does not state that BP's acceptance of J.V.'s work eliminates J.V.'s indemnity obligation. Instead, the sentence merely allocates risk during the period prior to BP's acceptance. Additionally, J.V.'s construction of the first sentence of § 27.01 as eliminating its indemnity obligation upon acceptance by BP is illogical and unreasonable since it is likely that latent defects in the work performed by J.V. may not become known or may not cause damage until well after the work has been completed by J.V. and accepted by BP. The Court rejects J.V.'s argument that its duty to indemnify BP ends when BP accepts the work as irrational and unsupported by the language of the Contract.

BP is entitled to summary judgment that it may assert a claim for indemnity under the Contract even though it is a party to that Contract.

C. *Indemnity Provision Covers Consequential Damages*

BP seeks summary judgment that the indemnity provision covers consequential damages. The indemnity provision, § 27.01, provides clearly and unambiguously that it covers *"any and all* liability, costs ..., loss, damage, expense, claims ..., suits, fines, and penalties on account of any and all bodily injuries or death to any persons ... or damage to, or loss or destruction of any property ...." Contract, § 27.01 (emphasis added).

J.V. argues that, notwithstanding this clear inclusion of "any and all" damage within the coverage of the indemnity agreement, the indemnity provision does not cover consequential damages. J.V. argues that the indemnity provision does not specifically state that it covers consequential damages. J.V. cites no legal authority that supports its position that an indemnity provision must list each element of damages that it covers, and this Court is aware of none. The indemnity provision states that it covers "any and all ... damage," and "any and all" means *any and all. See, e.g., Oxy USA, Inc. v. Southwestern Energy Prod. Co., 161 S.W.3d 277, 285* (Tex.App.-Corpus Christi 2005, pet. denied) (holding that "all claims" in an indemnity agreement means "all" claims).

*6 J.V. also argues that the consequential damages are not included in the indemnity obligation because they are excluded in § 28.01, which provides that neither party shall be liable to the other for "special, indirect, or incidental consequential damages." Contract, § 28.01. There is nothing in § 28.01 that suggests it is a limitation on the preceding indemnity provision. To the contrary, the second sentence in § 28.01 states clearly and unambiguously that the "parties agree that this limitation of liability *does not apply* to any consequential damages which are integrated into any indemnification liability assumed by [J.V.] pursuant to this Contract." *Id.* (emphasis added).

J.V.'s argument that the indemnity provision does not cover consequential damages is not supported by legal authority and is refuted by the Contract. As a result, BP is entitled to summary judgment that the indemnity provision covers consequential damages.

**V.** *CONCLUSION AND ORDER*

J.V. has failed to present evidence that raises a genuine issue of material fact in support of its breach of contract counterclaim and affirmative defense. As a result, BP is entitled to summary judgment on those issues.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2010 WL 1610114 (S.D.Tex.)
**(Cite as: 2010 WL 1610114 (S.D.Tex.))**

The clear and unambiguous language of the indemnity provision establishes that the provision is valid, enforceable, applies to claims by BP against J.V. for damage to BP's property, and provides generally for indemnity for consequential damages. Accordingly, it is hereby

**ORDERED** that BP's Motion for Summary Judgment on J.V.'s breach of contract counterclaim and affirmative defense [Doc. # 54] and BP's Motion for Partial Summary Judgment [Doc. # 55] are GRANTED.

S.D.Tex.,2010.
BP Products North America Inc. v. J.V. Industrial Companies, LTD.
Slip Copy, 2010 WL 1610114 (S.D.Tex.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 2850163 (E.D.La.)
**(Cite as: 2006 WL 2850163 (E.D.La.))**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
Kelly ZEIGLER
v.
BP AMERICA PRODUCTION CO.
**Civil Action No. 05-4138.**

Oct. 4, 2006.

Lawrence Blake Jones, David Christopher Whitmore, Scheuermann & Jones, New Orleans, LA, for Kelly Zeigler.

