A

Not Reported in F.Supp.2d, 2008 WL 217177 (E.D.La.)
(Cite as: 2008 WL 217177 (E.D.La.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
A.M.C. LIFTBOATS, INC.
v.
APACHE CORPORATION, et al.
**Civil Action No. 06-10543.**

Jan. 25, 2008.

Robert Seth Reich, Lawrence R. Plunkett, Jr., Reich, Album & Plunkett, LLC, Metairie, LA, for A.M.C. Liftboats, Inc.

Peter B. Tompkins, Mark Thomas Mahfouz, Peter Brooks Sloss, Murphy, Rogers, Sloss & Gambel, Evans Martin McLeod, George Moore Gilly, Phelps Dunbar, LLP, New Orleans, LA, for Apache Corporation, Expro Americas Inc.

*ORDER AND REASONS*

KURT D. ENGELHARDT, District Judge.

*1 Before the Court are cross motions for summary judgment.[FN1] After reviewing the memoranda of the parties and the applicable law, this Court concludes as follows.

> FN1. (1) Apache Corporation's Motion for Summary Judgment (Rec.Doc.16), and (2) the Cross-Motion for Partial Summary Judgment of A.M.C. Liftboats, Inc. (Rec.Doc.20).

**I. BACKGROUND**

**A. Facts**

On or about December 2, 2004, the L/B WHIT-NEY, a liftboat owned by A.M.C. Liftboats, Inc.

("A.M.C."), was working for Apache Corporation ("Apache") when a leg of the vessel apparently punched through the sea floor as it was positioning itself adjacent to an Apache platform. This incident caused the vessel to capsize. Rayln P. Trahan, an employee of Expro Americas, Inc. ("Expro"), was allegedly injured when this occurred. As a result of that incident, A.M.C. filed a limitation of liability proceeding captioned "In the Matter of A.M.C. Liftboats, Inc.," C.A. 05-1641. Trahan was one of two individuals who filed a claim in that proceeding. Trahan also filed a claim in litigation brought against Houston Casualty Company ("HCC"), the P & I insurer of the L/B WHITNEY and of A.M.C. Apache was not made a party to that litigation.

After settling with Trahan for $515,000, A.M.C. instituted the instant lawsuit against Apache and Expro.

**B. The Contracts**

On November 1, 2002, Apache entered into a Master Time Charter with Gulf Offshore Logistics, L.L.C., ("GOL") (Exhibit A to Apache's motion). (This Master Time Charter shall hereinafter be referred to as the "Apache/GOL contract.") Because GOL did not own a liftboat to work for Apache, GOL entered into another Master Time Charter with A.M.C., on March 1, 2004. (Exhibit B to Apache's motion). (This Master Time Charter shall hereinafter be referred to as the "GOL/AMC contract.") A.M.C. and Apache never contracted directly with each other.

The Apache/GOL agreement contains reciprocal indemnity obligations. In it, Apache agrees to provide indemnity as follows:

> Neither owner [GOL], its officers, directors, employees, the vessel [L/B WHITNEY], her owners [A.M.C.], operators, master, and crew, nor the underwriters [HCC] of any of the foregoing shall have any responsibility or liability for any claim

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

involving damage to or loss of any cargo and/or equipment carried by the vessel, or for any injury, illness, disease or death of employees of charterer [Apache], its sub-contractors [Expro], or their employees or agents, and charterer [Apache] shall defend, indemnify, and hold harmless owner [GOL], its parent, subsidiary and affiliated companies and their officers, directors, employees, in-house legal counsel, agents, representatives, invitees, co-lessees, co-owners, partners, joint venturers, contractors and sub-contractors and each of their respective successors, spouses, relatives, dependents, heirs and estates, the vessel, its owners [A.M.C.], operators, master and crew, and the underwriters of each of the foregoing from and against any such claim, whether groundless or not, and whether caused in whole or in part by the negligence or fault of indemnitees, or by the unseaworthiness of the vessel or equipment of the vessel owner's property or subcontractors' property. It is expressly understood that charterer [Apache] shall insure its obligations assumed under this contract.

*2 Exhibit A to Apache's motion, ¶ 13). Apache also agreed to obtain "Comprehensive General Liability Insurance, including Contractual Liability Insurance, covering Charterer's obligations under this Agreement ..." (Exhibit A to Apache's motion, ¶ 11). The contractual liability coverage required Apache to name:

the vessel, its owners, operators, master and crew and their respective underwriters as additional insureds and shall waive subrogation against such additional insureds, but such naming and waiving shall only apply with respect to indemnities obligations and risks assumed by Charterer in this agreement.

(*Id.*)

On the other hand, in the GOL/A.M.C. contract, A.M.C. agreed to procure P & I insurance, which included the following endorsement:

"When the vessel(s) named herein is working for

or through [GOL], pursuant to either the verbal or written charter, it is hereby agreed that [GOL] ... and its related and affiliated companies, agents, employees, servants and shareholders, ... and any entity with whom [GOL] may have contracted with to supply the services of the vessel(s), whether by time charter or other form of agreement, their agents, servants, sub-contractors, employees, co-lessees, co-ventures, and related, subsidiary, and affiliated corporations, (collectively referred to as "customer(s)") are hereby named as additional assureds, enjoying full waiver of subrogation in favor of [GOL] as defined aforesaid, and customer(s). This policy is further endorsed to delete the "misdirected arrows" clause, "other than owner" clause, and all other terms restricting coverage to claims brought against [GOL] as defined aforesaid, or its customer(s) in a capacity other than owner of the vessel(s). It is understood that this policy shall be primary to any other insurance available to [GOL] as defined aforesaid, and customer(s). Underwriters agree to provide [GOL] with thirty (30) days written notice of cancellation, modification or restriction; provided, however, that the coverage available to customer(s) hereunder shall be no greater than the coverage required to be provided by [GOL] under the terms of its agreement with customer(s)."

(page 5 of Exhibit B to Apache's motion). According to Exhibit C to Apache's motion, A.M.C. obtained the coverage required by the GOL/A.M.C. contract.

## C. The Claims

A.M.C. claims that it is entitled to contractual defense and indemnification from Apache and Expro. A.M.C. also claims that it is entitled to tort contribution and/or indemnity from Apache.

Apache has filed a motion for summary judgment, seeking dismissal of A.M.C.'s claims against it with prejudice and at A.M.C.'s costs. A.M.C., on the oth-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

er hand, has filed a cross-motion for partial summary judgment, requesting the granting of its claims for contractual defense and indemnification from Apache.

## II. *THE ARGUMENTS OF THE PARTIES*

In its motion for summary judgment, Apache claims that A.M.C.'s P & I deductible was $10,000. Apache infers that HCC likely paid all but this $10,000 of the settlement, although the lawsuit was filed only in the name of A.M.C., and not HCC. Based on the GOL/A.M.C. contract and the A.M.C. insurance policies, HCC waived its subrogation rights against Apache. Thus, because HCC waived its subrogation rights, Apache claims that neither A.M.C. nor HCC have a claim to the extent any payment was made by HCC. Apache argues that this precludes any cause of action against Apache for the payments made by HCC in this case.

*3 If the Court determines that A.M.C.'s subrogation rights have not been waived, Apache argues, in the alternative, that it is entitled to defense and indemnity under the A.M.C. insurance policy for the claims asserted against it by A.M.C. Apache asserts that because the "other than owner" and "as owner" language has been deleted from the P & I policy, coverage was extended to Apache for the claims brought by A.M.C. Further, Apache argues that A.M.C.'s insurance is primary to any other policy that may have afforded coverage to Apache.

