UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BP AMERICA PRODUCTION COMPANY, *et al.* | § § § | |
| v. | § § | CIVIL ACTION NO. H-10-1162 |
| NATIONAL OILWELL VARCO, LP, *et al.* | § § § § | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTERCLAIMS FOR CONTRACTUAL INDEMNITY FILED BY THE NOV DEFENDANTS**

Plaintiffs, BP America Production Company ("BP America"), BP Exploration & Production Inc. ("BPX&P"), and American Home Assurance Company ("American Home"), respectfully file this memorandum in opposition to the motion for partial summary judgment filed by defendants, National Oilwell Varco, L.P., National Oilwell Varco, Inc., National Oilwell Norway, AS, Hydralift Amclyde, Inc., Hydralift, Inc., and Hydralift AS, with respect to their counterclaims for contractual defense and indemnity. While the defendants refer to themselves collectively as "NOV" and have moved for summary judgment as a group, each of the defendants was or is a distinct business entity and must be treated as such when considering the motion before the Court.

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES .......................................................................................... iii

I.      SUMMARY OF THE ARGUMENT ............................................................... 1

II.     STATEMENT OF FACTS ............................................................................... 1

III.    LAW AND ARGUMENT ................................................................................ 7

        A.      Louisiana Law Applies ......................................................................... 7

        B.      Indemnity Agreements are to be Strictly Construed............................. 8

        C.      Indemnity is Not Owed......................................................................... 8

                1.      None of the Defendants is a Member of "Contractor
                        Group".......................................................................................9

                2.      "Contractor Group" does not include "Successors and
                        Assigns" ..................................................................................14

                3.      The Warranty Obligation Exception.......................................15

                4.      Because a Substantial Quality of the Drilling Rig Was Not
                        as Promised in Contract No. BPA-02-06080, Error Vitiates
                        BP America's Consent to Indemnify "Contractor Group"
                        Under Article 14.03.01 ...........................................................18

                5.      Actions by One or More of the Defendants Materially
                        Increased the Risk and Prejudiced the Rights of BP
                        America Thereby Invalidating any Release/Indemnity
                        Provisions................................................................................19

                6.      Article 14.03.01 Provides Coverage for "Damages" and
                        Does Not Apply to "Loss of" the Drilling Rig .......................20

                        a.      The Construction Contract                             21

                        b.      The Operation Contract                                22

                7.      There is No Way to Segregate Attorneys' Fees and Legal
                        Expenses Incurred in Defending All Claims Other than
                        those Relating to Gross Fault...................................................22

IV.     CONCLUSION............................................................................................... 23

CERTIFICATE OF SERVICE ................................................................................ 24

APPENDIX OF AUTHORITIES ........................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*A.M.C. Liftboats, Inc. v. Apache Corp.*, No. 06-10543, 2008 WL 217177 (E.D. La. Jan. 25, 2008) ........................................................................................... 15

*American Cas. Co. of Redding, Pennsylvania v. Idaho First Nat'l Bank*, 328 F.2d 138 (9th Cir. 1954)........................................................................................... 20

*Concrete Solutions v. Georgia Gulf Corp.*, 99 F. Supp. 2d 731 (M.D. La. 2000).............................................................................................................................. 14

*DeWoody v. Citgo Petroleum Corp.*, 595 So. 2d 395 (La. App. 3 Cir. 1992) ............................. 15

*General Ins. Co. of America v. Fleeger*, 389 F.2d 159 (5th Cir. 1968)........................................ 19

*Grand Isle Shipyard, Inc. v. Secor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009)............................................................................................................................. 7

*Griffin v. Kinberger*, 507 So. 2d 821 (La. 1987) ........................................................................ 17

*Heirn v. St. Paul-Mercury Indemnity Co.*, 262 F.2d 526 (5th Cir. 1959).................................... 19

*Heritage Bank v. Redom Laboratories, Inc.*, 250 F.3d 319 (5th Cir. 2001) ................................ 13

*Home Ins. Co. of Illinois v. Nat'l Tea Co.*, 588 So. 2d 361 (La. 1991) ........................................ 8

*Hudson v. Forest Oil Corp.*, No. 02-2225, 2003 WL 21276385, *4 (E.D. La. June 2, 2003), *aff'd*, 372 F.3d 742 (5th Cir. 2004)...................................................... 19

*Kardis v. Barrere*, 136 So. 135 (La. App. Orleans 1931)............................................................. 18

*Kiln Underwriting Ltd. v. Jesuit High School of New Orleans,* No. 06-4350, 2008 WL 4724390 (E.D. La. Oct. 4, 2008)................................................................. 13

*Leaming v. Century Vina, Inc.*, 2004-1599 (La. App. 4 Cir. 6/1/05), 908 So. 2d 21 ...................................................................................................................... 15

*Lockerman v. Global Santa Fe Drilling Co.*, 213 F. Supp. 2d 778 (S.D. Tex. 2002)......................................................................................................................... 11

*Marathon Pipe Line Co. v. Drilling Rig Rowan/Odessa*, 527 F. Supp. 824 (E.D. La. 1981), *aff'd* 699 F.2d 240 (5th Cir.), *cert. denied*, 464 U.S. 820, 104 S. Ct. 82 (1983) ..................................................................................... 9

*Martinez v. Bally's Louisiana*, 244 F.3d 474 (5th Cir. 2001)....................................................... 14

*Matte v. Zapata Offshore Co.*, 784 F.2d 628 (5th Cir.), *cert. denied sub nom. Zapata Offshore Co. v. Timco, Inc.*, 479 U.S. 872 (1986) ................. 8

*Matter of Corland Corp.,* 967 F.2d 1069 (5th Cir. 1992) ............................ 13

*McDermott, Inc. v. Clyde Iron*, 979 F.2d 1068 (5th Cir. 1992) *rev'd in part*, 511 U.S. 202 (1994) ......................................................................... 18

*McDermott, Inc. v. M-Electric and Construction Co.*, 496 So. 2d 1105 (La. App. 4 Cir. 1986).................................................................................. 17

*McGill v. Cochran-Sysco Foods*, 35,898 (La. App. 2 Cir. 5/8/02), 818 So. 2d 301 ....................................................................................................... 8

*Michel v. Efferson*, 65 So. 2d 115 (La. 1953) .............................................. 17

*Northeastern Power Co. v. Balcke-Durr, Inc.,* 39 U.C.C. Rep. Serv. 2d 713 (E.D. Pa. 1999) .......................................................................................... 18

*Ogg v. Ferguson*, 521 So. 2d 525 (La. App. 4th Cir. 1988) ........................ 13

*Robin v. Wong*, 2007-0547 (La. App. 4 Cir. 10/24/07), 971 So. 2d 386, *writ denied*, 2007-2245 (La. 1/11/08), 972 So. 2d 1169................................... 8

*Sanitec Industries v. Micro-Waste Corp.*, No. H-04-3066, 2006 WL 3455000 (S.D. Tex. Nov. 28, 2006) *aff'd* 296 Fed. Appx. 44 (5th Cir. 2008)......................................................................................................... 15

*Stack v. Irwin*, 167 So. 2d 363 (La. 1964) .................................................. 18

*Texaco Exploration and Production, Inc. v. AmClyde Engineered Products Co., Inc.,* 448 F.3d 760 (5th Cir.), *cert. denied*, 549 U.S. 1053 (2006) ........ 8

