# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **BP EXPLORATION &** | § | |
| **PRODUCTION, INC.,** *ET AL.* | § | |
| **Plaintiffs,** | § | **CIVIL ACTION NO. 4:10-CV-01162** |
| | § | *consolidated with* **NO. 4:09-CV-03360** |
| **v.** | § | |
| | § | |
| **NATIONAL OILWELL** | § | |
| **VARCO, L.P.,** *ET AL.* | § | **HON. VANESSA GILMORE** |
| **Defendants.** | § | **PRESIDING** |

## NOV DEFENDANTS' REPLY IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

### Introduction

In its opposition to NOV's motion for partial summary judgment on indemnity, BP does not dispute the central tenet of NOV's motion: that the Contractor Group, including subcontractors and vendors for the Mad Dog project, are entitled to indemnity from BP for damages caused by their own negligence to the Production Facility. BP also does not claim that there are genuine issues of material fact precluding summary judgment. Instead, BP raises legal arguments that: (1) BP's indemnity obligations do not apply here and/or (2) BP can avoid its indemnity obligations to NOV by rescinding its contracts. NOV addresses these legal arguments here, demonstrating that BP's contractual indemnity obligations to NOV does apply here and cannot be rescinded as a matter of law.

# Table of Contents

Page:

Table of Contents.................................................................................................ii

Index of Authorities............................................................................................iii

Summary of Reply............................................................................................... 1

Argument & Authority ......................................................................................... 2

I.    The NOV Defendants Are Indemnitees Under the Operation Contract .................... 2

      A. The Relationship Between Pride Offshore, Pride International and
         Petroleum Supply with Respect to the Mad Dog Project ...................................... 3

      B. The Definition of Contractor Group Includes Subcontractors of
         Pride International and Petroleum Supply............................................................. 6

      C. The Definition of Contractor Group Includes All of the NOV
         Defendants ............................................................................................................ 9

II.   The Warranty Exception Does Not Apply to Injuries Incurred Years
      After the Expiration of the Warranty ...................................................................... 11

III.  BP Cannot Avoid Its Indemnity Obligations Under Article 1948 ............................ 13

      A. The Error Alleged by BP Could Constitute Breach of Contract But
         Not a Basis for Rescission .................................................................................... 14

      B. BP Has Confirmed the Contracts by Seeking to Enforce Them
         Against Pride in the Arbitration Action................................................................ 17

IV.   BP May Not Discharge Its Indemnity Obligations on an Estoppel
      Theory ...................................................................................................................... 17

V.    The Indemnity Provision Applies to "All Damages" Including the
      Loss of the Drilling Rig.......................................................................................... 19

Conclusion & Prayer ............................................................................................. 20

# Table of Authorities

## Cases

*Abraham v. Volkswagen of Am.*,
  795 F. 2d 238 (2nd Cir. 1986) ...................................................................... 12

*American Casualty Co. of Redding, Pennsylvania v. Idaho First National
  Bank*, 328 F.2d 138 (9th Cir. 1964).............................................................. 19

*Bass, Ltd. v. Gerald*,
  954 So.2d 243 (La. App. 3 Cir. 2007) ........................................................... 14

*Cascio v. Twin Cities Development, LLC*,
  2010 WL 3666323 (La. App. 2 Cir. 2010) .................................................... 16

*CDI Corp. v. Hough*,
  9 So. 3d 282 (La. App. 1 Cir. 2009) .............................................................. 11

*Chance v. Designer Wardrobe Trailers, Inc.*,
  2009 WL 799963 (E.D. La. 2009)................................................................... 7

*Clemens v. Daimler Chrysler*,
  534 F. 3d 1017 (9th Cir. 2008) ..................................................................... 12

*Coffee Bay Investors, LLC v. WOGC Co.*,
  878 So. 2d 665 (La. App. 1 Cir. 2004) .......................................................... 15

*Conoco, Inc. v. Medic Sys., Inc.*,
  259 F.3d 369 (5th Cir. (La.) 2001) ................................................................. 7

*Duquesne Light Co. v. Westinghouse Elec. Corp.*,
  66 F. 3d 604 (3rd Cir. 1995) ......................................................................... 12

*Griffin v. Tenneco Oil Co.*,
  625 So.2d 1090 (La. App. 4 Cir. 1993) ........................................................... 7

*Hanover Petro. Corp. v. Tenneco, Inc.*,
  521 So.2d 1234 (La. App. 3 Cir. 1988) ......................................................... 16

*Heirn v. St. Paul-Mercury Indemnity Co.*,
   262 F.2d 526 (5th Cir. 1959) ........................................................................ 18

*Hudson v. Forest Oil Corp.*,
   No. 02-2225, 2003 WL 21276385 (E.D. La. June 2, 2003) ........................................ 18

*Ins. Storage Pool, Inc. v. Parish Nat'l Bank*,
   732 So.2d 815 (La. App. 1 Cir. 1999) ............................................................. 17

*Kardis v. Barrere*,
   136 So. 135 (La. App. Orleans 1931) ............................................................. 16

*Michel v. Efferson*,
   65 So. 2d 115 (La. 1953) ....................................................................... 13

*Morales v. Dept. of Army*,
   947 F.2d 766 (5th Cir. 1991) ..................................................................... 3

*Naquin v. La. Power & Light Co.*,
   951 So.2d 228 (La. App. 1 Cir. 2006) ............................................................. 7