Peter L. Hilbert, Jr., Kevin Michael McGlone, Sher Garner Cahill Richter Klein McAlister & Hilbert, LLC, New Orleans, LA, for BP America Production Co.

*ORDER AND REASONS*

ELDON E. FALLON, District Judge.

**\*1** Pending before the Court is the Defendant's Motion for Summary Judgment (Rec.Doc.22). The Court heard oral argument and took this motion under submission. For the following reasons, the Defendant's motion is GRANTED.

**I. BACKGROUND**

Pride Offshore, Inc. ("Pride") developed and operated the Mad Dog spar platform for the Defendant BP America Production Co. ("BP"). The Mad Dog facility is owned by BP and located on the Outer Continental Shelf ("OCS") at Green Canyon Block 782 of the Gulf of Mexico. BP entered into the Drilling Rig Construction and Purchase Contract ("Construction Contract") with Pride on March 15, 2002. Under the Construction Contract, Pride designed and developed the drilling rig for the Mad Dog facility. On September 24, 2004, BP provisionally accepted the rig from Pride, thereby ending the term of the Construction Contract and initiating the term of the Drilling Rig Operation and Maintenance Services Contract ("Operation Contract"). From this date, Pride provided operational services on the Mad Dog platform. The facility began production in January, 2005.

The Plaintiff, Kelly Zeigler, was employed by Pride as a motorman and was responsible for checking machinery on the platform to make sure it was functioning properly. The Plaintiff alleges that he was injured while working on the pipe rack of the Mad Dog platform on August 20, 2004, at approximately 4:00 a.m. The Plaintiff was in the middle of a fourteen-day hitch, and at the time of his alleged accident he was working a 12-hour tour from 6:00 p.m. until 6:00 a.m. On the morning in question, the Plaintiff and others were moving equipment that had just arrived on the platform. The Plaintiff's immediate supervisor, Ray Buckley, instructed the Plaintiff to accompany him to the pipe rack to move a drill press out of a box container so that a crane could move it into the proper location for the morning tour. The Plaintiff and Buckley entered the container and lifted the drill press. The Plaintiff was walking backwards while carrying the drill press and was the first man out of the container. As he stepped out of the container, the Plaintiff's left leg went into a hole in the deck and he fell down, with the drill press coming down on top of him. After reporting the injury to his supervisors, the Plaintiff received some treatment and was then evacuated from the platform.

On July 25, 2005, the Plaintiff filed suit in the Civil District Court for the Parish of Orleans, Louisiana, against the platform owner BP. BP subsequently removed the case to this Court. On August 26, 2006, BP filed the instant motion for summary judgment seeking dismissal of the Plaintiff's claims.

**II. LAW AND ANALYSIS**

Summary judgment is appropriate where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor." *Hunt v. Cromartie,* 526 U.S. 541, 552 (1999). Once the mov-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2850163 (E.D.La.)
**(Cite as: 2006 WL 2850163 (E.D.La.))**

ing party identifies the parts of the record that support its claim that no genuine issue of material fact exists, the nonmoving party must "go beyond the pleadings" to identify specific facts that are at issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986).

**\*2** The Mad Dog facility is a fixed platform located on the OCS in the Gulf of Mexico, thus the Plaintiff's claims are governed by the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, *et seq.* Under this Act, the rights of an injured worker are governed by "federal law, supplemented by the law of the adjacent state." *Rodrigue v. Aetna Cas. & Sur. Co.,* 395 U.S. 352, 355 (1969). Louisiana is the adjacent state in this case, and therefore traditional principles of Louisiana negligence law apply.

At the time of the accident on the pipe rack, the parties were operating under the Construction Contract. Pursuant to the Construction Contract, Pride maintained ownership and control of the rig while it was being developed and installed on the platform. The rig package included the pipe rack where the Plaintiff claims he was injured. Accordingly, the Plaintiff cannot argue that BP presumably controlled the pipe rack when the dangerous condition was created because BP did not assume ownership of the rig until September 24, 2004, a month after the Plaintiff's accident.