As for paragraph 14 of the Apache/GOL contract, which could be read to require Apache to defend and indemnify A.M.C., Apache claims that, according to Fifth Circuit case law, the insurance obtained by A.M.C. trumps the indemnity arguably owed by Apache. Apache cites *Ogea v. Loffland Bros. Co.,* 622 F.2d 186 (5th Cir.1980), to support this assertion. In Ogea, the issue before the Fifth Circuit was the interpretation of a drilling contract entered into between the owner of a drilling platform and the operator the drilling platform. The drilling contract included an indemnity clause providing that the

owner of the platform would indemnify the operator under certain circumstances with the operator indemnifying the owner in other circumstances. The drilling contract also required the operator to acquire liability insurance and to name the owner as an additional insured under the policy. The *Ogea* court rejected the argument that the contract should be governed exclusively by the indemnity provisions. Instead, the Fifth Circuit held that inclusion of the mandatory insurance provisions meant that the parties would first look to insurance to cover claims and damages. In other words, only after insurance coverage was exhausted would the indemnity provisions be enforced. Essentially, the Ogea court determined that where indemnity obligations in a contract are supported by insurance agreements which require the parties to name each other as additional insureds in their respective policies, the parties, prior to asserting a claim for indemnity, are to first look to their own insurance coverage.

A.M.C., on the other hand, claims that the indemnity it seeks does not conflict with *Ogea.* A.M.C. argues that the indemnity language here is different from the Ogea indemnity language because here, A.M.C.'s underwriters are included as an indemnitee. Here, Apache agrees to indemnify A.M.C., the WHITNEY, and its underwriters. (Exhibit A to Apache's motion, ¶ 13). A.M.C. contends that if it and its underwriters, as indemnitees, are required to exhaust A.M.C.'s insurance prior to seeking indemnification from Apache (as required by *Ogea* ), then the agreement to indemnify the underwriters is hollow and meaningless. In other words, A.M.C.'s underwriters could not receive the benefit of Apache's indemnity obligation if the insurance limits must be exhausted before Apache's indemnity obligation is triggered. A.M.C. claims that such an interpretation would violate *Ogea* and the resulting requirement of a harmonious reading of the indemnity and insurance provisions. A.M.C. also argues that such an interpretation would relieve Apache of any indemnity obligation whatsoever towards A.M.C.'s underwriters and make the inclusion of the underwriters superfluous, which is an impermissible con-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

tract interpretation.

*4 A.M.C. makes a second distinction between the instant case and *Ogea.* In *Ogea,* there was no language in the indemnity obligation requiring the indemnitor to obtain insurance in support of its indemnity obligations. Here, the indemnity provision specifically requires such insurance to be acquired. (Exhibit A to Apache's motion, ¶ 13).

In support of its position, Apache also cites *Tullier v. Halliburton Geophysical Services, Inc.,* 81 F.3d 552, 553-54 (5th Cir.1996), wherein the Fifth Circuit quoted *Ogea* and determined that the "insurance procurement and indemnity provisions of a drilling contract 'must be read in conjunction with each other in order to properly interpret the meaning of the contract." ' The *Tullier* court reasoned that the controlling fact in *Ogea* was the existence of "additional assured" coverage whereby an indemnitee agreed to procure insurance coverage for the benefit of the indemnitor.

A.M.C. notes that in *Tullier,* the "primary" insurance requirement in the contract bolstered the finding that the insurance must be exhausted prior to looking to the indemnity provision. A.M.C. reasons that there is no requirement in the Apache/GOL contract that one party's insurance be primary over the insurance of the other. A.M.C. concedes that the requirement that the insurance coverage provided to an additional insured/indemnitor be primary over its own coverage would support an interpretation that the indemnitee must look to its own insurance before the indemnity obligation. However, A.M.C. asserts that the absence of such a requirement, specifically where the indemnitor has obtained insurance in support of its indemnity obligations, supports A.M.C.'s position that the indemnity provision takes precedent over the insurance provision.

Here, Apache claims that if the Court were to conclude that A.M.C. is entitled to indemnity based on the Apache/GOL contract, that indemnity would only be enforceable once the policy limits of the A.M.C. policy are exhausted, as that policy favors

Apache as an additional insured. Apache asserts that A.M.C. has no valid claim against Apache for indemnity because A.M.C.'s claim is below the policy limits afforded to Apache under the A.M.C. insurance policy.

In further opposition, A.M.C. contends that the indemnity language in the Apache/GOL contract requires Apache to defend, indemnify and hold A.M.C., the WHITNEY, and their underwriters, harmless from claims brought by employees of Apache or its contractors (Expro). A.M.C. argues that Apache clearly obligated itself to indemnify the WHITNEY and A.M.C. (and A.M.C.'s underwriter) from personal injury claims asserted by employees of Apache and its subcontractors (Rayln Trahan). A.M.C. argues that the parties clearly intended a "knock for knock" indemnity and required Apache to obtain insurance in support of its indemnity obligations.

## III. *LAW AND ANALYSIS*

### A. Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment may be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*

*5 Initially, the movant bears the burden of demonstrating the absence of material fact issues. *Abbott v. Equity Group, Inc.,* 2 F.3d 613, 619 (5th Cir.1993). The movant is not required, however, to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

negate the elements of the nonmovant's case. *Little v.. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) *(citing Celotex,* 477 U.S. at 323). If the dispositive issue is one for which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its summary judgment burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *Celotex,* 477 U.S. at 325. If the movant meets his burden, then the burden then shifts to the nonmovant, who, to avoid summary judgment, must go beyond the pleadings and designate specific facts that show that there is a genuine issue for trial. *Little,* 37 F.3d at 1075 *(citing Celotex,* 477 U.S. at 325). Of course, unsubstantiated assertions do not constitute competent summary judgment evidence. *Abbott,* 2 F.3d at 619 *(citing Celotex,* 477 U.S. at 324).

Before granting a motion for summary judgment, the district court must be satisfied that no reasonable trier of fact could find in favor of the nonmoving party. *Anderson,* 477 U.S. at 249; *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (stating that "the facts and inferences [must] point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict"). In determining whether a material issue of fact exists, the evidence and all inferences drawn therefrom must be considered in the light most favorable to the nonmoving party. *Baker v. American Airlines, Inc.,* 430 F.3d 750, 753 (5th Cir.2005) *(quoting Machinchick v. PB Power, Inc.,* 398 F.3d 345, 350 (5th Cir.2005) ).

**B. Analysis**

As explained above, the Fifth Circuit mandates harmonious reading of the indemnity and insurance procurement provisions. *Tullier,* 81 F.3d at 554. Here, there were two operative contracts: the Apache/GOL contract and the GOL/A.M.C. contract. While neither *Ogea* or *Tullier* involved the in-

terpretation of two contracts, the Court finds these cases instructive nonetheless. The Court cannot focus on one contract while ignoring the other. The terms of those two contracts must be read harmoniously with the insurance procurement provisions included therein.

The GOL/A.M.C. policy afforded Apache a "full waiver of subrogation." (page 5 of Exhibit B to Apache's motion). As argued by Apache and not contradicted by A.M.C., the P & I policy procured by A.M.C. waived subrogation rights against additional insureds (like Apache). (Exhibit C to Apache's motion). Similarly, in *Marathon Oil Co. v. Mid-Continent Underwriters,* 786 F.2d 1301 (5 th Cir.1986), Marathon chartered a vessel from B & C Boat Rentals under an agreement that required B & C to provide protection and indemnity insurance naming Marathon as an additional assured and waiving subrogation rights against it. As in the instant case, the policy in *Marathon* included a waiver of subrogation. The policy also named Marathon as an additional assured, but only while the vessel was chartered to Marathon and only for claims arising out of the operation of the vessel. A seaman working aboard the vessel was injured as a result of the negligence of Marathon employee who was working aboard a fixed platform. Although the insurance policy covered Marathon for liability incurred as an operator, owner, or charterer, it did not insure Marathon for liability arising in its capacity as platform owner. The Fifth Circuit held:

*6 When underwriters issue a policy covering an additional assured and waiving "all subrogation" rights against it, they cannot recoup from the additional assured any portion of the sums they have paid to settle a risk covered by the policy, even on the theory that the recoupment is based on the additional assured's exposure for risks not covered by the policy.