*Thomas v. Pace,* 496 So. 2d 609 (La. App. 1 Cir. 1986) ............................ 18

*Union Texas Petroleum Corp. v. PLT Engineering, Inc.,* 895 F.2d 1043 (5th Cir. 1990) ........................................................................................... 8

*Unisys Corp. v. Legal Counsel, Inc.,* 768 F. Supp. 6 (D.D.C. 1991), *aff'd sub. nom. Unisys Corp. v. Speights and Micheel*, 15 F.3d 1160 (D.C. Cir. 1994)........................................................................................................ 20

*Walter Oil and Gas Corp. v. Safeguard Disposal Sys.,* 961 F. Supp. 931 (E.D. La. 1996)........................................................................................ 12

*White v. ARCO/Polymers, Inc.,* 720 F.2d 1391 (5th Cir. 1983) ................. 14

*Yeargain v. Blum*, 144 So. 2d 756 (La. App. 4 Cir. 1962) ......................... 16

## STATUTES AND ARTICLES

43 U.S.C. § 1333 ................................................................................................. 7

Louisiana Civil Code article 1853 ................................................................... 13

Louisiana Civil Code article 1948 ................................................................... 18

Louisiana Civil Code article 1950 ................................................................... 18

## I.    <u>SUMMARY OF THE ARGUMENT</u>

The defendants refer to themselves collectively as "NOV" and claim they are entitled to indemnity from BP America pursuant to Article 14.03.01 of the Operation Contract for all damages and expenses over $100,000 (exclusive of any damages or expenses caused by gross negligence).  Each of the defendants was or is a distinct business entity and must be treated as such when considering the motion before the Court.  None of the defendants is entitled to partial summary judgment because:  (1) the definition of "Contractor Group" in the Operation Contract does not include any of the defendants; (2) even if the definition of "Contractor Group" included Hydralift, Inc., Hydralift AS, and/or National-Oilwell, LP, it does not include their successors, National Oilwell Varco, LP and National Oilwell Norway AS; (3) Article 14.03.01 of the Operation Contract is subject to an important exception when coverage is afforded by Pride Offshore's warranty obligations owed under the Construction Contract; (4) any indemnity obligations owed under Article 14.03.01 are discharged due to error relating to the cause of the Operation Contract; (5) Hydralift Inc., Hydralift AS, and/or Pride Offshore materially and significantly increased the risk of BP America, thereby discharging BP America from any indemnity obligation; and (6) Article 14.03.01 provides coverage for "damages" and does not apply to "loss of" the drilling rig.

## II.    <u>STATEMENT OF FACTS</u>

On March 15, 2002, BP America entered into Contract No. BPA-02-06080 with Pride Offshore, Inc. which included a Drilling Rig Operation and Maintenance Services Contract ("Operation Contract") and a Drilling Rig Construction and Purchase Contract ("Construction

Contract").[1]  Pursuant to the terms of Contract No. BPA-02-06080, Pride Offshore, Inc. was to construct the drilling rig so that it would be able to withstand 100 year hurricane conditions.[2]

Although the details are unclear because there has been no discovery other than the exchange of initial disclosures, it appears that Pride Offshore, Inc. enlisted the assistance of its parent company, Pride International, Inc., in performing its obligations under Contract No. BPA-02-06080.  By letter agreement dated May 14, 2002, Pride International, Inc. sent a CD containing the BP Specifications for the Mad Dog Project to Hydralift, Inc. (a Houston-based subsidiary of a Norwegian company known at the time as Hydralift AS, but previously known as Hydralift ASA).  The letter agreement, which was countersigned by Tom Yost of Hydralift, Inc., stated that Hydralift, Inc. was "responsible for full compliance to the specifications" in relation to "all equipment or services provided to Pride International."[3]

On May 28, 2002, Pride International, Inc. issued an Invitation to Bid to Hydralift, Inc. with respect to the rig skidding system.[4]  Pride International, Inc. subsequently issued document No. 1430-60-ME-SP-0013 entitled "Technical Specification Rig, Parking Brake Clamps & BOP Skidding Equipment (hereinafter the "Specification").[5]  The Specification defined the requirements for the "Fail Safe Parking Brake Clamps" that were to be used to secure the rig on the Mad Dog spar platform.[6]  Section 4.1.1 of the Specification states:  "The supplier should note that the platform will be Offshore GOM and subject to the weather and sea conditions associated

---

[1]     Copies of the Operation Contract and Construction Contract were attached as Exhibits "A" and "B," respectively, to the defendants' supporting memorandum.

[2]     See Attachment A-1 to Exhibit "A" of the Operation Contract.

[3]     A copy of the May 14, 2002 letter agreement is attached as Exhibit "1."

[4]     A copy of the Pride International, Inc. Mad Dog Invitation to Bid on the Skidding System is attached as Exhibit "2."

[5]     A copy of document No. 1430-60-ME-SP-0013 entitled "Technical Specification Rig, Parking Brake Clamps & BOP Skidding Equipment is attached as Exhibit "3."

[6]     See Exhibit "3" at Section 1.1.

with the location.  The sea condition will generate motions and accelerations detrimental to the

Rig, Fail Safe Parking Brake Clamps & BOP Skidding Equipment. … The supplier shall design

the Rig, Fail Safe Parking Brake Clamps & BOP Skidding Equipment for all deflections, stress

and fatigue expected, due to the spar motions and accelerations."   Section 4.2.9 of the

Specification provides that the parking brake clamps "shall be designed to be fail-safe" and

"designed to hold 100 year hurricane loading."   Attachment D to the Specification, expressly

provides for a "a full Factory Acceptance Test prior to shipment" of the parking brake clamps.[7]

On December 16, 2002, Hydralift, Inc. submitted an updated proposal to Pride International

based on the Specification.[8]

On or about April 30, 2003, Pride International, Inc. received Quote No. JD 21163 from

Hydralift, Inc. for a rig skidding package and sixteen (16) "Failsafe Parking Brake Clamps" to

hold the drilling rig on the Mad Dog platform.[9]  The quote expressly provides that the clamps are

to "hold 100 year hurricane horizontal loads parallel to skidding direction."[10]  Shortly thereafter,

a subsidiary of Pride International, Inc., Petroleum Supply Company, issued Purchase Order

1356678-000 OP (hereinafter the "Purchase Order") requesting that sixteen (16) rig skidding fail

safe parking brake clamps be shipped from Hydralift, Inc. to Pride International.[11]  The Purchase

Order expressly states that the "Rig Skidding Fail Safe Parking Brake Clamps" shall be

"designed to hold 100 year horizontal hurricane loading parallel to skidding direction."[12]  The

Purchase Order also contains a "Performance Guarantee" that provides:  "Seller guarantees that

---

[7]     See Exhibit "3" and Attachment D thereto.

[8]     Correspondence dated December 16, 2002 to Pride International, Inc. is attached as Exhibit "4."

[9]     A copy of Hydralift Inc. Quotation for Pride International, Inc. ECO for PO 1350264 is attached as Exhibit "5."

[10]    See Item 2 on Exhibit "5."

[11]    A copy of Purchase Order 1356678-000 OP is attached as Exhibit "6."