*Northeastern Power Co. v. Balcke-Durr, Inc.*,
   1999 WL 674332 (E.D. Pa. Aug. 23, 1999) ...................................................... 12

*Poloza v. Garlock, Inc.*,
   376 So2d 1009 (La. App. 1979, writ denied) ..................................................... 7

*Salard v. Jim Walter Homes, Inc.*,
   563 So. 2d 1327 (La. App. 3 Cir. 1990) ........................................................ 15

*Salassi v. Salassi*,
   13 So.3d 670 (La. App. 5 Cir. 2009) ........................................................... 17

*Shelton v. Congress Street Properties, Inc.*,
   1993 WL 43637 (E.D. La. Feb. 16, 1993) ...................................................... 16

*Sonnier v. Boudreax*,
   673 So.2d 713 (La. App. 1 Cir. 1996) .......................................................... 14

*Stack v. Irwin*,
   167 So. 2d 363 (La. 1964) ..................................................................... 16

*Thomas v. Pace*,
   496 So.2d 609 (La. App. 1 Cir. 1986) ........................................................... 16

*U.S. Fidelity & Guar. Co. v. Putfark*,
   158 So. 9 (La. 1934) ......................................................................................... 18

*Yeargain v. Blum*,
   144 So.2d 756 (La. App. 4 Cir. 1962) ........................................................... 13

## Statutes

8 Del. C. § 259 ..................................................................................................... 11

La Civ. Code art. 2032 ......................................................................................... 17

La. Civ. Code art. 1005 ........................................................................................ 14

La. Civ. Code art. 1948 ................................................................................... 14, 17

La. Civ. Code art. 1949 ........................................................................................ 14

La. Civ. Code art. 1950 ........................................................................................ 15

La. Civ. Code art. 1976 ........................................................................................ 14

La. Civ. Code art. 1994 ........................................................................................ 16

La. Civ. Code art. 2031 ........................................................................................ 17

La. Civ. Code art. 2047 ........................................................................................ 20

La. Civ. Code art. 2049 ........................................................................................ 12

La. R.S. 12:115 ..................................................................................................... 11

## Summary of Reply

BP concedes the existence and nature of its indemnity obligations under the Operation Contract but seeks to avoid those obligations here by arguing: (1) the NOV defendants are not within the indemnitee group; (2) the warranty exception applies; and/or (3) BP can rescind its contracts.[1]  Each of these theories fails as a matter of law:

- **The NOV Defendants are Indemnitees Under the Contract**

BP argues that the NOV defendants are not indemnitees within the Operation Contract's definition of "Contractor Group" because they subcontracted with an affiliate of Pride Offshore, Inc. ("Pride Offshore"), rather than Pride Offshore itself.   As a preliminary matter, BP has judicially admitted that NOV is a subcontractor of Pride Offshore and may not contradict that fact now.   Regardless, the NOV defendants are indemnitees under the contract whether the subcontracts were with Pride Offshore or its affiliates (collectively, "Pride").   The contract's broad definition of "Contractor Group" includes all subcontractors and vendors on the project (and their affiliates) without distinction as to whether they have contracts with Pride Offshore or one of its affiliates.

- **Pride's Warranty Expired Years Before BP's Alleged Injury**

BP next argues that its indemnity obligations to NOV do not apply here because the damages at issue fall within the warranty exception.  BP does not deny that Pride's warranty expired years before BP incurred the damages at issue here.  Instead, BP argues

---

[1] BP also argues that partial summary judgment should not be granted because attorneys' fees and expenses cannot be segregated.  NOV strongly disagrees that BP can somehow avoid its indemnity obligations on this basis but does not address that issue here because the segregation issue is not presented by this partial summary judgment.  NOV has requested only that the Court determine BP's indemnity obligations under the Operation Contract as a matter of law.

that the warranty applies to any defects existing during the warranty period regardless of when the defects manifested themselves.  This position is contrary to well-established law and would render the one-year limitation on Pride's warranty meaningless because the warranty applies to defects that necessarily existed within the warranty period.

- **There Is No Doctrine of Law That Permits BP to Disavow Its Indemnity Obligations After Receiving All of the Contract's Benefits**

BP's effort to avoid its indemnity obligations to NOV by voiding the underlying contracts also fails because the doctrines of rescission and discharge are not legally operative under these facts.  Moreover, the negligence BP alleges here is precisely the kind of negligence the indemnity provisions govern – if the alleged negligence were a basis for avoiding the contracts, the indemnity provisions would have no application.  BP's attempt to avoid its contractual indemnity obligations on the basis of these doctrines is particularly inappropriate here, where BP has accepted the monetary benefits of the contracts and seeks to enforce these same contracts against Pride in a parallel arbitration.

## Argument & Authority

## I.   The NOV Defendants Are Indemnitees Under the Operation Contract

BP does not dispute that the Operation Contract obligates BP to indemnify Pride's subcontractors and vendors on the Mad Dog project for all damage to the Mad Dog facility in excess of $100,000, including the damages BP seeks to recover in this action.  It is also undisputed that NOV was a subcontractor and vendor on the Mad Dog project – precisely the roles that invoke BP's contractual indemnity obligations.  However, despite its judicial admissions to the contrary, BP now asserts that NOV was a subcontractor of

an *affiliate of Pride Offshore* on the project, rather than Pride Offshore.  On this basis, BP advocates a hyper-technical reading of the definition of "Contractor Group" to exclude subcontractors and vendors who contracted with Pride Offshore's affiliates.