The Plaintiff argues that genuine issues of fact do exist, however, regarding BP's liability for the negligence of its independent contractor Pride. In general, under Louisiana law, a principal platform owner such as BP is "not liable for the offenses an independent contractor commits in the course of performing its contractual duties." *Ainsworth v. Shell Offshore, Inc.,* 829 F.2d 548, 549-50 (5th Cir.1987). There are two exceptions to this general rule. First, a principal cannot avoid liability for injuries resulting from an ultrahazardous activity. *Id.* Offshore drilling is not ultrahazardous, and therefore this exception does not apply. *Id.* Second, a principal cannot avoid liability if it retains or exercises operational control. *Id.; Coulter v. Texaco, Inc.,* 117 F.3d 909, 912 (5th Cir.1997).

To determine whether or not BP retained operational control, the Court must first "examine the extent to which [BP] contractually reserved the right to control the work." *Fruge v. Parker Drilling Co.,* 337 F.3d 558, 564 (5th Cir.2003). At the time of the accident, the parties' relationship was governed by the Construction Contract. The Construction contract contains the following language relevant to whether or not BP retained operational control:

Article 4.01 Independent Contractor

In the performance of the Work, [Pride] is an independent contractor, shall control the performance of the details of the Work, and shall be responsible for the results and for ensuring that the Work is performed in a manner consistent with appropriate health, safety, and environmental considerations.... The presence of and the observation and inspection by [BP's] representative(s) at the Work Site shall not relieve [Pride] from [Pride's] obligations and responsibilities under this Contract.

The plain language of the Construction Contract demonstrates that BP did not retain operational control. *See Fruge,* 337 F.3d at 564.

**\*3** It is not enough for the principal to have a company man on the platform, rather, the principal must exercise "direct supervision over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way." *Fruge v. Parker Drilling Co.,* 337 F.3d 558 (5th Cir.2003). Indeed, "absent an express or implied order to the contractor to engage in an unsafe work practice leading to an injury, a principal like [BP] cannot be liable under the operational control exception." *Coulter,* 117 F.3d at 912.

The pleadings, depositions, and affidavits in this case describe the situation on the platform and also support the conclusion that BP did not retain operational control. BP argues that a Pride employee, probably the crane operator, removed the post from the pipe rack to allow the container boxes to be opened and unloaded. One of BP's on-shore supervisors, Dan Kline, reviewed personnel rosters and testified during his deposition that the only crane operators aboard the platform at the time were Pride employees. The Plaintiff went along with this theory during his deposition, stating that although he did not see who took the post out, the crane operator was the only individual with equipment large enough to complete such a task. The Plaintiff asks the Court to assume that one of the BP employees present on the platform ordered the removal of the post from the pipe rack. However,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

...

Page 3

Not Reported in F.Supp.2d, 2006 WL 2850163 (E.D.La.)
**(Cite as: 2006 WL 2850163 (E.D.La.))**

under *Ainsworth, Coulter,* and *Fruge,* the Plaintiff must identify specific facts demonstrating operational control; the Court cannot "assume that the [Plaintiff] could or would prove the necessary facts at trial." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994) (en banc).

The Plaintiff also alleges that the lighting on the platform was inadequate. BP denies having knowledge of inadequate lighting, but even if it had such knowledge, a platform owner does not owe an independent contractor's employee a duty to provide a safe working environment. *See* Graham v. Amoco Oil Co., 21 F.3d 643, 647 (5th Cir.1994).

**III. CONCLUSION**

For the foregoing reasons, the Defendant's motion for summary judgment is GRANTED and the Plaintiff's claims are hereby DISMISSED WITH PREJUDICE.

E.D.La.,2006.
Zeigler v. BP America Production Co.
Not Reported in F.Supp.2d, 2006 WL 2850163 (E.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.