786 F.2d 1302. The Court reasoned as follows:
No waiver of subrogation was required, however, with respect to covered liability, for the provision of insurance necessarily implies that the insurer

will not seek to recoup amounts paid by it to satisfy insured claims. Were this not so, the insurance would be illusory. The addition of a waiver-of-subrogation clause reinforces the provision implied by law, but the clause is not merely redundant, particularly when, as here, "all subrogation" is waived. Because they had waived "all subrogation," [the underwriters] could not have sued in their own name to recover from Marathon [the additional insured] any part of the $60,000 they paid [the injured individual].

*Id.* at 1304.

In the instant case, Apache notes that the settlement proceeds A.M.C. seeks to recover far exceed the deductible actually paid by A .M.C. Thus, Apache claims the real party in interest is HCC, A.M.C.'s P & I insurer, which has not yet been added as a party plaintiff, although A.M.C. is allegedly in the process of doing so. (See Rec. Doc. 20, n. 2). Because the P & I policy procured by A.M.C. waived subrogation rights against additional insureds (like Apache), the Court finds that this waiver of subrogation in favor of Apache prevents claims against Apache such as the ones brought against it in this case.

Further, even if this Court determined that A.M.C.'s subrogation rights were not waived, the Court finds that reading the contracts together with the procured insurance provisions reveals that Apache is entitled to defense and indemnity for the claims asserted against it by A.M.C. in this case. Most importantly, the GOL/A.M.C. contract specifically states that insurance procured by A.M.C. shall be "primary to any other insurance available to [GOL] ... and customer(s)." (pages 5-6 of Exhibit B to Apache's motion). There is not a similar provision in the Apache/GOL contract.

The Court finds that Apache's alleged indemnity obligations (from the Apache/GOL contract) only come into play if and when A.M.C.'s P & I policy limits are exhausted. Because the settlement and defense costs were apparently within the policy limits of the HCC policy, Apache owes no indemnity obligation to A.M.C. Thus, A.M.C.'s claims against Apache fail as a matter of law.

### IV. *Conclusion*

Accordingly,

**IT IS ORDERED** that Apache's Motion for Summary Judgment (Rec.Doc.16) should be and hereby is **GRANTED.**

**IT IS FURTHER ORDERED** that A.M.C.'s Cross-Motion for Partial Summary Judgment (Rec.Doc.20) should be and hereby is **DENIED.**

E.D.La.,2008.
A.M.C. Liftboats, Inc. v. Apache Corp.
Not Reported in F.Supp.2d, 2008 WL 217177 (E.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**B**

595 So.2d 395
(Cite as: 595 So.2d 395)

**H**

Court of Appeal of Louisiana,
Third Circuit.

Dru Ann DeWOODY, Individually and as Natural
Tutrix of the Minors, Caleb DeWoody and Jared
DeWoody, Plaintiffs,
v.
CITGO PETROLEUM CORPORATION and Fred
Bruno, et al., Defendants-Third Party Plaintiffs-
Appellants,
Lake Charles Electric Co., Inc., Third Party De-
fendant-Appellee.
**No. 90-963.**

March 11, 1992.

Widow of employee of electric maintainer which
had contracted to maintain electricity at refinery
sued refinery for wrongful death. Refinery owner
filed third-party demand against maintainer for con-
tractual indemnity pursuant to maintenance con-
tract. The 14th Judicial District Court, Parish of
Calcasieu, L.E. Hawsey, Jr., J., dismissed third-
party demand with prejudice. Refinery owner ap-
pealed. The Court of Appeal, Domengeaux, C.J.,
held that: (1) indemnity provision of maintenance
contract was unambiguous, and (2) maintenance
contract did not limit maintainer's liability to
amount of required insurance coverage.

Reversed and remanded.

West Headnotes

**[1] Indemnity 208 ⊃ 100**

208 Indemnity
    208V Actions
        208k98 Evidence
            208k100 k. Presumptions and Burden of
Proof. Most Cited Cases
    (Formerly 208k8.1(1))
When indemnity contract makes no express provi-

sions for indemnification against consequences of
indemnitee's negligence, and unequivocal intention
to so indemnify cannot be found after interpreting
each contractual provision in light of whole con-
tract and general rules of contractual interpretation,
court will presume that parties did not intend to
hold indemnitee harmless for such liability.

**[2] Indemnity 208 ⊃ 30(1)**

208 Indemnity
    208II Contractual Indemnity
        208k26 Requisites and Validity of Contracts
            208k30 Indemnitee's Own Negligence or
Fault
                208k30(1) k. In General. Most Cited
Cases
    (Formerly 208k8.1(1))
Intent to indemnify another for other's negligence
can be taken from contract as whole.

**[3] Indemnity 208 ⊃ 32**

208 Indemnity
    208II Contractual Indemnity
        208k32 k. Concurrent Fault; Active or Pass-
ive Negligence. Most Cited Cases
    (Formerly 208k8.1(5))
"Sole negligence," as used in contract requiring in-
demnity except in case of indemnitee's "sole negli-
gence," was not ambiguous; most reasonable con-
struction was that parties intended to exclude in-
demnitee in those instances where indemnitee's
negligence was found to be only cause of incident
giving rise to indemnity obligation.

**[4] Indemnity 208 ⊃ 35**

208 Indemnity
    208II Contractual Indemnity
        208k34 Scope and Extent of Liability
            208k35 k. In General. Most Cited Cases
    (Formerly 208k9(1))
Under contract to maintain electricity at refinery,
maintainer's obligation to indemnify refinery owner

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

for damages arising out of maintainer's perform-
ance of contract was independent of maintainer's
obligation under contract to procure insurance, and
thus, indemnity obligation was not limited to insur-
ance coverage; indemnity provision, which con-
tained no limit on amount of damages covered, was
added at later date, presumably after insurance had
already been procured, and there was no intention
to limit maintainer's liability to amount of required
insurance coverage.

*396 Jones, Jones & Alexander, J.B. Jones, Jr.,
Cameron, for plaintiffs.

Jones, Tete, Nolen, Hanchey, Swift & Spears,
Charles N. Harper, Lake Charles, for Citgo Petro-
leum Corp.

Thomas Sanders, Lake Charles, Jeansonne &
Briney, Pat Briney, Lafayette, for appellees.

Before DOMENGEAUX, C.J., and STOKER and
YELVERTON, JJ.

DOMENGEAUX, Chief Judge.

In this wrongful death action, defendant Citgo Pet-
roleum Corporation appeals the summary judgment
dismissing its claim for contractual indemnity
against Lake Charles Electric Company, Inc. For
the following reasons, we reverse.

In January of 1986, Lake Charles Electric contrac-
ted with Citgo to perform electrical maintenance
services at Citgo's refinery in Lake Charles, Louisi-
ana. On February 5, 1988, Stephen DeWoody, an
employee of Lake Charles Electric, was killed
while working in the course and scope of his em-
ployment at the Citgo refinery.

DeWoody's widow filed suit against Citgo and Fred
Bruno, a Citgo supervisor, as well as the manufac-
turer and the vendor of certain equipment alleged to
be defective. Citgo then filed a third party demand
against Lake Charles Electric seeking contractual
indemnity pursuant to the maintenance contract of

January of 1986. Lake Charles Electric sought sum-
mary judgment on this demand contending that any
indemnity owed was limited to the amount of insur-
ance required by the contract. The trial court gran-
ted this motion and dismissed Citgo's third party
demand with prejudice.