[12]    See page 1 of Exhibit "6."

equipment provided will perform in accordance with agreed to operating parameters established between buyer and seller."[13]   Of final importance, the General Terms and Conditions to the Purchase Order provide:

> WITHOUT LIMITATION OF ANY OTHER WARRANTIES OR GUARANTEES (EXPRESS OR IMPLIED), SELLER EXPRESSLY WARRANTS … THAT ALL GOODS WILL PERFORM TO BUYER'S SPECIFICATIONS, DRAWINGS, SAMPLES OR OTHER DESCRIPTIONS, IF ANY; THAT ALL GOODS WILL BE FIT AND SUFFICIENT FOR THE PURPOSES INTENDED; AND THAT SUCH GOODS ARE OF MERCHANTABLE QUALITY AND FREE FROM DEFECTS IN MATERIALS, DESIGN AND WORKMANSHIP. …ALL WARRANTIES AND GUARANTEES SURVIVE ACCEPTANCE OF THE GOODS. [14]

There appear to have been several changes made to the original Purchase Order.  All change orders, however, were issued by Petroleum Supply Company.[15]

While the exact roles of the Hydralift entities involved in the design, manufacture, testing, and sale of the brakes is unknown because discovery is just commencing, on information and belief, it appears that defendant, Hydralift, Inc., and defendants, Hydralift AS (and its predecessor, Hydralift ASA),[16] were involved in the design, manufacture, testing, and sale of the brakes that were used to secure the rig on the Mad Dog platform.  Hydralift, Inc., Hydralift ASA, and Hydralift AS are no longer in existence.  The liabilities of Hydralift, Inc. have apparently been transferred through a series of transactions to defendant, National Oilwell Varco, LP,[17] and

---

[13]   See page 9 of Exhibit "6."

[14]   See Paragraph 12 of the Purchase Order General Terms and Conditions which is contained within Exhibits "6" and "7."

[15]   See Purchase Order No. 1356678-004 OP attached hereto as Exhibit "7."

[16]   See Paragraphs 2 and 3 of the Sworn Declaration of Per Geir Lovstad filed in 4:10-cv-01162 on March 12, 2010 and designated as Record Document No. 38-3.  Hydralift ASA changed its name to Hydralift AS on April 2, 2003.  On August 3, 2004, Hydralift AS was dissolved for merger with National Oilwell-Hydralift AS, which in turn was dissolved for merger on the same day into National Oilwell Norway AS.  A copy of the Sworn Declaration of Mr. Lovstad is attached as Exhibit "8."

[17]   See Paragraph 3(e) of the Certificate of Interested Parties/Corporate Disclosure Statement filed in 4:09-cv-03360 on November 4, 2009 and designated as Record Document No. 4.  Hydralift, Inc. merged with and into National-Oilwell, Inc., effective November 1, 2003.  The assets of Hydralift, Inc. were transferred to National-Oilwell, L.P., which assumed the liabilities of Hydralift, Inc., on October 31, 2003.  On December 30, 2005, National-

the liabilities of Hydralift ASA and Hydralift AS have apparently been transferred through a series of transactions to defendant, National Oilwell Norway AS.[18]

In designing the parking brake clamps, Hydralift AS calculated the maximum sliding load per shoe during a 100 year hurricane to be 957 kips (or 957,000 pounds of force).[19] Because each shoe was to contain two brakes, Hydralift AS designed each brake to accommodate 479 kips.[20]

Once manufactured, Factory Acceptance Testing ("FAT") of the parking brake clamps was performed by Hydralift AS in October 2003.[21] The FAT protocol states: "This test shall show that during the test period the DES Parking Clamp Units are in accordance with the customer given specifications and regulations."[22] As discussed above, a key specification contained in Purchase Order provides: "Clamps designed to hold 100 year horizontal hurricane loading parallel to skidding direction."[23] Notably absent from the FAT, however, were load tests or any design verification tests.[24] Moreover, there is no evidence whatsoever that Hydralift, Inc. or Hydralift AS conducted proof testing of the brake clamps.[25] In other words, as part of the design of the brake clamps, neither Hydralift, Inc. nor Hydralift AS conducted "a full Factory

---

Oilwell, L.P. changed its name to National Oilwell Varco, L.P. A copy of the Certificate of Interested Parties/Corporate Disclosure Statement is attached as Exhibit "9."

[18] See Paragraph 3(e) of Exhibit "9" and Paragraphs 2 and 3 of Exhibit "8."

[19] See page 5 of document No. T3695-N-RD-008 entitled "Design Basis Skidbase Parking DES Parking Unit which is attached as Exhibit "10." THIS DOCUMENT IS CONFIDENTIAL AND IS SUBMITTED UNDER SEAL OF THE COURT.

[20] See page 5 of Exhibit "10."

[21] A copy of the Factory Acceptance Testing is attached as Exhibit "11." THIS DOCUMENT IS CONFIDENTIAL AND IS SUBMITTED UNDER SEAL OF THE COURT.

[22] See page 6 of Exhibit "11."

[23] See page 2 of Exhibit "11."

[24] Design verification is the process of ensuring that a design meets its specifications.

[25] Rather than testing the product to specifications, proof testing is designed to test the product to failure. For example, if a table is designed to support a certain amount of weight, prototype testing will be used to ensure that the table will support the specified weight plus a pre-determined safety factor. Proof testing would continue

Acceptance Test prior to shipment"[26] to confirm that the parking brake clamps had the actual holding capacity to withstand the forces generated by a 100 year hurricane as per the given specifications.

On December 19, 2003, National Oilwell (presumably National-Oilwell, LP since that was the name of the corporate successor to Hydralift, Inc. as of that date) issued Invoice No. 467282 which referenced the Purchase Order and was billed to Petroleum Supply Company.[27] The invoice requested payment for 40% of the original Purchase Order value for completing the FAT.  (Of course, a full FAT was never completed as explained above.)

On September 1, 2004, the Norwegian design team which had then become employees of defendant, National Oilwell Norway, AS,[28] performed calculations relative to modifications to the brakes to be performed in September 2004.[29]  Despite this significant modification in the original design of the brake clamps, no FAT (much less load testing or design verification testing) was conducted following the design modification and reworking of the brake clamps.

Provisional Acceptance of the rig under Article 12.02 of the Construction Contract took place on September 24, 2004.  At that point, in accordance with Article 7.02 of the Operation Contract, the Operation Contract commenced.

In November 2007, National Oilwell Norway, AS prepared document T3695-N-RD-0012 entitled "Description of Parking Brake Calculation" for the "Skidbase Failsafe Parking Unit."

---

loading the table until failure is reached - likely beyond the specified limits. These tests are often used to identify where eventual failures might occur.

[26]   See Attachment D of Exhibit "3."

[27]   Invoice No. 467282 is attached as Exhibit "12."

[28]   Hydralift AS merged into National Oilwell Norway AS on August 3, 2004.

[29]   See page 20 of Document NO. T3695-N-RD-002, entitled Hydralift Calculations for Parking Brake which is attached as Exhibit "13."  THIS DOCUMENT IS CONFIDENTIAL AND IS SUBMITTED UNDER SEAL OF COURT.