As an initial matter, BP repeatedly pled that NOV was a subcontractor of Pride Offshore on the Mad Dog project before BP realized that this fact was fatal to BP's position in this case.[2]  These factual assertions in BP's pleadings with the Court are binding judicial admissions that BP may not now contest.  *Morales v. Dept. of Army*, 947 F.2d 766, 769 (5th Cir. 1991).  Regardless, whether NOV was a subcontractor of Pride Offshore or its affiliate does not affect the outcome of this partial summary judgment because the definition of Contractor Group in the Operation Contract is written to encompass *all* subcontractors and vendors on the Mad Dog project.  Moreover, BP's own evidence demonstrates that Pride Offshore was the purchaser on the Mad Dog project, such that NOV would fall within the Contractor Group as a vendor of Pride Offshore even if NOV were not covered as a subcontractor of Pride Offshore's affiliates.[3]

### A.   The Relationship Between Pride Offshore, Pride International and Petroleum Supply with Respect to the Mad Dog Project

To put BP's argument into context, it is helpful to understand the relationship between Pride Offshore and its affiliates: Pride International, Inc., Pride Offshore's parent company,[4] and Petroleum Supply Company, another wholly owned subsidiary of

---

[2] *See* BP and American Homes' Complaint at ¶¶ 14, 19, 28; BP and American Homes' Original Petition at ¶¶ 19, 24, 33.  These pleadings define "Pride" as referencing Pride Offshore, Inc.

[3] *See* Exh. 3 to BP's Opposition at p. 3 of 36.

[4] *See* Exh. A, Pride Corporate Filings.

Pride International.[5]  In 2001, BP selected Pride International to design, engineer and build the drilling and production package to be placed on the Mad Dog spar.[6]  Pride International's website states that it was "awarded projects to construct, commission and operate four deepwater platform rigs," including Mad Dog.[7]  Pride International selected its wholly-owned subsidiary Pride Offshore to be the "Contractor" for the Construction Contract[8] and the Operation Contract[9] (collectively, the "Mad Dog Contracts").  Then, as BP admits, "Pride Offshore enlisted the assistance of its parent company, Pride International, Inc., in performing its [contractual obligations]."[10]  Pride Offshore also "enlisted the assistance" of its sister subsidiary, Petroleum Supply.

Pride International, not Pride Offshore, issued the technical specifications for the project;[11] Pride International, not Pride Offshore, issued the requests for bids to the subcontractors and vendors;[12] and Pride International's employees oversaw the subcontractors' work.[13]  The "Procurement Manager" for the Mad Dog project was a Pride International employee, Craig Metcalf, who sent written communications to NOV

---

[5] *Id.*.

[6] Exh. B, available at http://www.prideinternational.com/fw/main/History-5.html.

[7] *Id.*

[8] A copy of the Drilling Rig Construction and Purchase Contract (the "Construction Contract") is attached as Exh. B to NOV's motion for partial summary judgment (hereafter, "NOV's MPSJ").

[9] A copy of the Drilling Rig Operation and Maintenance Services Contract (the "Operation Contract") is attached as Exh. A to NOV's MPSJ.

[10] BP's opposition to NOV's motion for partial summary judgment on contractual indemnity ("BP's Opposition") at p. 2.

[11] Exh. 1 & Exh. 3 to BP's Opposition.

[12] Exh. 2 to BP's Opposition.

[13] Exh. 6 to BP's Opposition.

on Pride International stationery.[14]   As requested, NOV submitted its bids on the Mad

Dog project to Pride International.[15]   Pride International was also given responsibility for

the mechanical completeness dossiers on the Mad Dog project.[16]      The purchase orders

for the Mad Dog project bore Petroleum Supply letterhead, identified Pride International

as the recipient, and stated the order was placed by Craig Metcalf of Pride International.[17]

The purchase orders also identified Pride International employees as the project's

Procurement Manager, Technical Lead Engineer, Expediting Coordinator, Planning

Manager, QA/QC Manager, and Shipping Agent Representatives.[18]   Petroleum Supply,

not Pride Offshore, handled invoicing for the project's vendors and subcontractors.[19]

   In sum, Pride International is a highly integrated company that orchestrated and

performed the role of general contractor on the Mad Dog project both directly and

through its constituent entities, Pride Offshore and Petroleum Supply.

---

[14]  Exh. 1 to BP's Opposition; *see also* Exh. K, November 11, 2003 Letter from Pride International regarding submission of commissioning consumables list for Mad Dog project.

[15] *See, e.g.,* Exh. 5 to BP's Opposition.

[16] *E.g.,* Exh. C, Mechanical Completeness Dossier for the DES parking unit; Exh. D, Mechanical Completeness Dossier for the skidbase parking unit.

[17] *See* Exh. 7 to BP's Opposition; *see also* Exh. E, Collection of Mad Dog Purchase Order Documents:  No. 1347328, No. 1350264, No. 1350274, No. 1356872, No. 1356866, and No. 1345702.  These purchase order documents are offered only to demonstrate that all of the Purchase Order documents NOV received on the Mad Dog project appear to have been issued on Petroleum Supply Letterhead with Pride International identified as the recipient.  In fact, to NOV's knowledge all subcontracts were entered into by Petroleum Supply and/or Pride International rather than Pride Offshore. Under BP's interpretation of the contracts, that would mean none of the subcontractors or vendors would be included in the "Contractor Group," in direct contradiction to the plain language of the contracts.

NOV does not intend, by the inclusion of Exhibit E, to make any representations as to the function or finality of these documents, or otherwise endorse them.