The initial contract between Citgo and Lake
Charles Electric contained the following clause re-
quiring Lake Charles Electric to procure certain in-
surance coverage:

(12)(d) Contractor shall provide the following in-
surance for Contractor's operations extended to pro-
tect the Company, its co-owners and joint venturers
during the term of this agreement.

(3) Comprehensive General Liability insurance
covering all services performed under this Agree-
ment, including coverage for liability assumed in
this Agreement, not less than $1,000,000.00 per oc-
currence;

The contract contained an initial term of one year,
from January 1, 1986 through December 13, 1986.
After the expiration of this term, the parties consist-
ently renewed the agreement so that the contract
was in effect on the date of DeWoody's death in
February of 1988. The change order dated February
11, 1987, which renewed the agreement from
March 1, 1987 through May 30, 1987, contained
the following indemnity provision:

*Indemnification:* Contractor agrees to indemnify
fully, hold harmless and defend Citgo Petroleum
Corporation, its parent, subsidiaries and affiliates
and its and their agents, officers, directors, employ-
ees,*397 representatives, successors and assigns,
from and against all Damages (as hereinafter
defined) arising out of or in any way connected
with Contractor's performance of this contract,
through negligence, strict or absolute liability, or
otherwise wrongful acts or omissions. The term
"Damages" shall mean any and all (i) obligations,
(ii) liabilities, (iii) personal injuries (including, but
not limited to, death of any person), (iv) damages to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

property, (v) penalties, (vi) actions, (vii) claims, (viii) law suits, (ix) judgments and (x) costs and expenses (including, but not limited to, attorney's fees) relating to the foregoing. This indemnity does not extend to the sole negligence of Citgo, its employees, agents, or collateral contractors.

The February 11, 1987 change order provided that this paragraph was to be incorporated into the original contract as paragraph (12)(F), and all subsequent contract renewals specifically referred to the indemnity provision.

On appeal, Citgo argues the trial court erred in concluding that no indemnity was owed beyond the required insurance. In response, Lake Charles Electric contends the agreement is unenforceable because the term "sole negligence," as used in the last sentence, is ambiguous and because the agreement does not state that Citgo is to be indemnified for its own negligence.

[1][2] When a contract of indemnity makes no express provisions for indemnification against the consequences of the indemnitee's negligence, and an unequivocal intention to so indemnify cannot be found after interpreting each contractual provision in light of the whole contract and the general rules of contractual interpretation, the court will presume that the parties did not intend to hold the indemnitee harmless for such liability. *Sovereign Insurance Co. v. Texas Pipe Line Co.,* 488 So.2d 982 (La.1986); *Polozola v. Garlock, Inc.,* 343 So.2d 1000 (La.1977). The intent to indemnify another for the other's negligence can be taken from the contract as a whole. *Polozola v. Garlock, Inc.,* 376 So.2d 1009 (La.App. 1st Cir.1979), writ denied, 379 So.2d 1103 (La.1980); *Jennings v. Ralston Purina Co.,* 201 So.2d 168 (La.App. 2d Cir.1967), writs denied, 203 So.2d 554 (La.1967).

[3] According to the terms of the agreement, Lake Charles Electric agreed to indemnify and hold Citgo harmless from "all Damages (as hereinafter defined) arising out of or in any way connected with the contractor's performance of this contract

..." "Damages" was later defined to include "any and all ... (vi) actions, (vii) claims, (viii) law suits, (ix) judgments ... relating to the foregoing." The one exception where indemnity would not be owed is in the case of Citgo's "sole negligence." We must disagree with appellee's argument that the term "sole negligence" as used here is ambiguous. The most reasonable construction of this provision is that the parties intended to exclude indemnity in those instances where Citgo's negligence is found to be the only cause of the incident giving rise to the indemnity obligation. The words of the contract are clear and explicit, and other indemnity agreements have been interpreted to reach the same result. See, for example, *Smith v. Shell Oil Co.,* 746 F.2d 1087 (5th Cir.1984).

We also find that the language of the agreement, when viewed as a whole, is broad enough to encompass the negligence of the indemnitee, subject to the one narrow exception where the indemnitee's negligence is found to be the sole cause of the accident. Indeed, it is the presence of this exclusion that convinces us the parties intended that indemnity would be owed upon a finding of concurrent fault of the indemnitee or if the indemnitee is exonerated from fault. See *Smith; Monson v. Shell Oil Co.,* 412 F.2d 294 (5th Cir.1969).

[4] We now turn to the question of whether the indemnity obligation is limited to the insurance coverage required by the contract. After reviewing the documents in question, we find the indemnity obligation is independent of the obligation to procure insurance. We base this conclusion on the broad terms of the indemnity provision as well as the actions of the parties. The initial agreement contained only the requirement that Lake Charles Electric obtain insurance coverage in a minimum stated amount. The parties later amended **\*398** the contract to incorporate the indemnity provision, which covers "all damages" as defined therein. We find no intention to limit Lake Charles Electric's liability under the contract to the amount of the required insurance coverage. The indemnity provision, which

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 4:10-cv-01162   Document 73-6   Filed in TXSD on 09/22/10   Page 12 of 25

contains no limit on the amount of damages covered, was added at a later date, presumably after insurance had already been procured. Thus, the instant case is distinguishable from *Dickerson v. Continental Oil Co.,* 449 F.2d 1209 (5th Cir.1971), cert. denied, 405 U.S. 934, 92 S.Ct. 942, 30 L.Ed.2d 809 (1972), where such an intention was found from the language of the contract.

For the above reasons, the judgment of the trial court dismissing the third party demand of Citgo Petroleum Corporation and Fred Bruno is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

Costs of this appeal are assessed to third party defendant-appellee, Lake Charles Electric Company, Inc.

REVERSED AND REMANDED.

La.App. 3 Cir.,1992.
DeWoody v. Citgo Petroleum Corp.
595 So.2d 395

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**C**

507 So.2d 821
(Cite as: 507 So.2d 821)

▷

Supreme Court of Louisiana.
Marcus S. GRIFFIN et al.
v.
Frank KINBERGER, M.D. et al.
No. 85-CC-0657.

May 28, 1987.

In medical malpractice action, the trial court over-
ruled defendants' exception of prescription, and de-
fendants appealed. The Court of Appeal affirmed.
Certiorari was granted. The Supreme Court, Lem-
mon, J., held that: (1) statute setting three-year peri-
od for applicability of discovery rule in medical
malpractice cases could not be used to bar action
based on act that occurred before effective date of
statute, and (2) medical malpractice action based on
alleged negligent administration of oxygen to pre-
mature child 18 years earlier resulting in retrolental
fibroplasia was not untimely, where action was
brought within one year from time plaintiffs had ac-
tual or constructive knowledge that they were vic-
tims of medical malpractice.

Affirmed.

Marcus, J., dissented and assigned reasons.

West Headnotes

[1] Limitation of Actions 241 ⚏ 6(1)

241 Limitation of Actions
    241I Statutes of Limitation
        241I(A) Nature, Validity, and Construction
in General
            241k6 Retroactive Operation
                241k6(1) k. In General. Most Cited
Cases
Statute setting outside limit of three years on ap-
plicability of discovery rule in medical malpractice
cases could not be used to bar action based on act
or omission that occurred prior to effective date of

statute. LSA-R.S. 9:5628.

[2] Limitation of Actions 241 ⚏ 95(1)

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(F) Ignorance, Mistake, Trust, Fraud,
and Concealment or Discovery of Cause of Action
            241k95 Ignorance of Cause of Action
                241k95(1) k. In General; What Consti-
tutes Discovery. Most Cited Cases
Constructive knowledge sufficient to commence
running of prescription requires more than mere ap-
prehension that something might be wrong.