The document expressly represented that the brakes were designed to withhold "loads in the skidding direction (forces from 'Sliding' and 'List')" of 479 kips.[30]

On September 11, 2008, notwithstanding the repeated representations made by Hydralift, Inc., Hydralift AS, and National Oilwell Norway, AS that the parking brakes were "fail safe" and designed to withstand 100 year hurricane loads, the drilling rig slid off the Mad Dog platform and was lost during Hurricane Ike.   After the incident, BPX&P conducted a detailed investigation with the assistance of a well-respected outside engineering firm, Stress Engineering Services, Inc. ("Stress").   Significantly, Stress independently concluded that (1) the loads generated by Hurricane Ike were less than the 100 year hurricane loads set forth in BP's design criteria and (2) based on load and friction testing the *actual* capacity of the brakes was much lower than the design capacity of 479 kips per brake and was lower than the loads generated by Hurricane Ike.[31]

## III.   LAW AND ARGUMENT

### A.   Louisiana Law Applies

Because the Mad Dog spar platform is located on the Outer Continental Shelf in Green Canyon Block 782 off the coast of Louisiana, the parties agree that Louisiana law applies as surrogate federal law pursuant to the Outer Continental Shelf Lands Act ("OCSLA").[32]  *See* 43 U.S.C. § 1333; *Grand Isle Shipyard, Inc. v. Secor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009). The OCSLA is itself "a Congressionally mandated choice of law provision requiring that the substantive law of the adjacent state applies even in the presence of a choice of law provision in the contract to the contrary."  *Union Texas Petroleum Corp. v. PLT Engineering, Inc.,* 895 F.2d

---

[30]      See page 10 of Exhibit "10."

[31]      See Exhibit "14."

[32]      See page 7 of the defendants' motion for partial summary judgment.

1043, 1050 (5th Cir. 1990).  *See also Texaco Exploration and Production, Inc. v. AmClyde Engineered Products Co., Inc.,* 448 F.3d 760, 772 (5th Cir.), *cert. denied*, 549 U.S. 1053 (2006) (OCSLA's choice of law rules are not subject to exception by the parties' agreement); *Matte v. Zapata Offshore Co.*, 784 F.2d 628, 631 (5th Cir.), *cert. denied sub nom. Zapata Offshore Co. v. Timco, Inc.*, 479 U.S. 872 (1986).

### B.    Indemnity Agreements are to be Strictly Construed

Indemnity agreements are to be strictly construed and the party seeking to enforce such an agreement bears the burden of proof.  *McGill v. Cochran-Sysco Foods*, 35,898 (La. App. 2 Cir. 5/8/02), 818 So. 2d 301; *Robin v. Wong*, 2007-0547 (La. App. 4 Cir. 10/24/07), 971 So. 2d 386, *writ denied*, 2007-2245 (La. 1/11/08), 972 So. 2d 1169.  *See also Home Ins. Co. of Illinois v. Nat'l Tea Co.,* 588 So. 2d 361, 363 n.2 (La. 1991).  As the parties seeking indemnity, each of the defendants must prove that it is entitled to indemnity under Article 14.03.01 of the Operation Contract which must be strictly construed.

### C.    Indemnity is Not Owed

The defendants' reliance on the release/indemnity provision in Article 14.03.01 of the Operation Contract in support of their counterclaims is misplaced for the following reasons which are discussed in detail below: (1) the definition of "Contractor Group" in the Operation Contract does not include any of the defendants; (2) even if the definition of "Contractor Group" included Hydralift, Inc., Hydralift AS, and/or National-Oilwell, LP, it does not include their successors, National Oilwell Varco, LP and National Oilwell Norway AS; (3) Article 14.03.01 of the Operation Contract is subject to an important exception when coverage is afforded by Pride Offshore's warranty obligations owed under the Construction Contract; (4) any indemnity obligations owed under Article 14.03.01 are discharged due to error relating to the cause of the

Operation Contract; (5) Hydralift Inc., Hydralift AS, and/or Pride Offshore materially and significantly increased the risk of BP America, thereby discharging BP America from any indemnity obligation; and (6) Article 14.03.01 provides coverage for "damages" and does not apply to the "loss of" the drilling rig.

### 1.        None of the Defendants is a Member of "Contractor Group"

Although the plaintiffs believe Article 14.03.01 of the Operation Contract does not apply under the circumstances present here for the reasons explained below in Section 6, assuming *arguendo* that Article 14.03.01 is applicable, in order to be entitled to indemnification from BP America under Article 14.03.01, each of the defendants must prove that it falls within the definition of "Contractor Group" as that term is defined by the Operation Contract.  In *Marathon Pipe Line Co. v. Drilling Rig Rowan/Odessa*, 527 F. Supp. 824, 835 (E.D. La. 1981), *aff'd* 699 F.2d 240 (5th Cir.), *cert. denied*, 464 U.S. 820, 104 S. Ct. 82 (1983), the court stated, "[t]he obligation to indemnify is to be strictly construed, and **the status of indemnitee is also interpreted narrowly**."  (Emphasis added).  An indemnity agreement "will be held to benefit a particular party only when it is express in that effect…."  *Id.* at 836.

Pursuant to Article 14.03.01, indemnity is owed to "Contractor Group."[33]  Article 2.08 of the Operation Contract defines the term "Contractor Group" as:

> the following entities and persons individually and collectively:  Contractor[34] and its Affiliates, its subcontractors and vendors of every tier and their Affiliates, and

---

[33]    The Operation Contract provides in pertinent part:

        14.03    Company's General Indemnity Obligations

        Subject to the other provisions of this Article 14, [BP America] shall defend, indemnify, release, and hold **Contractor Group** harmless from and against all Claims, Losses, and Expenses for the following, when arising out of or incidental to this Contract: …

        (Emphasis added.)

[34]    The term "Contractor" is defined in the opening paragraph of the Operation Contract as meaning only the entity "Pride Offshore, Inc."

the officers, directors, shareholders, employees, and representatives of all of those entities.

In other words, Article 2.08 of the Operation Contract defines "Contractor Group" as Pride Offshore, Inc. and Pride Offshore Inc.'s Affiliates, Pride Offshore Inc.'s subcontractors and vendors of every tier and their Affiliates, and the officers, directors, shareholders, employees, and representatives of all of those entities.

Based on the facts currently known, none of the NOV defendants is a subcontractor or vendor of <u>Pride</u> <u>Offshore</u>, <u>Inc.</u> The only contractual relationship that has been established by the exchange of initial disclosures of the parties is the sale of the brake clamps by Hydralift, Inc. (and its successor National-Oilwell, LP) to <u>Petroleum</u> <u>Supply</u> <u>Company</u>. Moreover, that contractual relationship was entered into in connection with the Construction Contract, not the Operation contract. In order for Hydralift, Inc. (or its successor National-Oilwell, LP) to fit within "Contractor Group" as that term is defined in the Operation Contract, the Operation Contract would have to provide: "the following entities and persons individually and collectively: Contractor and its Affiliates, Contractor's **and its Affiliates'** subcontractors and vendors of every tier and their Affiliates, and the officers, directors, employees, agents, and representatives of all of those entities." Alternatively, for the term "Contractor Group" to include Hydralift, Inc. the definition could read:   "Contractor and its Affiliates, **their** subcontractors and vendors of every tier and their Affiliates, and the officers, directors, employees, agents, and representatives of all of those entities." But this is not what the Operation Contract provides, however. The defendants' contention that they fall within the Operation Contract's definition of "Contractor Group" is not possible without re-writing the definition of "Contractor Group."