[18] *E.g.* Exh. 7 to BP's Opposition at PRIDE00003536.

[19] *E.g.,* Exh. 12 to BP's Opposition.

**B.      The Definition of Contractor Group Includes Subcontractors of Pride International and Petroleum Supply**

The definition of the "Contractor Group," to whom BP owed indemnity under the Operation Contract, includes the project's subcontractors and vendors of every tier regardless of whether they contracted with Pride Offshore or an affiliate.  Section 2.08 of the Operation Contract defines "Contractor Group" as:

> the following entities and persons individually and collectively: Contractor and its Affiliates, <u>its</u> subcontractors and vendors of every tier and their Affiliates, and the officers, directors, shareholders, employees and representatives of all of those entities.[20]

BP's argument is that the word "its," underlined above, is in the singular because it was intended to modify the term "Contractor" and not the phrase "Contractor and its Affiliates."  By this logic, BP contends that subcontractors and vendors on the project who contracted with Pride International or Petroleum Supply are not included within the "Contractor Group" and, therefore, are not indemnitees.

NOV respectfully suggests there are good reasons for the Court to reject what BP says "its" means.  First, BP was fully knowledgeable of the contract language when it filed this lawsuit, in which BP has repeatedly pled that NOV was Pride Offshore's subcontractor.[21]  Second, a fair reading of the contract terms demonstrates that it was the common intent of the parties that *all* vendors and subcontractors on the project would be included within the "Contractor Group" and entitled to indemnity protection.

---

[20] Operation Contract, Exhibit A to NOV's MPSJ.

[21] *See* BP and American Homes' Complaint at ¶¶ 14, 19, 28; BP and American Homes' Original Petition at ¶¶ 19, 24, 33.

The language employed by the parties when defining the "Contractor Group" (and also when defining "Company Group") is expansive, not restrictive. Note the reference to "individually and collectively"; note the reference to subcontractors and vendors "of every tier and their Affiliates"; note the reference to the "officers, directors, shareholders, employees and representatives of *all of those entities*"; and note that "Affiliates" was defined to include "current a*nd future entities*."[22] The obvious intent of this language was to cover an expansive array of entities under the umbrella of the "Contractor Group." *Cf. Naquin v. La. Power & Light Co.*, 951 So.2d 228, 232 (La. App. 1 Cir. 2006) (indemnity provision was intended to create indemnity obligation as to all damages and costs at issue in light of "broad" rather than "explicit" wording); *Griffin v. Tenneco Oil Co.*, 625 So.2d 1090, 1097 (La. App. 4 Cir. 1993) ("inclusive language" of indemnity agreement indicated intent to include claims for punitive damages); *Poloza v. Garlock, Inc.*, 376 So2d 1009, 1015 (La. App. 1979, writ denied) (indemnity provision extended to the indemnitee's own negligence based on the "broad" and "inclusive" language); *Conoco, Inc. v. Medic Sys., Inc.*, 259 F.3d 369, 371 (5th Cir. (La.) 2001) ("extremely broad language in the indemnity provision" made it clear that the parties intended it to apply to every claim related in any way to the contract).

If the parties were attempting to restrict "Contractor Group" to just those subcontractors and vendors who had an agreement directly with Pride Offshore, it would have been simple enough to do so. *See Chance v. Designer Wardrobe Trailers, Inc.*, 2009 WL 799963, at *5 n.20 (E.D. La. 2009) (slip op.) ("Good legal draftsmanship

---

[22] Operation Contract, attached as Exh. A to NOV's MPSJ, at §§ 2.01, 2.08.

dictates that coverage be expressed by all-inclusive terms such as 'all' . . . and that exclusions be specifically enumerated.").  Instead, the punctuation and language of the contract shows that the parties intended just the opposite. There is a comma after the phrase "Contractor and its affiliates" suggesting to the reader that the word "its" was meant to modify the phrase and not just the first word of the phrase.  As written, "Contractor and its Affiliates," collectively, is the antecedent of "*its*."

If the parties had wanted to have "its" modify the word "Contractor" and not the phrase, the punctuation would have been different.  It would have read:

> Contractor, ~~and~~ its Affiliates, its subcontractors and vendors of every tier and their Affiliates, and the officers, directors, shareholders, employees and representatives of all of those entities.

BP suggests that the term "Contractor Group" would include NOV if the parties had used the word "their" instead of the word "its" to modify the phrase "Contractor and its Affiliates."  Then the definition would have read:

> Contractor and its Affiliates, ~~its~~ their subcontractors and vendors of every tier and their Affiliates, and the officers, directors, shareholders, employees and representatives of all of those entities.

The use of the plural "their" would have included subcontractors and vendors of Pride Offshore's affiliates.  But, by BP's logic, use of the word "their" instead of the word "its" would have *excluded* subcontractors and vendors of Pride Offshore itself.