[3] Limitation of Actions 241 ⚏ 95(1)

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(F) Ignorance, Mistake, Trust, Fraud,
and Concealment or Discovery of Cause of Action
            241k95 Ignorance of Cause of Action
                241k95(1) k. In General; What Consti-
tutes Discovery. Most Cited Cases
Prescription does not run against one who is ignor-
ant of facts upon which his cause of action is based,
as long as his ignorance is not willful, negligent, or
unreasonable.

[4] Limitation of Actions 241 ⚏ 95(12)

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(F) Ignorance, Mistake, Trust, Fraud,
and Concealment or Discovery of Cause of Action
            241k95 Ignorance of Cause of Action
                241k95(10) Professional Negligence or
Malpractice
                    241k95(12) k. Health Care Profes-
sionals in General. Most Cited Cases
    (Formerly 241k95(1))
Even if malpractice victim is aware that undesirable
condition developed at some point in time after
medical treatment, prescription does not run as long
as it was reasonable for victim not to recognize that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

condition may be related to treatment.

**[5] Limitation of Actions 241** ☞ **95(12)**

241 Limitation of Actions
   241II Computation of Period of Limitation
      241II(F) Ignorance, Mistake, Trust, Fraud,
and Concealment or Discovery of Cause of Action
      241k95 Ignorance of Cause of Action
         241k95(10) Professional Negligence or
Malpractice
         241k95(12) k. Health Care Profes-
sionals in General. Most Cited Cases
   (Formerly 241k95(1))

Medical malpractice action based on alleged negli-
gent administration of oxygen to premature child
resulting in retrolental fibroplasia was not untimely,
even though action was brought more than 18 years
after alleged negligence, where plaintiffs had no
reason to relate child's eye symptoms to any mal-
practice on part of doctors until mother read news-
paper article, and suit was filed within one year
from time mother read article. LSA-C.C. art. 3492.
**\*822** C. William Bradley, Jr., Lemle, Kelleher,
Kohlmeyer, Dennery, Hunley, Moss & Frilot, New
Orleans, et al, for applicant.

Edward Castaing, Jr., Dymond, Crull & Castaing,
Henri Wolbrette, III, Stephanie Lawrence,
McGlinchey, Stafford, Mintz, Cellini & Lang, New
Orleans, for respondent.

LEMMON, Justice.

[1] This medical malpractice action presents two is-
sues. The first issue is whether La.R.S. 9:5628,
which sets an outside limit of three years on the ap-
plicability of the doctrine of *contra non valentem
agere nulla currit praescriptio* in medical malprac-
tice cases, may be used to bar an action based on an
act or omission that occurred before September 12,
1975, the effective date of the statute. For the reas-
ons assigned in *Maltby v. Gauthier,* 506 So.2d 1190
(La.1987), we hold that La.R.S. 9:5628 is not ap-
plicable to claims which became vested before the

effective date of the statute.

The second issue is whether plaintiffs, more than a
year prior to filing this suit, had actual or construct-
ive knowledge that they were the victims of medic-
al malpractice sufficient to commence the running
of the one-year prescriptive period of La.C.C. art.
3492 (formerly La.C.C. art. 3536 and 3537). We
conclude that plaintiffs, under the evidence appar-
ently accepted by the trial court, were not unreason-
able in failing to recognize at some earlier point in
time the connection between the condition upon
which this action is based and the alleged malprac-
tice.

On November 13, 1964, plaintiff Sharon Anselmo
gave birth to a child at Southern Baptist Hospital.
Because the child was born prematurely, he was
placed in an incubator and was administered oxy-
gen. This oxygen treatment continued from the date
**\*823** of birth through November 30 or December 2,
1964.

On August 17, 1983, plaintiffs filed this action for
damages caused by medical malpractice. They al-
leged that the negligent administration of oxygen at
the time of the child's birth caused retrolental fibro-
plasia (RLF) in the child's left eye, resulting in total
blindness of that eye, and that the child has also de-
veloped glaucoma in his left eye, a myopic right
eye, and cataracts and RLF in his right eye.

Plaintiffs further alleged that they first noticed the
child was having trouble with his eyes sometime in
1965, when Mrs. Anselmo brought this problem to
the attention of defendant Dr. Kinberger, the origin-
al pediatrician, and an ophthalmologist. The doctors
consistently assured Mrs. Anselmo, who was an
eighteen-year old mother with a sixth grade educa-
tion, that this condition was a natural and expected
consequence of the necessary administration of
oxygen to premature children at birth.[FN1] She as-
serted that she had no reason to believe that the
child's condition was the result of negligence or the
improper administering of oxygen at birth.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN1. Plaintiffs allege that the child required oxygen for eight days, but that oxygen was administered for twenty-two days.

Plaintiffs further alleged that they were first alerted to the possibility of medical malpractice on October 21, 1982 when Mrs. Anselmo read a newspaper article that reported a substantial settlement in Florida of a claim involving a child who had lost her vision in one eye after being negligently treated with oxygen during a premature birth. The following month, Mrs. Anselmo took the child to another hospital, where a doctor diagnosed the child as having retrolental fibroplasia. She contended that this was the first time she had ever heard of this disease.

Defendants filed exceptions of prescription, pleading the three-year prescription of La.R.S. 9:5628 and the one-year prescription of La.C.C. art. 3492. The trial court overruled the exceptions, citing *Lott v. Haley,* 370 So.2d 521 (La.1979). The court, however, did not directly address the issue of the one-year prescription under La.C.C. art. 3492. The court of appeal denied defendants' application for supervisory writs. We granted certiorari to address these issues. 497 So.2d 1005 (La.1986).

A prescriptive statute is subject to the discovery rule embodied in the doctrine of *contra non valentem agere nulla currit praescriptio,* when that doctrine is invoked to suspend the running of prescription during the period in which the cause of action was not known or reasonably knowable to the plaintiff. *Corsey v. State of Louisiana, Department of Corrections,* 375 So.2d 1319 (La.1979). The enactment of La.R.S. 9:5628 placed an outside limit of three years on the applicability of the doctrine in medical malpractice cases. However, La.R.S. 9:5628 is not applicable in this case, since the act or ommission which gave rise to the cause of action occurred before the effective date of the statute. *Maltby v. Gauthier, supra.* The critical determination, therefore, is the point in time at which the doctrine of *contra non valentem* no longer suspended the running of prescription.

[2][3][4] The one-year prescriptive period commences running on the date the injured party discovers or should have discovered the facts upon which his cause of action is based. *Lott v. Haley,* 370 So.2d 521 (La.1979). Constructive knowledge sufficient to commence the running of prescription, however, requires more than a mere apprehension that something might be wrong. *Cordova v. Hartford Accident & Indemity Co.,* 387 So.2d 574 (La.1980). Prescription does not run against one who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not willful, negligent or unreasonable. *Young v. Clement,* 367 So.2d 828 (La.1979). Thus, even if a malpractice victim is aware that an undesirable condition developed at some point in time after the medical treatment, prescription does not run as long as it was reasonable for the victim not to recognize *824 that the condition may be related to the treatment.FN2

FN2. This court in *Cartwright v. Chrysler Corp.,* 255 La. 597, 232 So.2d 285 (La.1970) spoke of constructive knowledge in *contra non valentem* cases as follows:

"Whatever is notice enough to excite attention and put the owner on his guard and call for inquiry is tantamount to knowledge or notice of everything to which inquiry may lead and such information or knowledge as ought to reasonably put the owner on inquiry is sufficient to start the running of prescription."

*Id.* at 287. However, subsequent decisions such as *Young, Cardova* and *Lott* have refined that language to emphasize that the proper focus is on the reasonableness of the tort victim's s action or inaction.