In *Lockerman v. Global Santa Fe Drilling Co.*, 213 F. Supp. 2d 778 (S.D. Tex. 2002), the court considered whether an entity claiming entitlement to indemnity pursuant to a Master Service Agreement between Global Santa Fe Drilling Company ("GSFD") and Rigblast USA, Inc. ("Rigblast") was a member of "Contractor Group." The term "Contractor Group" in *Lockerman* was defined as follows:

> (a) "Contractor Group" means the following persons and entities, individually and collectively:
>
> 1. [GSFD], its parent, subsidiary, affiliated, associated companies and co-venturers;
>
> 2. [GSFD]'s other contractors and other parties contracting with GSFD (excepting [Rigblast] and [Rigblast]'s subcontractors);
>
> 3. Any customer or client or other entity for whom [GSFD] is performing services and the co-venturers, other contractors and subcontractors of such customer or client or other entity.

CrewBoats, Inc. ("Crewboats"), the party seeking indemnity in *Lockerman*, argued that as a subcontractor of a customer it was included in the "Contractor Group." The court concluded, however that Crewboats was actually a "subcontractor of a contractor of a customer of a customer" of GSFD and was not a member of "Contractor Group." The court went on to state:

> The precise language of the M.S.A. § simply cannot be stretched to such an extreme. In short, such an attenuated relationship simply cannot serve as the basis for including Crewboats in the Contractor Group. This result makes both practical and legal sense. If the Court was to extend the MSA's indemnity provision so far as to encompass claims against Crewboats (an entity that is not in contractual privity with either party to the MSA), Rigblast's indemnification obligations would exceed comprehension.

The same reasoning applies in this case. Hydralift, Inc. contracted with Petroleum Supply Company, not Pride Offshore, Inc. to provide the parking brake clamps for the Mad Dog rig. The term "Contractor Group" in the Operation Contract has a specifically defined meaning

which includes Pride Offshore Inc.'s subcontractors and vendors of every tier and their Affiliates.  It does not include subcontractors and vendors of Pride Offshore Inc.'s Affiliates.

Another instructive case is *Walter Oil and Gas Corp. v. Safeguard Disposal Sys.,* 961 F. Supp. 931 (E.D. La. 1996).  In *Walter Oil* an independent contractor of an oil and gas production company argued it was entitled to indemnity as part of "Company" under a master service contract between the oil and gas production company and a cleaning contractor.  The term "Company" was defined in the master service agreement to include the oil and gas production company and its "affiliated companies, owners, co-owners, and joint venturers associated therewith, and any of its agents, directors, officers, employees and *subcontractors*."  (Emphasis added.)  After noting that the terms "independent contractor" and "subcontractor" have distinct meanings, the court held that indemnity was not owed to the independent contractor.  In reaching its conclusion, the court noted that had the parties intended to include independent contractors in the definition of "Company," the term easily could have been included in the definition.

Tellingly, rather than offering summary judgment evidence to establish that they fit within the definition of "Contractor Group," each of the defendants relies solely on a mistaken, preliminary allegation in the plaintiffs' Original Complaint in an attempt to establish its status as a subcontractor to Pride Offshore, Inc..  There are many problems with the defendants' judicial admission argument.  First, as the defendants, themselves, acknowledge, the plaintiffs never alleged that the defendants were subcontractors to Pride Offshore, Inc. under the Operation Contract.  Indeed, the allegations of the Complaint only discuss the Construction Contract.

Additionally, the defendants are well aware of the fact that the plaintiffs were originally under the mistaken impression that Pride Offshore, Inc. had contracted directly with one or more of the defendants to design, manufacture, test, and install the rig skidding and brake clamp

system.  Indeed, _prior_ _to_ the defendants' filing of this motion, plaintiffs filed a motion for leave to amend their originally filed pleadings because, as explained in their motion to amend, after the lawsuits were filed, the plaintiffs received a copy of the Purchase Order revealing that the parking brake clamps were ordered not by Pride Offshore, Inc., but instead by an affiliate of Pride Offshore, Inc., Petroleum Supply Company.  Only then did plaintiffs discover their initial supposition and allegations were factually incorrect.  Plaintiffs' motion for leave to withdraw their original mistaken allegations was filed well in advance of the Court ordered deadline for amending pleadings of December 1, 2010.  Once withdrawn, judicial admissions are no longer binding.  *See Kiln Underwriting Ltd. v. Jesuit High School of New Orleans,* No. 06-4350, 2008 WL 4724390 (E.D. La. Oct. 4, 2008).  Moreover, trial judges are given broad discretion to relieve parties from the consequences of judicial admissions in appropriate cases.  As the court explained in *Kiln*, "[l]itigation is not a game of 'gotcha,'" where one party can take advantage of another party's mistaken pleadings.[35]

Importantly, under Louisiana law, a judicial admission can be revoked if it was based on a mistaken factual understanding.  Indeed, article 1853 of the Louisiana Civil Code expressly provides for revocation of a judicial confession "on ground of error of fact."  *See Ogg v. Ferguson*, 521 So. 2d 525 (La. App. 4th Cir. 1988) (consent judgment debtor was entitled to revoke his admission that he owned one-sixth interest in certain property and was entitled to amend his petition when he discovered that the pleading contained an error of fact as to ownership of the property).

---

[35]       Even if plaintiffs' requested motion for leave to amend their previously filed pleadings to withdraw the erroneous allegations is not "freely given" by the Court as required by Rule 15 of the Federal Rules of Civil Procedure, the statements in the plaintiffs' original complaint and petition are not judicial admissions.  To qualify as a judicial admission, a statement must be "deliberate, clear, and unequivocal."  *Heritage Bank v. Redom Laboratories, Inc.*, 250 F.3d 319, 329 (5th Cir. 2001); *Matter of Corland Corp.*, 967 F.2d 1069, 1074 (5th Cir. 1992).  Moreover, a

In sum, the defendants' reliance on the plaintiffs' mistaken allegations (allegations that the plaintiffs sought leave to withdraw prior to the defendants' filing of this motion) cannot serve to bring the defendants within the definition of "Contractor Group."  It is clear based on the facts now known that Hydralift, Inc. contracted with Petroleum Supply Company and not Pride Offshore, Inc. to supply the parking brakes.  Because the definition of "Contractor Group" includes subcontractors and vendors of Pride Offshore, Inc., but not subcontractors and vendors of Pride Offshore, Inc.'s affiliates, none of the defendants is a member of "Contractor Group" and none are entitled to indemnity under Article 14.03.01.

### 2.        "Contractor Group" does not include "Successors and Assigns"

In addition to the fact that none of the defendants have established that they directly contracted with Pride Offshore, Inc., even if Hydralift, Inc. had directly contracted with Pride Offshore, Inc., neither Hydralift, Inc. nor Hydralift AS are ongoing business entities.  Hydralift Inc.'s (and National-Oilwell, LP's) liabilities were passed on to their successor, National Oilwell Varco, LP, and Hydralift AS's liabilities were passed on to its successor, National Oilwell Norway, AS.  The definition of "Contractor Group" does not include successors and assigns.  In order for National Oilwell Varco, LP or National Oilwell Norway, AS to be a member of "Contractor Group," the definition would have to specifically and expressly include not only "the officers, directors, shareholders, employees and representatives of all of those entities" but also the "successors and assigns" of all of those entities.  It does not.