To avoid just such problems, the Operation Contract expressly provides that the singular and plural are being used interchangeably.  Section 1.06 of the Operation Contract states "**reference to the singular includes a reference to the plural and vice versa** . . . ."  Since "its" includes "their" and vice versa, BP's strained argument is refuted

within the four corners of the document and should be rejected by the court as a matter of law.  The parties intended for this project's subcontractors and vendors to be included as indemnitees within the "Contractor Group," and defined that term accordingly.  This broad definition of Contractor Group is consistent with the overarching risk-allocation scheme of the Mad Dog Contracts, which provided the parties with certainty as to risk exposure and eliminated the need for multiple overlapping insurance policies by assigning risk and insurance obligations as between the contractor's side of the project and the owner's side of the project according to ownership and control.[23]

### C.  The Definition of Contractor Group Includes All of the NOV Defendants

BP has also argued that not all of the NOV defendants are entitled to summary judgment because, although the Contractor Group includes "**subcontractors and vendors *of every tier and their Affiliates*, and the officers, directors, shareholders, employees and representatives of all of those entities**,"[24] it does not include a subcontractor or vendor's "successors or assigns."  What BP must ignore to make this argument is the fact that "Affiliates" is a defined term in the Operation Contract, and the definition of "Affiliates" clearly includes any successor entity.  Section 2.01 of the Operation Contract defines an "Affiliate" of a company as "a **current *or future* person**

---

[23] *See* Articles 14 and 15 of the Mad Dog Contracts, attached as Exh. A and Exh. B to NOV's MPSJ.

[24] Operation Contract, Exh. A to NOV's MPSJ, at § 2.08.

**or entity directly or indirectly controlling, controlled by, or under common control with** such company."[25]  All of the NOV defendants fall squarely within this definition.

In November of 2003, former-defendant Hydralift, Inc. (the party to the Purchase Order identified by BP as the pertinent subcontract)[26] was merged into National-Oilwell, Inc.,[27] which subsequently became defendant National Oilwell Varco, Inc.[28]  Hydralift, Inc.'s parent company, Hydralift AS, merged into defendant National Oilwell Norway AS, which is a wholly-owned subsidiary of defendant National Oilwell Varco, Inc.[29]  Defendant National Oilwell Varco, L.P. is also a subsidiary of National Oilwell Varco, Inc.[30]  Thus, all of the NOV defendants share common ownership and control, so as to qualify as "Affiliates" under the Operation Contract.  As a subcontractor and vendor and Affiliates of a subcontractor and vendor on the Mad Dog project, all of the NOV defendants are entitled to indemnity from BP under the Operation Contract.

Moreover, even if the Operation Contract had not expressly included future entities among its indemnitees, the surviving-entity defendants succeed to all rights and privileges possessed by the merged-entities by operation of law.   This is true under both

---

[25] Operation Contract, Exh. A to NOV's MPSJ, at § 2.01.

[26] BP's Opposition at Exh. 6.

[27] Exh. F, Certificate from Delaware Secretary of State (Hydralift, Inc. – National Oilwell, Inc.).

[28] Exh. G, Certificate from Delaware Secretary of State (National Oilwell, Inc. – National Oilwell Varco, Inc.).

[29] Exh. H, Certificate from Norway's Register of Corporations (Hydralift AS – National Oilwell Norway, AS).

[30] Exh. I, Corporate filings of National Oilwell Varco, L.P. and its General Partner, NOW Oilfeild Services, Inc., which is wholly owned subsidiary of National Oilwell Varco, Inc.

Louisiana and Delaware law.  *CDI Corp. v. Hough*, 9 So. 3d 282, 293 (La. App. 1 Cir. 2009) (discussing Louisiana and Delaware law); La. R.S. 12:115; 8 Del. C. § 259.

## II.   The Warranty Exception Does Not Apply to Injuries Incurred Years After the Expiration of the Warranty

BP's second argument for avoiding partial summary judgment on its indemnity obligations to NOV is that the warranty exception to indemnity applies.  As briefed in NOV's motion for partial summary judgment, BP's indemnity obligations under Section 14.03 of the Operation Contract excludes damages covered by Pride's warranty obligations under the Construction Contract; but this exclusion does not apply here because the Pride's warranty under the Construction Contract expired in September of 2005 – one year after the date of Provisional Acceptance – and the damages BP alleges in this lawsuit occurred three years later, in September of 2008.[31]  BP does not deny that Pride's warranty under the Construction Contract is expressly limited to one year after Provisional Acceptance or that this one-year term is now long-expired.  Instead, BP argues that the warranty exception covers the damages at issue anyway because the alleged design defect that caused the damages existed during the one-year warranty period.  BP's position is legally incorrect and would, in practice, wholly negate the very purpose of the one-year warranty limitation.

Pride's warranty relates exclusively to design and construction defects resulting from the "Work" performed under the Construction Contract.[32]  It is necessarily limited to

---

[31] *See* NOV's MPSJ at 15-16.

[32] Construction Contract, Exh. B. to NOV's MPSJ, at § 13.01.

defects existing at the completion of the construction work.[33]   Thus, if BP were correct that the warranty applies to any defect existing during the one-year warranty period regardless of when the defect manifested itself, then the warranty would apply to *all* defects and its one-year limitation would be rendered meaningless.   Such an interpretation is contrary to Louisiana law, which requires that a contract should not be interpreted in a manner that renders any of its provisions nugatory.   La. Civ. Code art. 2049.   The very purpose of the one-year warranty limitation is to provide a date-certain after which Pride no longer has warranty obligations to BP.

Contrary to BP's assertion, the case law overwhelmingly holds that a latent defect that does not manifest itself until after expiration of an express warranty does not give rise to a breach of express warranty. *E.g., Abraham v. Volkswagen of Am.*, 795 F. 2d 238, 250 (2nd Cir. 1986) (rejecting claim that the express warranty should cover a latent defect after the warranty period had expired); *Clemens v. Daimler Chrysler*, 534 F. 3d 1017 (9th Cir. 2008) (dismissing breach of warranty claims where alleged "latent defect" revealed itself after the expiration of the warranty); *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F. 3d 604, 616 (3rd Cir. 1995) (dismissing breach of warranty claim where plaintiffs alleged that the defect "did not appear until after the expiration of the respective warranty periods"); *see also Northeastern Power Co. v. Balcke-Durr, Inc.*, 1999 WL 674332, *5 (E.D. Pa. Aug. 23, 1999) (explaining that "the case law almost uniformly holds that time-limited warranties do not protect buyers against hidden defects which are typically not discovered until after the expiration of the warranty period").