[5] Here, according to evidence at the hearing on the exception, the first point in time at which plaintiffs were reasonably alerted that they may

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

have a cause of action and should seek to develop further information was when Mrs. Anselmo read the newspaper article about the Florida child's blindness resulting from the negligent administration of oxygen after her premature birth. Prior to this time, plaintiffs had no reason to relate the child's eye symptoms to any malpractice on the part of the doctors, especially since the doctors told them the symptoms were the normal result of result of necessary administration of oxygen in premature births. The doctrine of *contra non valentem* therefore suspended the running of prescription during the time that the cause of action was not known or reasonably knowable to plaintiffs. *Corsey v. State of Louisiana, Department of Corrections,* 375 So.2d 1319 (La.1979). Inasmuch as plaintiffs filed suit within one year of the first point in time that plaintiffs reasonably should have known of the cause of action, the exception of prescription was properly overruled.

Accordingly, the judgment of the trial court overruling the exception of prescription is affirmed.

MARCUS, J., dissents and assigns reasons.
MARCUS, Justice (dissenting).
I am of the opinion that the action has prescribed. Under the circumstances of this case, plaintiffs should have discovered the facts upon which their cause of action was based long before the year prior to their filing suit. Accordingly, I respectfully dissent.

La.,1987.
Griffin v. Kinberger
507 So.2d 821

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**D**

588 So.2d 361
(Cite as: 588 So.2d 361)

**H**

Supreme Court of Louisiana.
HOME INSURANCE CO. OF ILLINOIS, et al.
v.
NATIONAL TEA CO., et al.
VIGILANT INSURANCE COMPANY
v.
NATIONAL TEA COMPANY, et al.
**Nos. 91-C-0692, 91-C-0667.**

Oct. 21, 1991.
Rehearing Denied Nov. 21, 1991.

Action was brought to recover damages resulting
from shopping mall fire. The Twenty-Second Judi-
cial District Court, St. Tammany Parish, James R.
Strain, Jr., J., entered judgment finding lessee and
its insurers liable, and appeal was taken. The Court
of Appeal, 577 So.2d 65, affirmed. Writ applica-
tions were granted. The Supreme Court, Hall, J.,
held that: (1) under terms of lease agreement, lessor
had released lessee from obligations with respect to
fire, thus extinguishing subrogation rights of
lessor's insurer, and (2) rights of other lessees to
sue that lessee had not been extinguished.

Affirmed in part; reversed in part and rendered.

Marcus, J., concurred in part and dissented in part,
and filed opinion and would grant a rehearing.

Lemmon, J., would grant a rehearing.

West Headnotes

**[1] Indemnity 208 ⊂⊃ 31(6)**

208 Indemnity
    208II Contractual Indemnity
        208k31 Construction and Operation of Con-
tracts
            208k31(6) k. Indemnitee's Own Negli-
gence or Fault, in General. Most Cited Cases
    (Formerly 208k8(2.1), 208k8(2))

Rule that agreements providing for indemnification
of indemnitee's negligence are to be strictly con-
strued does not extend to agreements to indemnify
against strict liability. LSA-C.C. art. 2317.

**[2] Insurance 217 ⊂⊃ 3522**

217 Insurance
    217XXX Recovery of Payments by Insurer
        217k3511 Subrogation Against Third Parties;
Right to Proceeds of Action or Settlement
            217k3522 k. Waiver or Loss of Subroga-
tion Rights. Most Cited Cases
    (Formerly 217k606(8))

**Landlord and Tenant 233 ⊂⊃ 156**

233 Landlord and Tenant
    233VII Premises, and Enjoyment and Use
Thereof
        233VII(D) Repairs, Insurance, and Improve-
ments
            233k156 k. Covenants and Agreements as
to Insurance. Most Cited Cases
Release provision of lease, under which lessor
agreed to carry fire insurance on property and re-
leased and discharged lessee "from any and all
claims and damages whatsoever from any cause
resulting from or arising out of any fire" constituted
release from fire damage acknowledged to have
been caused by lessee's negligence, and extin-
guished any subrogation recovery by lessor's in-
surer.

**[3] Landlord and Tenant 233 ⊂⊃ 166(1)**

233 Landlord and Tenant
    233VII Premises, and Enjoyment and Use
Thereof
        233VII(E) Injuries from Dangerous or De-
fective Condition
            233k166 Injuries to Property of Tenant on
Premises
                233k166(1) k. Nature and Extent of the
Duties of Landlord and Tenant Respectively. Most

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cited Cases

Lease provision under which lessor of shopping mall agreed to release lessee from "any and all claims and damages whatsoever from any cause resulting from or arising out of any fire" on premises did not preclude suit against lessee for damages incurred by other lessees due to fire which had been acknowledged to be lessee's fault.

**\*361** Harry A. Johnson, III,J. Randall Trahan, Phelps, Dunbar, Marks, Claverie & Sims, Baton Rouge, Steven M. Lozes, Lozes & Cambre, New Orleans, for applicants.

**\*362** Charles V. Guilbault,Donald J. Volpi, Jr., David Shaw, Courtenay, Forstall, Guilbault, Hunter & Fontana, New Orleans, Kevin L. Cole, Michael J. Vondenstein, Hailey, McNamara, Hall, Larmann & Papale, Metairie, Joseph Paul Gordon, Jr., Edward J. Rice, Jr., Lindsey M. Bailleux, Adams & Reese, New Orleans, Christopher M. Moody, Cashe, Lewis, Moody & Coudrain, Hammond, Kristyne H. McCullough, John M. Holahan, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Brad George Theard, Young, Richaud, Theard & Myers, Joseph N. Marcal, III, Arthur H. Leith, McGlinchey, Stafford, Cellini & Lang, New Orleans, Gary A. Bezet, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, Rykert O. Toledano, Jr., Toledano & Toledano, Roger G. Broussard, Ronald G. Hand, Hand & Hand, Covington, Dale W. Poindexter, Poindexter & Oxner, New Orleans, Jack Arthur Blossman, Covington, Frederick R. Bott, Patrick J. Berrigan, Charles F. Seemann, Jr., Joseph L. McReynolds, Deutsch, Kerrigan & Stiles, Timothy M. Waller, Sr., New Orleans, Thomas W. Mull, Lorraine S. Mull, Mull & Mull, Covington, Joseph P. Demarest, Angela C. Imbornone, Favret, Favret, Demarest & Russo, Joseph Tosterud, James M. Colomb, III, E. Kelleher Simon, Simon & Rees, Frank A. Piccolo, Abbott, Best & Meek, David E. Walle, Bienvenu, Foster, Ryan & O'Bannon, Dean A. Sutherland, Sutherland & Juge, Gordon F. Wilson, Friend, Wilson & Draper, New Orleans, Stephen J. Caire, Reed & Caire, Metairie, John N. Chappuis, Voorhies &

Labbe, Lafayette, for respondents.

HALL, Justice.

This case involves various claims arising out of a fire which originated in a National Food Store in Covington, Louisiana and caused extensive damage to the shopping mall in which the store was located. The issues to be decided are whether provisions in a shopping center lease effectively (1) released the lessee from liability to the lessor for damages sustained by the lessor as a result of a fire caused by the lessee's fault, thereby precluding recovery from the lessee by the lessor's subrogated fire insurer; and (2) released the lessee, or held the lessee harmless, from liability to other mall tenants and their subrogated insurers for damages they sustained as a result of the fire.

The present controversy is between the lessee, National Tea Company ("National") and its liability insurer, Great Southwest Insurance Company ("Great Southwest"); the lessor's subrogated fire insurer, Vigilant Insurance Company ("Vigilant"); and various other mall tenants and their subrogated insurers (collectively referred to as the "Mall Tenants"). Both the district court and court of appeal allowed recovery by Vigilant and the Mall Tenants against National and its insurers.[FN1] We reverse as to Vigilant's claims, but affirm as to the Mall Tenants' claims.

> FN1. National's other liability insurer, Twin City Fire Insurance Company ("Twin City") did not apply for writs, and the judgment is apparently final as to that defendant.

I.