The case law is replete with examples of contractual language containing the words "successors" and "assigns" in indemnity provisions.[36]  The language in Article 14.03.01 must be

---

judicial admission must have been made "intentionally as a waiver."  *Martinez v. Bally's Louisiana*, 244 F.3d 474, 476 (5th Cir. 2001); *see White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983).

[36]   See, e.g., *Concrete Solutions v. Georgia Gulf Corp.*, 99 F. Supp. 2d 731 (M.D. La. 2000) ("Agency [Concrete Solutions] agrees to defend, indemnify and hold harmless Contractor [HydroChem] and Owner [Georgia Gulf]

strictly construed to include only those entities expressly included within the definition of "Contractor Group." If the parties had intended to include "successors" and "assigns" within the definition of "Contractor Group" they could have expressly stated so. They did not.

### 3.     The Warranty Obligation Exception

The defendants acknowledge,[37] and the Operation Contract clearly provides, that BP America's release/indemnity obligation under Article 14.03.01(ii) of the Operation Contract does not apply when damage to the Drilling Rig is covered by the warranty obligations undertaken by Pride Offshore, Inc. under the Construction Contract.[38]   In other words, if the warranty provisions in the Construction Contract provide a remedy to plaintiffs, then plaintiffs have no obligation to release/indemnity "Contractor Group."

---

and their respective affiliates, officers, directors, employees, agents, **successors and assigns** (individually or collectively, the 'Indemnitee')…"); *DeWoody v. Citgo Petroleum Corp.*, 595 So. 2d 395 (La. App. 3 Cir. 1992) ("Contractor agrees to indemnify fully, hold harmless and defend Citgo Petroleum Corporation, its parent, subsidiaries and affiliates and its and their agents, officers, directors, employees, representatives, **successors and assigns**, …"); *Sanitec Industries v. Micro-Waste Corp.*, No. H-04-3066, 2006 WL 3455000 (S.D. Tex. Nov. 28, 2006) ("LICENSOR shall at all times during the term of this Agreement, and thereafter, indemnify, defend, and hold harmless LICENSEE, its officers, directors, employees, affiliates, **successors, and assigns** …") *aff'd* 296 Fed. Appx. 44 (5th Cir. 2008); *Leaming v. Century Vina, Inc.*, 2004-1599 (La. App. 4 Cir. 6/1/05), 908 So. 2d 21 ("Tenant hereby agrees to hold harmless, indemnify and protect and, at Landlord's option, defend Landlord, his mortgagees, his agents, **successors and assigns** …"); *A.M.C. Liftboats, Inc. v. Apache Corp.*, No. 06-10543, 2008 WL 217177 (E.D. La. Jan. 25, 2008) ("charterer [Apache] shall defend, indemnify, and hold harmless owner [GOL], its parent, subsidiary and affiliated companies and their officers, directors, employees, in-house legal counsel, agents, representatives, invitees, co-lessees, co-owners, partners, joint venturers, contractors and sub-contractors **and each of their respective successors**, spouses, relatives, dependents, heirs and estates, the vessel, its owners [A.M.C.], operators, master and crew, and the underwriters of each of the foregoing…").

[37]     See page 15 of the defendants' motion for partial summary judgment.

[38]     Article 14 provides in pertinent part:

> 14.03     Company's General Indemnity Obligations
>
> Subject to the other provisions of this Article 14, [BP America] shall defend, indemnify, release, and hold Contractor Group harmless from and against all Claims, Losses, and Expenses for the following, when arising out of or incidental to this Contract: …
>
> 14.03.01          (ii) all damages to the Production Facility, including the Drilling Rig, in excess of One Hundred Thousand U. S. Dollars (US$100,000) per occurrence;
>
> regardless of the Negligence or Other Fault of Contractor Group or any other entity or person (**provided that such indemnity obligation shall not apply to damage to the Drilling Rig to the extent such damage is covered under the warranty**

Pride Offshore, Inc.'s warranty obligations are set forth in Article 13 of the Construction Contract which provides in pertinent part:

> 13.01 [Pride Offshore, Inc.] warrants and guarantees that (i) all Work will be performed in accordance with good and sound design and construction practices and will satisfy the requirements of this Contract, (ii) the Work, including all materials and equipment provided by [Pride Offshore, Inc.] and incorporated into the Work, shall be free from defects and shall perform in accordance with the requirements of this Contract, and (iii) all materials and equipment provided by [Pride Offshore, Inc.] shall be suitable for their intended purpose. [Pride Offshore, Inc.] warrants and guarantees the Work as provided above, irrespective of whether the Work is attributable to [Pride Offshore, Inc.] or any of its subcontractors or vendors during performance of the Work up to and including twelve (12) months after Provisional Acceptance of the Work.

In arguing that the loss of the Drilling Rig and the other damages to the Production Facility did not occur until after the twelve (12) month warranty period had expired, the defendants completely ignore the fact that the alleged defect was the poorly designed and/or manufactured braking system which was, by its nature, in existence from the moment the rig was installed and, therefore, existed during the twelve month warranty period.

Under Louisiana law the duration of a warranty establishes the time during which the product defect must come into existence and not the time within which a claim must be filed on account of the defect.  As long as the defect existed during the warranty period, the party owed the warranty still has the applicable prescriptive (*i.e.*, limitations) period within which to bring a claim for breach of the warranty obligation.  Until the claim prescribes, the warrantor, in this case Pride Offshore, Inc., remains liable for any defect that existed during the warranty period. This principle of law was explained by the court in *Yeargain v. Blum*, 144 So. 2d 756 (La. App. 4 Cir. 1962), where the court stated:

---

**obligations undertaken by [Pride Offshore, Inc.] under the Drilling Rig**

> [T]he cited provision in the painting contract guaranteed the
> material and workmanship for one year from the date of
> completion of the contract; but it did not provide that suits for
> breach of the contractual warranty must be brought within one
> year.   This guaranty clause therefore does not affect the
> prescriptive period within which suit must be brought.

*Id.* at 758.  *See also Michel v. Efferson*, 65 So. 2d 115 (La. 1953) (Guaranty clause that

guaranteed all material and workmanship "for a period of one year, starting from the date of

acceptance of the contract" did not deal with prescription of actions and the plaintiff had the

right to assert her breach of warranty claim after the one year warranty period).

Had Article 13.01 of the Construction Contract stated that claims for breach of warranty

obligations owed by Pride Offshore, Inc. must be **filed** within twelve (12) months after

Provisional Acceptance, the warranty obligation exception to the Article 14.03.01 indemnity

provision would not be triggered.  *See McDermott, Inc. v. M-Electric and Construction Co.*, 496

So. 2d 1105, 1111-12 (La. App. 4 Cir. 1986) (distinguishing, but acknowledging, *Yeargain* on

the basis that the warranty clause at issue contained an express requirement that **claims be filed**

within one year).  However, the Article 13.01 warranty language is analogous to the language in

*Yeargain* and not *McDermott*.  In this litigation, the defect in the brakes was present from the

outset (*i.e.*, within the twelve (12) month warranty period), and the plaintiffs' suit, filed within

one year of discovery of the defect,[39] was timely.

Additionally, Article 13.01 makes no reference to latent defects.  Had the parties intended

for latent defects to be included within the twelve (12) month limitation period, they would have

expressly stated so as was done by the parties in *McDermott, Inc. v. Clyde Iron*, 979 F.2d 1068

---

**Construction Contract).** (Emphasis added.)

[39]   Under Louisiana tort law, and in particular the Louisiana Products Liability Act, the plaintiff has one year to file
suit after the cause of action arises and, if the cause of action was unknown, the plaintiff has one year from the
time a reasonable person would have discovered the cause of action.  *Griffin v. Kinberger*, 507 So. 2d 821 (La.
1987).