---

[33] *Id.*

The cases BP relies on in its opposition do not support BP's position.  Those cases address the *statute of limitations* for warranty actions, not time limits on express warranties.  *See Yeargain v. Blum*, 144 So.2d 756 (La. App. 4 Cir. 1962) (where defect in paint job manifested itself eight months after paint job – within the one-year express warranty – court held that ten-year statute of limitations applied to plaintiff's claims); *Michel v. Efferson*, 65 So. 2d 115 (La. 1953) (holding that warranty time limit did not alter statute of limitations applicable to a claim for breach of warranty).  These cases only demonstrate that the statute of limitations on a breach of warranty claim and the time-limit placed on an express warranty are two distinct limitations, either of which may apply in the absence of the other.  *See id.*  Here, NOV does not claim that Pride's contractual warranty does not apply because BP failed to bring suit in a timely manner after it incurred the alleged damages at issue (governed by the statute of limitations) but, rather, that the warranty does not apply because BP did not incur the alleged damages within the warranty's express term (governed by the warranty agreement).  Because the damages at issue undisputedly occurred years after Pride's warranty expired, the warranty exception does not excuse BP from its indemnity obligations to NOV.

## III.   BP Cannot Avoid Its Indemnity Obligations Under Article 1948

BP's argument that "error" vitiates the Mad Dog Contracts is frivolous.  BP cannot avoid summary judgment on this basis for a number of reasons, including: (1) a failure to comply with the specifications of a contract sounds in breach of contract, not error that vitiates consent; (2) BP has confirmed the contracts by seeking to enforce them against Pride in the arbitration action; and (3) error that vitiates consent relates to facts in

existence at the time of contracting, not unknown future events.  Moreover, error is an affirmative defense which BP failed to plead and, thus, cannot rely on here.[34]   La. Civ. Code art. 1005; *see also Sonnier v. Boudreax*, 673 So.2d 713, 717 (La. App. 1 Cir. 1996).

A.     **The Error Alleged by BP Could Constitute a Breach of Contract But Not a Basis for Rescission**

Under Louisiana law, consent to a contract may be vitiated by error, fraud or duress.  La. Civ. Code art. 1948.  The Louisiana legislature has dictated that error may vitiate a contract *only* if the error "concerns a cause without which the obligation would not have been incurred" and was "known or should have been known to the other party." *Id.* at 1949.  "Cause" is defined as the reason that the party obligated itself to the contract. *Id.* at 1976.  These statutes permit the nullification of a contract when one or both parties enter into the contract with a mistaken belief about an existing fact that is critical to the decision to enter into the contract, of which the other party is or should be aware.  *E.g., Bass, Ltd. v. Gerald*, 954 So.2d 243, 248 (La. App. 3 Cir. 2007) (error vitiated lease where parties thought lease covered different property than it actually covered).

The official comments to article 1950 of the Louisiana Civil Code explain:

[R]elief may be obtained when a party has consented to a contract different from the one he intended to make, as when, intending to conclude a sale, he has given his consent to a contract of lease. . . .

[R]elief may be obtained when either the thing for which a party has contracted or a substantial quality of that thing is different from what he understood it to be at the time of contracting, as when, intending to buy bars of silver, he has unknowingly bought bars of another metal, or, when, intending to buy a gold vase, he has unknowingly bought a gold-plated one.

---

[34] *See* BP and American Home's Answer to NOV's counterclaims [Doc. No. 63].

La. Civ. Code art. 1950, cmts. (b), (c).  Accordingly, under Louisiana law, rescission of a

contract is not permitted when there is error as to a *subsidiary*, rather than primary, cause.

*Coffee Bay Investors, LLC v. WOGC Co.*, 878 So. 2d 665, 671 (La. App. 1 Cir. 2004).

Similarly, a construction contract may not be rescinded when there has been substantial

performance.  *Salard v. Jim Walter Homes, Inc.*, 563 So. 2d 1327 (La. App. 3 Cir. 1990).

Here, the "cause" of BP's Mad Dog Contracts with Pride is described in the Scope

of Work, Exhibit A to the Construction Contract:

> The Contract object to be delivered by contractor shall be a complete and
> fully functional drilling rig (Base Case Rig) as described and specified
> within this scope of work. [35]

The contractual aim was thus for BP to use this "fully functional drilling rig" to drill for

and produce oil and gas in the Mad Dog field in the Gulf of Mexico.[36]  In fact, Pride

constructed and delivered to BP a "complete and fully functional drilling rig."

According to BP, the startup of oil and natural gas production began from the Mad

Dog rig on January 13, 2005.  In the five years since it accepted the drilling rig from

Pride and began operations, BP has made a king's ransom in revenue from this structure.