Extensive damage to the Bogue Falaya Shopping Center located in Covington, Louisiana, occurred on March 11, 1984, as the result of a fire. The fire originated in or around an oven located in the premises leased by National from the mall owner,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Bogue Falaya Plaza, Incorporated (the "Lessor"). The fire spurred numerous lawsuits among the affected parties. Particularly, the Lessor's fire insurer, Vigilant, filed suit against National and its liability insurers, Great Southwest and Twin City; the manufacturer of the oven; and others. The Mall Tenants who suffered damage as a result of the fire also sued National. Numerous cross-claims and reconventional demands were filed. These suits were consolidated for trial, and the trial was bifurcated into liability and damages phases.

After trial on liability, the district court found that the cause of the fire was defective wiring in the oven installed by National, or under National's direction and control, and that the sole cause of the fire was National's fault. The court further found that the lease provisions relied upon by *363 National neither released National from liability to the Lessor and its subrogated fire insurer, Vigilant, nor held National harmless from the Mall Tenants' claims. Judgment was rendered in favor of Vigilant and the Mall Tenants against National and its insurers, Great Southwest and Twin City, for such damages as might be established in the trial on damages. National, among others, appealed.

On appeal, National, while conceding its fault, urged that the district court erred in failing to find that the manufacturer of the oven was at fault and that the lease provisions precluded recovery by the Lessor's fire insurer, Vigilant, and the Mall Tenants. The court of appeal affirmed, with one judge dissenting. *Home Insurance Co. of Illinois v. National Tea Co.*, 577 So.2d 65 (La.App. 1st Cir.1990). The majority held that the release provision "merely outlines the responsibilities to obtain insurance and reconstruct the mall; nothing more, nothing less." *Id.* at 78. The dissenting judge was of the opinion that by virtue of the lease provisions, Lessor had released National from any claim Lessor had by reason of damages caused by fire, including fire caused by National's fault, whether based on strict liability or negligence. 577 So.2d at 78-80.

National applied for writs, reurging the same as-

signments of error it urged in the court of appeal. Great Southwest likewise applied for writs. We granted both writ applications, but limited our consideration to the defenses based on the lease provisions. 580 So.2d 364 and 580 So.2d 365 (La.1991).

II.

The parties, or their predecessors, entered into a commercial lease agreement in 1968. Under the terms of the lease, Lessor agreed to rebuild the shopping center in the event of damage caused by fire, to insure the leased premises against damage caused by fire, and to release National from any claims for damages caused by fire. Particularly, the release provision of the lease (paragraph 11), labeled "Fire", provides:

The Lessor hereby covenants and agrees to carry replacement insurance in limits sufficient to rebuild total development including demised premises and *does hereby release and discharge the Lessee, its agents, successors and assigns from any and all claims and damages whatsoever from any cause resulting from or arising out of any fire* or other casualty on the herein demised premises or on said total development or any part thereof. (emphasis supplied).

Another pertinent provision of the lease is the surrender provision (paragraph 4), labeled "Repairs", which provides:

At expiration of said term, Lessee will quit and surrender the premises hereby demised in as good state and condition as received, reasonable wear and tear incident to Lessee's business and *damage by fire* or the elements, or from other causes beyond its control *excepted.* (emphasis supplied).

III.

Lessor's subrogated fire insurer, Vigilant, urges, and the court of appeal held, that the lease provisions quoted above are not sufficiently explicit un-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

der the rules of construction set forth by this court in *Polozola v. Garlock, Inc.,* 343 So.2d 1000 (La.1977), and *Soverign Insurance Co. v. Texas Pipe Line Co.,* 488 So.2d 982 (La.1986), to exculpate National from liability for fire damage caused by National's fault. Vigilant further urges that the district court found the fire was caused by National's negligence, as well as strict liability, and thus the more stringent test of *Polozola* should apply. FN2

> FN2. While the parties dispute the characterization of the release provision as an indemnity agreement and the court of appeal found the release provision was not an indemnity agreement, Louisiana courts have characterized contractual exculpatory agreements, as set forth in the release provision, as "in substance comparable to an agreement to indemnify one against one's own negligence. Such indemnification must be 'expressed in unequivocal terms.' " *See Melancon v. Juno,* 337 So.2d 652, 653 (La.App. 4th Cir.1976) (quoting *Green v. Taca Int'l Airlines,* 304 So.2d 357, 361 (La.1974)); *see also* Litvinoff, *Stipulations as to Liability and as to Damages,* 52 Tul.L.Rev. 258, 284 n. 153 and 289 n. 184 (1978).

*364 On the other hand, National urges, supported by the dissent in the court of appeal, that the provisions of the lease are clear, precise and amount to a release by Lessor of all Lessor's claims against the lessee for fire damage, even though caused by National's fault. National further urges that the trial court found it strictly liable, not negligent, but that in any event, the release provision precludes recovery by Lessor's subrogated insurer, Vigilant. National still further urges that the provisions of the lease obligated Lessor to hold it harmless from not only Lessor's claims, but also the Mall Tenants' claims.

IV.

[1] The law as stated in *Polozola, supra,* is well-settled. *Polozola* held:

A contract of indemnity whereby the indemnitee is indemnified against the consequences of his own negligence is strictly construed, and such a contract will not be construed to indemnify an indemnitee against losses resulting to him through his own negligent act, unless such an intention was expressed in unequivocal terms.

343 So.2d at 1003. Continuing, *Polozola* holds that the general rules which govern the interpretation of other contracts apply in interpreting indemnity contracts.

[A construction that renders a contract virtually nugatory] should be avoided in favor of one that gives the clause effect. La.Civil Code art. 1951 (1870).... When there is doubt as to the true sense of the words of a contract, they may be explained by referring to other words or phrases used in making the same contract. La.Civil Code art. 1948 (1870).... Further, all clauses of a contract should be interpreted the one by the other, giving to each the sense that results from the entire agreement. La.Civil Code art. 1955 (1870).... Finally, when there is anything doubtful in agreements, including indemnity agreements, we must endeavor to ascertain what was the common intention of the parties, rather than adhere to the literal sense of the terms. La.Civil Code art. 1950 (1870).

*Id.* When after applying the rules set forth above, *i.e.,* the general rules governing the construction of contracts and interpreting the provisions of a contract as a whole, the intent of the parties to indemnify against negligence remains equivocal, a presumption or inference arises that the parties did not intend to hold the indemnitee harmless from such liability.

*Soverign, supra,* held that a slightly different standard governs when the indemnitee's liability is based on strict liability rather than negligence. Simply put, *Soverign* held that the *Polozola* rule of strict

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

construction, discussed above, is inapplicable to an agreement to indemnify against strict liability under LSA-C.C. Article 2317. Moreover, in that context, *Soverign* held that a court is called upon to further construe the agreement in light of everything that by law, custom, usage or equity is considered incidental to the contract in question or necessary to carry it into effect. 488 So.2d at 985.

[2] Whether National's fault is based on negligence or strict liability, we find that the release provision clearly and expressly releases National from liability to Lessor for damages resulting from fire, whether caused by National's fault or otherwise. As plainly expressed in the lease, the parties' clear intent was to shift the risk of fire loss to Lessor's fire insurer. Lessor expressly released National from any claims for damages caused by fire. The only claims Lessor could have against National for damages caused by fire were claims based on National's fault. *See* LSA-C.C. Art. 2723. [FN3] Significantly, in the release provision Lessor expressly "releases and discharges" from liability not only National, but also National's "agents." Logic dictates that the only claims Lessor *365 could have against National's "agents" were claims arising out of the fault of such "agents." A finding that the release clause does not relieve National from damages resulting from fire caused by National's fault would render the clause virtually nugatory, contrary to the applicable rules of construction.

> FN3. LSA-C.C. Art. 2723 provides: "He can only be liable for the destruction occasioned by fire, when it is proved that the same has happened either by his own fault or neglect, or by that of his family."