-17-

(5th Cir. 1992) *rev'd in part*, 511 U.S. 202 (1994), where the contract expressly provided: "The remedies set forth herein are exclusive, without regard to whether any defect was discoverable or latent at the time of delivery of the apparatus to the Buyer." *See generally, Northeastern Power Co. v. Balcke-Durr, Inc.,* 39 U.C.C. Rep. Serv. 2d 713 (E.D. Pa. 1999) (express warranty that did not specify that the defect must be "found" or "discovered" during the one-year warranty period provided coverage for manifest but undiscovered defects).

For all of the above reasons, the warranty obligation exception to the indemnity obligation in Article 14.03.01 of the Operation Contract applies and indemnity is not owed under Article 14.03.01.

    **4.** **Because a Substantial Quality of the Drilling Rig Was Not as Promised in Contract No. BPA-02-06080, Error Vitiates BP America's Consent to Indemnify "Contractor Group" Under Article 14.03.01**

Under Louisiana law, contractual consent may be vitiated by error, fraud, or duress. La. Civ. Code art. 1948. Error vitiates consent when it bears on a substantial quality of a thing that is the contractual object of the contract. La. Civ. Code art. 1950. Pursuant to article 1950 of the Louisiana Civil Code, a party to a contract may rescind the contract when either the thing for which the party has contracted or a substantial quality of that thing is different from what he understood it to be at the time of contracting. *See, e.g., Thomas v. Pace,* 496 So. 2d 609 (La. App. 1 Cir. 1986) (purchasers who were assured that property sold to them was not susceptible to flooding were allowed to invalidate contract after the property became inundated with water after a heavy rain); *Stack v. Irwin,* 167 So. 2d 363 (La. 1964) (break in a slab was a serious, latent defect, entitling purchaser to rescind contract as contract would not have been made if the latent defect had been known); *Kardis v. Barrere,* 136 So. 135 (La. App. Orleans 1931) (seller's

misrepresentation that ice cream boxes were a particular make, though innocently made, entitled buyer to rescind sale where misrepresentation induced sale).

When BP America entered into Contract No. BPA-02-06080, it did so based upon the representation by Pride Offshore, Inc. that the rig would be designed and constructed to withstand 100 year hurricane forces.  Pride Offshore Inc.'s failure to provide a rig that could withstand 100 year hurricane forces vitiates BP America's consent to Contract No. BPA-02-06080 as there was an error as to a substantial quality of the drilling rig.  BP America should be discharged, as a matter of law, from its obligations under Article 14.03.01.

> **5.     Actions by One or More of the Defendants Materially Increased the Risk and Prejudiced the Rights of BP America Thereby Invalidating any Release/Indemnity Provisions**

The representation by Pride Offshore, Inc. that the rig would withstand 100 year hurricane forces related directly to BP America's risk under the contractual release/indemnity provisions.  Where a material misrepresentation induces one party to enter into a contract, "any act on the part of an indemnitee which materially increases the risk, or prejudices the rights, of the indemnitor, will discharge the indemnitor under the contract of indemnity."  *Heirn v. St. Paul-Mercury Indemnity Co.*, 262 F.2d 526, 528 (5th Cir. 1959) (reversing summary judgment in favor of indemnitee and holding that indemnitee's misrepresentations relied upon by indemnitor could constitute a material increase of risk sufficient to discharge indemnitor); *Hudson v. Forest Oil Corp.*, No. 02-2225, 2003 WL 21276385, *4 (E.D. La. June 2, 2003), *aff'd*, 372 F.3d 742 (5th Cir. 2004) ("[A]ny act on the part of an indemnitee which materially increases the risk, or prejudices the rights, of the indemnitor, will discharge the indemnitor under the contract of indemnity."); *General Ins. Co. of America v. Fleeger*, 389 F.2d 159, 161 n.3 (5th Cir. 1968) (holding that an indemnitor's reliance on a false representation invalidates an indemnity

agreement).  *See also American Cas. Co. of Redding, Pennsylvania v. Idaho First Nat'l Bank*, 328 F.2d 138, 142-43 (9th Cir. 1954) ("It is a general rule of law that any act on the part of an indemnitee which materially increases the risk, or prejudices the rights, of the indemnitor, will discharge the indemnitor under the contract of indemnity."); *Unisys Corp. v. Legal Counsel, Inc.,* 768 F. Supp. 6, 8 (D.D.C. 1991), *aff'd sub. nom. Unisys Corp. v. Speights and Micheel*, 15 F.3d 1160 (D.C. Cir. 1994) (lessor's duties to indemnify lessee for rental losses on sublease of lessee's former office space were discharged as a matter of law as a result of lessee's misrepresentations to lessor that sub-lessee had been paying its rent when in fact it had been in default, lessee's failure to take any appropriate action to follow up on continuing nonpayment of rent, and lessee's failure to evict sub-lessee).

Based on the above principle of law, BP America should be discharged, as a matter of law, from the release/indemnity obligations in Article 14.03.01 because Pride Offshore, Inc. failed to provide a rig that would withstand 100 year hurricane forces (as it represented it would do).  Pride Offshore Inc.'s failure to provide a rig that would withstand a 100 year hurricane obviously  materially and significantly increased the risk of BP America sustaining damages to, or as was the case here, loss of the rig.

### 6.    Article 14.03.01 Provides Coverage for "Damages" and Does Not Apply to "Loss of" the Drilling Rig

Although the plaintiffs agree that the release/indemnity provisions of the Operation Contract (and not the Construction Contract) control in this case, they disagree with the reasons defendants have proposed for reaching that conclusion.  Contrary to the arguments advanced by the defendants, there is no "overlapping applicability" resulting in an inconsistency in the release/indemnity provisions of the Construction Contract and Operation Contract such that the release/indemnity provision in the Operation Contract "trump[s]" the provisions in the

Construction Contract.   Rather, as explained below and as alluded to in footnote 32 of the defendants' supporting memorandum, the release/indemnity provisions in the two different contracts apply to different types of damages and losses.

### a.      The Construction Contract

The release/indemnity provisions in the Construction Contract do not apply to the types of damages and losses that were sustained in this case long after the construction of the rig was completed and drilling operations had commenced off shore.   Subsections (ii) and (iii) of Article 14.02.01 of the Construction Contract pertain to "all damages to or losses of Items" provided by BP America and "all damages to or losses of Existing Property and Equipment" of BP America. The term "Items" is defined in Article 2.10 of the Construction Contract as "all tangible property including materials, equipment, supplies, or machinery provided under the terms hereof and intended for incorporation into the Work."   Damage or loss to the "Work" (*i.e*., the completed drilling rig) as opposed to the "Items" incorporated into the finished "Work" is not included in the language of the Construction Contract's release/indemnity provision. Similarly, the term "Existing Equipment and Property" is defined in Article 2.08 of the Construction Contract as "all machinery, buildings, equipment, pipelines, wells, wellheads or other tangible property belonging to Company Group and located at the Work Site."   The term "Site" means "the location or locations on, under, in, at or through which the Work is to be performed or stored by Contractor, its subcontractors and vendors (Article 2.11)."   The finished rig itself could scarcely be deemed to fit the definition of "Existing Equipment and Property" of BP America.