Additionally, during this period of time, the drilling rig weathered, without incident, four

named hurricanes before Ike (Hurricanes Gustav, Rita, Katrina, and Dennis), one or more

of which may have created sea conditions exceeding those anticipated in a 100-year

storm.  (*See* Appendix A)  At a minimum, Pride substantially fulfilled its contract with

BP, and BP enjoyed the benefit of a "fully functional" drilling rig.   Even taking BP's

---

[35] *See* Construction Contract, Exh. B to NOV's MPSJ, at "Exhibit A, Scope of Work," page 1.

[36] *Id.* at ¶ 1.1 and ¶ 1.2.

allegations of "error" as true, the alleged error relates to a "subsidiary" cause and not "the cause" of BP's contract with Pride. *Cf. Cascio v. Twin Cities Development, LLC*, 2010 WL 3666323, at *1 (La. App. 2 Cir. 2010) (slip copy) (error as to the existence of a mineral deposition was not the kind of error which could vitiate mineral estate lease to exploration company). Similarly, even taking BP's allegations of error as true, the alleged error was a defect in performance and not a failure of substantial performance. *See* La. Civ. Code art. 1994. BP's allegations simply do not rise to the level of rescinding the Mad Dog Contracts.

Moreover, Louisiana courts have expressly recognized that "a claim of error cannot be based on the fact that a party would never have entered into a contract had it anticipated a future event." *Shelton v. Congress Street Properties, Inc.*, 1993 WL 43637, at *2-3 (E.D. La. Feb. 16, 1993) (citing *Hanover Petro. Corp. v. Tenneco, Inc.*, 521 So.2d 1234 (La. App. 3 Cir. 1988)). No Louisiana court has ever applied the error doctrine in situations, like that asserted by BP, where the purported "error" was one contracting party's alleged subsequent failure to comply with a requirement of the contract.

The cases cited by BP are easily distinguishable from the situation here. *Thomas v. Pace*, 496 So.2d 609 (La. App. 1 Cir. 1986), *Stack v. Irwin*, 167 So. 2d 363 (La. 1964), and *Kardis v. Barrere*, 136 So. 135 (La. App. Orleans 1931), all involved situations where a purchaser was not able to enjoy the benefits of the bargain it had made because the thing sold was not suitable for its intended use. That is not the case here. While BP might have a claim against Pride for damages if its allegations were true, it does not plausibly have a claim for rescission.

### B.   BP Has Confirmed the Contracts by Seeking to Enforce Them Against Pride in the Arbitration Action

Nor has BP brought a claim against Pride for rescission – either in this action or in BP's arbitration action against Pride arising out of the same subject matter as this suit. Error under Articles 1948-1950 of the Louisiana Civil Code does not automatically nullify a contract.  Instead, it renders the contract a "relative nullity" and gives rise to an action for annulment.  *Salassi v. Salassi*, 13 So.3d 670 (La. App. 5 Cir. 2009) (citing La. Civ. Code arts. 1948, 2031, and 2032); *Ins. Storage Pool, Inc. v. Parish Nat'l Bank*, 732 So.2d 815, 821 (La. App. 1 Cir. 1999) (further noting that there is a five-year statute of limitations on such actions).  In its arbitration with Pride, however, BP does not seek rescission of the Mad Dog Contracts.  Instead, BP seeks $300 million in damages from Pride based on these contracts, including the warranties made therein.[37]  By seeking to enforce the Mad Dog Contracts against Pride, BP has confirmed the contracts and may not simultaneously seek to avoid the contracts in this action, to which Pride is not a party.

## IV.   BP May Not Discharge Its Indemnity Obligations on an Estoppel Theory

BP alleges in its opposition that Pride negligently failed to provide a rig that would withstand a 100-year hurricane and thus materially and significantly increased the risk of BP sustaining damages.  On this basis, BP seeks to avoid its indemnity obligations to NOV under the general legal principle that "any act on the part of an indemnitee which materially increases the risk, or prejudices the rights, of the indemnitor, will discharge the

---

[37] *See* Exh. J, Pride International's Form 10Q filed with the SEC in 2010, at p. 15.  BP should not be permitted to seek rescission here where Pride is not a party, while it seeks damages in the arbitration where Pride is a party.

indemnitor under the contract of indemnity." This legal general principle is akin to the principle of estoppel and depends on the existence of fraudulent activity by the indemnitee and reliance by the indemnitor. The principle does not apply here, where there is neither evidence nor allegation of fraud.

The legal doctrine that a surety is excused from its obligations to an indemnitee where the indemnitee acts to materially increase the surety's risk or prejudice the surety's rights was first introduced into case law by the Louisiana Supreme Court in *U.S. Fidelity & Guar. Co. v. Putfark*, 158 So. 9, 10 (La. 1934). In *Putfark*, two partners, Bird and Putfark, were subcontractors on a project for which they obtained a bond from U.S. Fidelity, for which Bird and Putfark agreed to personally indemnify U.S. Fidelity. *Id.* at 9-10. When U.S. Fidelity brought suit against Putfark to recover under his indemnity obligation, Putfark answered that U.S. Fidelity was estopped from seeking indemnity based on a letter in which U.S. Fidelity informed Putfark that it would look exclusively to Bird for indemnification. *Id.* The court agreed that U.S. Fidelity was estopped from seeking indemnification from Putfark because it had made a representation to Putfark on which Putfark had relied, citing the principle of law now relied on by BP. *Id.* at 10.