The parties' intent to shift the risk of loss by fire however caused to Lessor and its fire insurer is further evidenced by the express requirement in the lease that Lessor insure the leased premises. As the dissent in the court of appeal stated, "the fact that lessor agreed to provide coverage was not accidental, but was clearly bargained for during the drafting of the lease agreement. No one appears to seriously

suggest that one side had an unfair bargaining advantage over the other." *Home Insurance,* 577 So.2d at 79. Moreover, the Lessor did in fact procure fire insurance through Vigilant. [FN4]

> FN4. As the dissent in the court of appeal points out, courts have construed similar provisions as barring subrogation based on a finding "that the parties intended the lessee to be treated as an insured under the required fire policy and that the subrogated insurer does not have the right to subrogation against its own insured. *Cf. Peninsular Fire Ins. Co. v. Louisiana Debating & Literary Assn.,* 385 So.2d 510 (La.App. 4th Cir.), and *Peninsular,* 385 So.2d at 513 (Lemmon J., concurring), *writ refused,* 393 So.2d 742 (La.1980)." *Home Insurance,* 577 So.2d at 79.

Nonetheless, Vigilant contends that the release provision refers to contractual, as opposed to tort, claims by Lessor for damages resulting from National's fault. However, contractual rights in the event of fire are specifically provided for in other provisions of the lease. For instance, the surrender provision obligated National to return the premises in good condition, excepting reasonable wear and tear, and "damage by fire," further evidencing the parties' intent that National should not be responsible to Lessor for damage caused by fire. Other provisions regulate rebuilding, replacement and abatement of rent.

Vigilant additionally contends that as the release provision is broadly worded-referring to "any and all claims and damages" and "any fire or other casualty"-the provision cannot be construed as evidencing an unequivocal intent to allocate the risk of all fires to Lessor. We recognize that general verbiage such as "any and all liability" does not necessarily suffice to express an intent to assume liability for another's fault. *Arnold v. Stupp Corp.,* 205 So.2d 797 (La.App. 1st Cir.1967), *writ refused,* 251 La. 936, 207 So.2d 540 (1968). The release provision, however, is specific. Turning again to the dissent in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the court of appeal, "the lease provision in question is narrowly tailored to include only damage by fire and other similar cause." *Home Insurance,* 577 So.2d at 80.

Our construction of the release provision is further supported by the absence of the equitable considerations that underlie the *Polozola* rule of strict construction. As we noted in *Soverign, supra,* "impos[ing] on a person an obligation to indemnify another against the indemnitee's own negligence without the obligor's unambiguous consent is contrary to the principles of equity." 488 So.2d at 986. The equitable basis for this rule, we observed, is that the obligor lacks the ability to evaluate, predict, or control the risk that the indemnitee's future conduct may create. *Id.* To ensure that the indemnitee is not unjustly enriched at the obligor's expense, equity dictates that such a provision be enforced only if there is clear evidence that the risk was bargained for and accepted. *Id.* We further noted that "such an injustice may encourage antisocial acts and a relaxation of vigilance toward the rights of others by relieving the wrongdoer of liability for his conduct." *Id.*

In the instant case, these equitable considerations are absent. Indeed, as the dissent in the court of appeal aptly articulated, the absence of these considerations is revealed by the fact that, "the lessor did not need to evaluate or predict the risk-it purchased insurance from Vigilant for that purpose. Finally, under the facts presented, upholding the contract will not promote a lack of vigilance on National's part." *Home Insurance,* 577 So.2d at 80. Accordingly, since Lessor released National from any claims for damage caused by fire, Lessor*366 had no rights to which its fire insurer, Vigilant, could be subrogated, and Viligant's demands must be rejected. [FN5]

> FN5. *See Schechter v. S.S. Kresge Co.,* 579 F.2d 1231 (10th Cir.1978) (finding lease containing similar release and surrender provisions and requiring lessor to procure fire insurance exculpated lessee from liab-

ility). An excellent annotation on the subject, entitled "Validity, Construction, and Effect of Provision of Lease Exempting Landlord or Tenant From Liability on Account of Fire," appears in Annot., 15 ALR 3d 786 (1967).

V.

[3] As mentioned above, a second issue to be decided is whether under the lease provisions Lessor effectively released National, or agreed to hold National harmless from, the Mall Tenants' claims. The court of appeal found that the lease does not address the allocation of liability among Lessor, National and third parties, such as the Mall Tenants. *Home Insurance,* 577 So.2d at 78. The dissent in the court of appeal agreed with the majority on this issue. We also agree.

While, as discussed above, the lease provisions expressly allocate the liability for damage caused by fire as between the Lessor and National, the lease provisions contain no such allocation of liability vis-a-vis third parties. Stated another way, the provisions of the lease do not purport to bind Lessor to hold harmless or to indemnify National from claims of others who were damaged by National's fault. There is no indemnification or hold harmless language in the release provision of the lease as it relates to third parties. Thus, National is liable to the Mall Tenants.

VI.

For the reasons assigned, the judgment in favor of Vigilant against National and its insurer, Great Southwest, is reversed, and Vigilant's demands against National and Great Southwest are rejected. The judgment of the district court, as affirmed by the court of appeal, is otherwise affirmed.

REVERSED IN PART AND RENDERED: AFFIRMED IN PART.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

MARCUS, J., dissents and assigns reasons.MAR-CUS, Justice (dissenting in part; concurring in part).

I disagree with the majority's conclusion that paragraph 11 of the lease releases National from all claims by the lessor for fire damage, even though caused by National's fault. In *Polozola,* we held that "a contract will not be construed to indemnify an indemnitee against losses resulting to him through his own negligent act, *unless such intention was expressed in unequivocal terms.* " (emphasis added). The majority attempts to find such an intention by reasoning that the *only claims* the lessor could have against National for damages caused by fire were claims based on National's fault, and that a finding that the release clause does not relieve National for damages resulting from fire caused by National's fault would render the clause virtually nugatory.

The majority fails to recognize that the lessee has other obligations under the lease. For example, under paragraph 3, the lessee is responsible for restoring "all broken glass, including plate." Under paragraph 4, the lessee agrees to "decorate the interior of the premises." In the event of a fire, however, the lessor undertakes the obligation to "repair, restore and rebuild the demised premises." For this reason, the lessor agrees to carry "replacement insurance in sufficient limits to rebuild total premises including demised premises." In the second clause of this sentence, the lessor discharges the lessee "from any and all claims and damages whatsoever from any cause resulting from or arising out of the fire." Taken as a whole, paragraph 11 seeks to have the premises restored as quickly as possible by the lessor. The second clause simply indicates that the lessor will take responsibility for matters which are usually the responsibility of the lessee, and will discharge the lessee from his ordinary *contractual* *367 duties under the lease. [FN1] The clause does not mention, and does not purport to deal with, the issue of fault. Clearly, it does not express in unequivocal terms an intent to relieve the lessee of the losses relating to his negligence.[FN2] Accordingly, I respectfully dissent on this issue. However, I concur with the majority opinion insofar as it finds National is liable to the mall tenants.

FN1. This interpretation harmonizes with other provisions of the lease specifically dealing with fire. The repair provision requires the lessee "to make necessary repairs, except such interior repairs due to fire or other casualty however caused." The lessee is also required to surrender the premises in as good a state as received "damage by fire or the elements, or from other causes beyond its control excepted." Thus, the lease shows a clear intent to shift the lessee's contractual burdens under the lease to the lessor in event of a fire.

FN2. The majority's reasoning would also appear to release the lessee for claims for a fire *intentionally* started by him. It is difficult to believe the parties intended the language of paragraph 11 to produce such a result.

La.,1991.
Home Ins. Co. of Illinois v. National Tea Co.
588 So.2d 361

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.