### b.    The Operation Contract

Article 14.03.01(ii) of the Operation Contract applies to "all damages to the Production Facility, including the Drilling Rig."[40]  While several other Article 14 clauses (14.02.01(ii), 14.02(ii), 14.03.02(ii), 14.04.01(ii), 14.04.02(ii), 14.05, and 14.08) pertain to "damage to or loss of" or "loss or damage to," Article 14.03.01(ii) of the Operation Contract purposefully does not apply to "loss of" the Production Facility, including the Drilling Rig.  Given that this case involves a complete "loss of" the Drilling Rig, the defendants' motion, insofar as it relates to the loss of the rig, should be denied.

### 7.    There is No Way to Segregate Attorneys' Fees and Legal Expenses Incurred in Defending All Claims Other than those Relating to Gross Fault

In arguing that they are entitled to be indemnified for attorneys' fees and legal expenses they have been incurred or will be incurred in the defense of claims exclusive of damages caused by gross fault, the defendants ignore the fact that even if the court were to issue a partial summary judgment as requested, the defense of claims cannot be segregated into those relating to ordinary fault as opposed to those relating to gross fault.

---

[40]    Article 14 provides in pertinent part:

    14.03    Company's General Indemnity Obligations

    Subject to the other provisions of this Article 14, [BP America] shall defend, indemnify, release, and hold Contractor Group harmless from and against all Claims, Losses, and Expenses for the following, when arising out of or incidental to this Contract: …

    14.03.01        (ii) all **damages to** the Production Facility, including the Drilling Rig, in excess of One Hundred Thousand U. S. Dollars (US$100,000) per occurrence;

    regardless of the Negligence or Other Fault of Contractor Group or any other entity or person (provided that such indemnity obligation shall not apply to damage to the Drilling Rig to the extent such damage is covered under the warranty obligations undertaken by [Pride Offshore, Inc.] under the Drilling Rig Construction Contract). (Emphasis added.)

IV.     **CONCLUSION**

For all of the foregoing reasons, plaintiffs request that the Court deny the plaintiffs'

motion for partial summary judgment.

Respectfully submitted,

LISKOW & LEWIS

/s/ S. Gene Fendler
S. Gene Fendler (La. Bar No. 5510)
*Admitted Pro Hac Vice*
***Attorney-in-Charge***
701 Poydras Street
Suite 5000, One Shell Square
New Orleans, LA 70139
Telephone:     (504) 581-7979
Facsimile:     (504) 556-4108
E-mail:        sgfendler@liskow.com

*Attorneys for BP America Production*
*Company, BP Exploration & Production*
*Inc., and American Home Assurance*
*Company*

**Of Counsel**:

LISKOW & LEWIS
David W. Leefe (La. Bar No. 1479)
*Admitted Pro Hac Vice*
Carol Welborn Reisman (Tex. Bar No. 24052638)
Devin C. Reid (La. Bar No. 32645)
*Admitted Pro Hac Vice*
701 Poydras Street
Suite 5000, One Shell Square
New Orleans, LA 70139
Telephone:     (504) 581-7979
Facsimile:     (504) 556-4108
E-mail:        dwleefe@liskow.com
               cwreisman@liskow.com
               dcreid@liskow.com

**and**

Robert Hayden Burns (Tex. Bar No. 03456000)
Federal I.D. No. 375
First City Tower
1001 Fannin Street, Suite 1800
Houston, TX 77002
Telephone:    (713) 651-2900
Facsimile:    (713) 651-2908
Email: hburns@liskow.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 21st day of October, 2010, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all attorneys of record.  I further certify that, on the same day, I mailed, faxed, or e-mailed the foregoing document and notice of electronic filing to all attorney(s) of record who are non-CM/ECF participants.


/s/ S. Gene Fendler


927204v1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BP AMERICA PRODUCTION COMPANY, *et al.* | § § § | |
| v. | § § | CIVIL ACTION NO. H-10-1162 |
| NATIONAL OILWELL VARCO, LP, *et al.* | § § § § § | |

## <u>APPENDIX OF AUTHORITIES</u>

**CASES**

*A.M.C. Liftboats, Inc. v. Apache Corp.*, No. 06-10543, 2008 WL 217177 (E.D. La. Jan. 25, 2008) ................................................................................. Tab A

*DeWoody v. Citgo Petroleum Corp.*, 595 So. 2d 395 (La. App. 3 Cir. 1992) ........................ Tab B

*Griffin v. Kinberger*, 507 So. 2d 821 (La. 1987) ..................................................... Tab C

*Home Ins. Co. of Illinois v. Nat'l Tea Co.*, 588 So. 2d 361 (La. 1991) ................................. Tab D

*Hudson v. Forest Oil Corp.*, No. 02-2225, 2003 WL 21276385, *4 (E.D. La. June 2, 2003), *aff'd*, 372 F.3d 742 (5th Cir. 2004).............................................Tab E

*Kardis v. Barrere*, 136 So. 135 (La. App. Orleans 1931)........................................Tab F

*Kiln Underwriting Ltd. v. Jesuit High School of New Orleans*, No. 06-4350, 2008 WL 4724390 (E.D. La. Oct. 4, 2008)....................................................... Tab G

*Leaming v. Century Vina, Inc.*, 2004-1599 (La. App. 4 Cir. 6/1/05), 908 So. 2d 21 ....................................................................................................... Tab H

*McDermott, Inc. v. M-Electric and Construction Co.*, 496 So. 2d 1105 (La. App. 4 Cir. 1986)...................................................................................................Tab I

*McGill v. Cochran-Sysco Foods*, 35,898 (La. App. 2 Cir. 5/8/02), 818 So. 2d 301 ........................................................................................................... Tab J

*Michel v. Efferson*, 65 So. 2d 115 (La. 1953) ......................................................... Tab K

*Northeastern Power Co. v. Balcke-Durr, Inc.,* 39 U.C.C. Rep. Serv. 2d 713 (E.D. Pa. 1999) ...................................................................................................Tab L

*Ogg v. Ferguson*, 521 So. 2d 525 (La. App. 4th Cir. 1988) ................................... Tab M

*Robin v. Wong*, 2007-0547 (La. App. 4 Cir. 10/24/07), 971 So. 2d 386, *writ denied*, 2007-2245 (La. 1/11/08), 972 So. 2d 1169.........................................Tab N

*Sanitec Industries v. Micro-Waste Corp.*, No. H-04-3066, 2006 WL 3455000 (S.D. Tex. Nov. 28, 2006) *aff'd* 296 Fed. Appx. 44 (5th Cir. 2008)...................................................................................................................... Tab O

*Stack v. Irwin*, 167 So. 2d 363 (La. 1964) .............................................................Tab P

*Thomas v. Pace,* 496 So. 2d 609 (La. App. 1 Cir. 1986)....................................... Tab Q

*Yeargain v. Blum*, 144 So. 2d 756 (La. App. 4 Cir. 1962) .................................... Tab R

## LOUISIANA CODAL ARTICLES

Louisiana Civil Code article 1853 .........................................................................Tab S

Louisiana Civil Code article 1948 .........................................................................Tab T

Louisiana Civil Code article 1950 ......................................................................... Tab U