The cases following *Putfark*, cited by BP in its opposition, likewise apply this principle where there has been a representation by the indemnitee and detrimental reliance on that representation by the indemnitor. *Heirn v. St. Paul-Mercury Indemnity Co.*, 262 F.2d 526 (5th Cir. 1959) (applying the principle in light of fraudulent misrepresentation by principal and reliance by surety); *Hudson v. Forest Oil Corp.*, No. 02-2225, 2003 WL 21276385, *4 (E.D. La. June 2, 2003) (declining to apply the

principle where there was "no evidence that Forest Oil made any misrepresentation of material fact"), *aff'd,* 372 F.3d 742 (5th Cir. 2004).[38]  These cases have no application here, where there is no alleged misrepresentation by NOV or detrimental reliance by BP.

Moreover, allowing BP to use allegations of negligence by Pride to avoid its indemnity obligations under the Operation Contract would frustrate one of the express functions of the indemnity provisions – indemnification for the indemnitee's own negligence.  The indemnity provisions of the Operation Contract explicitly state that BP will indemnify the Contractor Group "regardless of the Negligence or Other Fault of the Contractor Group."[39]  Having specifically agreed to accept a loss caused by Pride's or NOV's sole fault, BP cannot now be heard to say that Pride or NOV's negligence relieves BP of its contractual obligations.  If it did, BP's obligation to indemnify Pride and its subcontractors for their own negligence would be illusory and unenforceable.

## V.     The Indemnity Provision Applies to "All Damages" Including the Loss of the Drilling Rig

The indemnity provisions of the Operation Contract obligate BP to "indemnify, release and hold Contractor Group harmless from and against **all Claims, Losses, and Expenses** for the following, when arising out of or incidental to this contract: . . . (ii) **all damages to the Production Facility, including the drilling rig**, in excess of One

---

[38]  In its opposition, BP also cites a Ninth Circuit case, *American Casualty Co. of Redding, Pennsylvania v. Idaho First National Bank*, 328 F.2d 138 (9th Cir. 1964), for this proposition. Although the *American Casualty* court cites this principle, that case is decided on other grounds. The indemnity obligation in *American Casualty* was not discharged, although the indemnitor was given credit in the amount of certain property misapplied by defendants.  *Id.*

[39] Operation Contract, Exh. A to NOV's MPSJ, at § 14.03.

Hundred Thousand Dollars ($100,000) per occurrence."[40]  Incredibly, BP argues that the phrase "all damages to the Production Facility, including the drilling rig" does not include a "loss" of the drilling rig.  This reading of the provision is contrary to the plain meaning of the word "damages."  Under Louisiana law, "the words of a contract must be given their generally prevailing meaning."  La. Civ. Code art. 2047.  *Webster's Third New International Dictionary* defines damage as "loss due to damage."  *Black's Law Dictionary* defines damage as "loss, injury or deterioration, caused by the negligence, design, or accident of one person to another in respect to the latter's person or property."  In its common usage, the term "damage" includes the concept of "loss."  And since the words of the indemnity agreement specifically apply to **"all** . . . Losses," and "all damages," it is clear that it was the intent of the parties to include within the indemnity obligations a loss such as the one for which BP claims damages in this case.  Moreover, the loss of the drilling rig constitutes "damage" to the Production Facility as a whole, which is the damage covered by the indemnity provision.

## Conclusion & Prayer

In this lawsuit, BP seeks to recover for the very risk BP promised to assume and insure against in the Mad Dog Contracts.  The contracts protect against just such an aberration by obligating BP to indemnify NOV for any losses incurred in a lawsuit like this one.  NOV therefore respectfully requests that the Court grant NOV's motion for partial summary judgment.

---

[40] Operation Contract, Exh. A to NOV's MPSJ, at § 14.03.01(ii).

Respectfully submitted,

By: /s/ _____
        Melissa M. Davis

| | |
|---|---|
| J.D. PAGE<br>*Lead Counsel*<br>Texas Bar No. 15406700<br>3155 Phoenix Tower<br>3200 Southwest Frwy<br>Houston, TX 77027<br>Tel: (713) 840-9200<br>Fax: (713) 840-9217 | **WARE, JACKSON, LEE, &<br>CHAMBERS, L.L.P.**<br>Eileen O'Neill<br>Melissa M. Davis<br>Texas Bar No.  24045756<br>America Tower<br>2929 Allen Pkwy, 42nd Fl.<br>Houston, TX 77019<br>Tel: (713) 659-6400<br>Fax: (713) 659-6262 |
| **MAHTOOK & LAFLEUR, LLC**<br>Charles A. Mouton<br>Louisiana Bar No.  17721<br>P.O. Box 3089<br>600 Jefferson St., Ste. 1000<br>Lafayette, LA 70502<br>Tel:  (337) 266-2189<br>Fax: (337)266-2303 | **LEWIS, KULLMAN, STERBCOW<br>& ABRAMSON**<br>Lawrence S. Kullman<br>Louisiana Bar No. 07884<br>2614 Pan American Life Center<br>601 Poydras St.<br>New Orleans, LA 70130<br>Tel: (504) 588-1500<br>Fax: (504) 588-1514 |

*Counsel for National Oilwell Varco, L.P.,*
*National Oilwell Varco, Inc., and National Oilwell Norway AS*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of November, 2010, I electronically filed the foregoing document with the clerk of the court for the United States District Court, Southern District of Texas, using the electronic case filing system of the Court. The electronic case filing system will send a "Notice of Electronic Filing" to counsel of record who have consented in writing to accept this Notice as service of this document by electronic means; I further certify that I have served counsel of record who have not so consented to electronic service pursuant to the Federal Rules of Civil Procedure.

/s/ _____
Melissa M. Davis

# APPENDIX A

