# APPENDIX
# OF
# UNPUBLISHED
# AUTHORITIES

*Cascio v. Twin Cities Development, LLC*,
  2010 WL 3666323 (La. App. 2 Cir. 2010)

*Chance v. Designer Wardrobe Trailers, Inc.*,
  2009 WL 799963 (E.D. La. 2009)

*Hudson v. Forest Oil Corp.*,
  No. 02-2225, 2003 WL 21276385 (E.D. La. June 2, 2003)

*Northeastern Power Co. v. Balcke-Durr, Inc.*,
  1999 WL 674332 (E.D. Pa. Aug. 23, 1999)

*Shelton v. Congress Street Properties, Inc.*,
  1993 WL 43637 (E.D. La. Feb. 16, 1993)

Westlaw.

--- So.3d ----, 2010 WL 3666323 (La.App. 2 Cir.), 45,634 (La.App. 2 Cir. 9/22/10)
**(Cite as: 2010 WL 3666323 (La.App. 2 Cir.))**

C
NOTICE: THIS OPINION HAS NOT BEEN RE-LEASED FOR PUBLICATION IN THE PERMA-NENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Court of Appeal of Louisiana,
Second Circuit.
Salvatore A. CASCIO and John B. Sardisco,
Co-Trustees of the Salvatore A. Cascio Trust, No. 2,
Plaintiffs-Appellants
v.
TWIN CITIES DEVELOPMENT, LLC, Christopher
Graham and Lee B. Santa Maria, Defen-
dants-Appellees.
**No. 45,634-CA.**

Sept. 22, 2010.

**Background:** Lessor brought action against lessee to rescind oil, gas, and mineral lease. The District Court, Bossier Parish, No. 127,985,Jeffrey S. Cox, J., granted summary judgment in favor of lessee, and lessor appealed.

**Holding:** The Court of Appeal, Lolley, J., held that lessor was not entitled to rescission of lease on the basis of error regarding the object of the contract.

Affirmed.

West Headnotes

[1] Mines and Minerals 260 ⌒55(2)

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
      260II(B) Conveyances in General
         260k55 Grants and Reservations of Miner-als and Mining Rights
            260k55(2) k. Construction and Opera-tion in General. Most Cited Cases

**Mines and Minerals 260 ⌒73**

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
      260II(C) Leases, Licenses, and Contracts
         260II(C)3 Construction and Operation of Oil and Gas Leases
            260k73 k. In General; General Rules of Construction. Most Cited Cases

**Mines and Minerals 260 ⌒83**

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
      260II(C) Leases, Licenses, and Contracts
         260II(C)4 Construction and Operation of Licenses and Contracts
            260k83 k. Rights and Liabilities of Par-ties. Most Cited Cases
Courts most often apply the general rules of contract interpretation when interpreting contracts involving mineral rights.

[2] Mines and Minerals 260 ⌒59

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
      260II(C) Leases, Licenses, and Contracts
         260II(C)1 In General
            260k59 k. Modification or Rescission.
Most Cited Cases
Lessor was not entitled to rescission of oil, gas and mineral lease on the basis of error regarding the object of the contract, even though it did not know the land it was leasing was not ordinary land, but land with exceptional qualities, namely that it overlaid one of the richest natural gas reservoirs in the country, and lessee had longstanding knowledge of the reservoir, where lessor's lack of awareness did not rise to level of error concerning a substantial quality of the object of the contract necessary to vitiate consent, and it should have been apparent to lessor that lessee entered into contract in order to explore for and hopefully discover and produce oil, gas and minerals from the land.

[3] Mines and Minerals 260 ⌒56

260 Mines and Minerals
   260II Title, Conveyances, and Contracts
      260II(C) Leases, Licenses, and Contracts

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2010 WL 3666323 (La.App. 2 Cir.), 45,634 (La.App. 2 Cir. 9/22/10)
**(Cite as: 2010 WL 3666323 (La.App. 2 Cir.))**

260II(C)1 In General
        260k56 k. Nature of Mining Leases and
Agreements. Most Cited Cases
The inherent nature and character of the right to ex-
tract oil and gas from the soil is such as not to be
susceptible of having an intrinsic, determinable, and
fixable value; the element which enters into the valu-
ation is too uncertain, conditional, and contingent.

**[4] Mines and Minerals 260 ⬿56**

260 Mines and Minerals
    260II Title, Conveyances, and Contracts
        260II(C) Leases, Licenses, and Contracts
            260II(C)1 In General
                260k56 k. Nature of Mining Leases and
Agreements. Most Cited Cases
At most any value which may be fixed on the right to
extract oil and gas from the soil is contemplative,
speculative, and conjectural, not to say fanciful and
theoretical.

Appealed from the Twenty-Sixth Judicial District
Court for the Parish of Bossier, Louisiana, Trial Court
No. 127,985, Honorable Jeffrey S. Cox,
Judge.Gregorio, Gregory & Payne, by Sam N. Gre-
gorio, Roy S. Payne, Joseph A. Gregorio, for Appel-
lants.

Jones, Walker, Waechter Poitevent, Carrere & Dene-
gre, by Michael B. Donald, Nicole M. Duarte, Joshua
A. Norris, for Appellee.

Before WILLIAMS, GASKINS and LOLLEY, JJ.

LOLLEY, J.

*1 In this appeal, plaintiffs, Salvatore A. Cascio and
John B. Sardisco, co-trustees of the Salvatore A.
Cascio Trust, No. 2, appeal the judgment of the 26th
Judicial District Court, Parish of Bossier, State of
Louisiana, which granted a partial summary judgment
by Twin Cities Development, LLC, Christopher
Graham, and Lee B. Santa Maria (collectively "Twin
Cities"). For the following reasons, we affirm the trial
court's judgment.

**FACTS**

Cascio and Sardisco are co-trustees of the Salvatore A.

Cascio Trust, No. 2 (the "Trust"), which owns a
76-acre tract in Bossier Parish ("trust property"). On
April 15, 2008, Cascio, acting on behalf of the Trust,
entered into an oil, gas, and mineral lease of the trust
property with Twin Cities, which was acting as an
undisclosed agent of Chesapeake Louisiana, L.P. The
lease granted Twin Cities the exclusive right to use the
trust property for exploration and production of oil,
gas, and minerals. The trust property overlays the
Haynesville Shale, which is alleged by plaintiffs to be
one of the richest natural gas reservoirs in the country.
The plaintiffs also allege while they did not know the
Haynesville Shale was situated below their property
before entering into the lease agreement, Twin Cities
had longstanding knowledge of this.

In October 2008, plaintiffs filed suit against Twin
Cities for rescission of the lease based on error con-
cerning a substantial quality of the object of the con-
tract. Twin Cities moved for partial summary judg-
ment on this claim. [FN1] The trial court, ruling in favor
of Twin Cities, determined that:

> [A]n error as to the existence of a mineral deposit is
> not an error as to a cause "without which the obli-
> gation would not have been incurred" under La.
> C.C. art.1949. In addition, an error as to the exis-
> tence of a mineral deposit is not an error as to a
> substantial quality which would vitiate consent
> under La. C.C. art.1950.

Thereafter, plaintiffs obtained certification of the
partial summary judgment as a final judgment, and
filed the instant appeal.

**DISCUSSION**

A motion for summary judgment is a procedural de-
vice used when there is no genuine issue of material
fact for all or part of the relief prayed for by a litigant.
Samaha v. Rau, 2007-1726 (La.02/26/08), 977 So.2d
880; Duncan v. U.S.A.A. Ins. Co., 2006-363
(La.11/29/06), 950 So.2d 544; see also La. C.C.P. art.
966. Appellate courts review summary judgments de
novo, while considering the record and all reasonable
inferences drawn from the record in the light most
favorable to the non-movant. Hines v. Garrett,
2004-0806 (La.06/25/04), 876 So.2d 764; Austin v.
Bundrick, 41,064 (La.App.2d Cir.06/30/06), 935
So.2d 836. Summary judgment is warranted only if
there is no genuine issue of material fact and the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2010 WL 3666323 (La.App. 2 Cir.), 45,634 (La.App. 2 Cir. 9/22/10)
**(Cite as: 2010 WL 3666323 (La.App. 2 Cir.))**

mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(C)(1). The burden of proof generally remains with the movant. La. C.C.P. art. 966(C)(2).

**\*2** [1] A mineral lease is a contract by which the lessee is granted the right to explore for and produce minerals in consideration of the payment of a rental or bonus. La. R.S. 31:114; _Odom v. Union Producing Co.,_ 243 La. 48, 141 So.2d 649 (La.1961); _Winnon v. Davis,_ 32,988 (La.App.2d Cir.05/15/00), 759 So.2d 321. A mineral lease is governed by the Mineral Code. La. C.C. art. 2672. However, La. R.S. 31:2 provides:

> The provisions of [the Mineral] Code are supplementary to those of the Louisiana Civil Code and are applicable specifically to the subject matter of mineral law. In the event of conflict between the provisions of this Code and those of the Civil Code or other laws the provisions of this Code shall prevail. If this Code does not expressly or impliedly provide for a particular situation, the Civil Code or other laws are applicable.

Therefore, courts most often apply the general rules of contract interpretation when interpreting contracts involving mineral rights. _See, Stephenson v. Petrohawk Properties, L.P.,_ 45,296 (La.App.2d Cir.06/02/10), 37 So.3d 1145, citing _Blanchard v. Pan-OK Production Co., Inc.,_ 32,764 (La.App.2d Cir.04/05/00), 755 So.2d 376, _writ denied,_ 2000-1297 (La.06/23/00), 765 So.2d 1043.

A contract is formed by the consent of the parties. La. C.C. art.1927. However, consent may be vitiated by error, fraud, or duress. La. C.C. art.1948. Error vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known to the other party. La. C.C. art.1949. Additionally, error may concern cause when it bears on the nature of the contract, or the thing that is the contractual object or a substantial quality of that thing. La. C.C. art.1950. Cause is defined as the reason why a party obligates himself. La. C.C. art 1967.

### Claim of Error

[2] Cascio and Sardisco claim that the contract, here the mineral lease, should be rescinded based on error regarding the object of the contract or a substantial quality thereof. Plaintiffs assert that the object of the mineral lease is the land and mineral formations, while the substantial quality of that object is the Haynesville Shale. They further argue that because they did not know the land they were leasing was not ordinary land, but land with exceptional qualities (namely the existence of the Haynesville Shale), this constitutes error that vitiates consent. Because of this, plaintiffs assert there exists a genuine issue of material fact and the trial court erred in granting summary judgment as to this issue of error.

The present case is very similar to _Thomas v. Pride Oil & Gas Properties, Inc.,_ 633 F.Supp.2d 238 (W.D.La., 2009). In _Thomas,_ plaintiff entered into a mineral lease with the defendant for land the plaintiff owned. At the time the mineral lease was entered into, Thomas did not know the Haynesville Shale existed below his property; however, Pride Oil did know. Thomas sought to have the contract rescinded on grounds of error, among other things. The _Thomas_ court, noting the "particularly speculative nature of mineral exploration and production," found that there was no error that vitiated consent and dismissed Thomas' claims.

**\*3** [3][4] As in the _Thomas_ case, here we accept as true plaintiffs' allegations that they did not know before entering into the mineral lease with Twin Cities that a potentially valuable shale deposit existed under the land and that Twin Cities did have such knowledge. However, this lack of awareness does not rise to the level of error concerning a substantial quality of the object of the contract that would serve to vitiate the plaintiffs' consent. It should have been apparent to the plaintiffs that Twin Cities entered into such a lease agreement in order to explore for and hopefully discover and produce oil, gas, and minerals from that land. Twin Cities was willing to assume the expenses and risks involved with leasing the land, subsequently exploring it for mineral deposits, and producing and selling what was found there in accordance with unstable market conditions. The ease and success of such an exploration as well as the potential profit to be made could not have been assumed at such an early stage. As the Louisiana Supreme Court explained in _Wilkins_:

> [T]he inherent nature and character of the right to extract oil and gas from the soil is such as not to be susceptible of having an intrinsic, determinable, and fixable value. The element which enters into the valuation is too uncertain, conditional, and contingent. At most any value which may be fixed on the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- So.3d ----, 2010 WL 3666323 (La.App. 2 Cir.), 45,634 (La.App. 2 Cir. 9/22/10)
**(Cite as: 2010 WL 3666323 (La.App. 2 Cir.))**

right is contemplative, speculative, and conjectural, not to say fanciful and theoretical.

The seller who sells such rights, and the buyer who buys, does so with a speculative intent, and it is a matter of common knowledge that every real estate owner uses his own judgment in estimating the sale value of his property. In the admitted speculative nature of the intangible right it is impossible that there could be any fixed and dependable valuation. The price may be at the very lowest today and by "leaps and bounds" reach the very peak of prices tomorrow, dependent on the production or non-production of oil and gas in the neighboring territory. After all is said the seller usually gets the best price in cash that he can get with the hope of getting a royalty in case oil or gas is discovered, and the buyer paying the price in cash estimated by the seller, assumes all of the chances and hazards of his undertaking.

*Wilkins v. Nelson,* 155 La. 807, 813-814, 99 So. 607 (1924).

Here, while Twin Cities knew of the potential existence of the Haynesville Shale below plaintiffs' property, there were other uncertainties that remained. Such uncertainties encompass the nature of mineral exploration. *Id.* Although plaintiffs did not know of the existence of the Haynesville Shale below the trust property, this lack of knowledge is unlike mistaking brass for gold, as plaintiffs analogized to the instant case. *See Gullette v. Woods,* 448 So.2d 856 (La.App. 2d Cir.1984). A mistake that a bar is made of gold when it is really made of brass is a finite determination. Here, however, both the plaintiffs and the defendants could speculate as to the existence and value of minerals found on the trust property. There could be no finite determination due to the aforementioned speculative nature of mineral exploration.

*4 Additionally, a claim of error that is asserted regarding the value of a mineral lease is synonymous with a claim of lesion beyond moiety. *Thomas,* 633 F.Supp.2d at 244. Because sales of mineral leases are not subject to rescission on this basis under La. R.S. 31:17, it follows that a claim of error on this basis cannot rescind the sale either. *Id.* Therefore, we find this contract may not be rescinded for error.

**CONCLUSION**

Considering the foregoing, we affirm the trial court's judgment granting the motion for partial summary judgment on the error claim asserted by Twin Cities Development, LLC. All costs of this appeal are assessed to Salvatore A. Cascio and John B. Sardisco, co-trustees of the Salvatore A. Cascio Trust, No. 2.

**AFFIRMED.**

> FN1. This motion also addressed claims of lesion; however, lesion is not an issue in this appeal because plaintiffs state in their appellate brief that they have asserted no lesion claims.

La.App. 2 Cir.,2010.
Cascio v. Twin Cities Development, LLC
--- So.3d ----, 2010 WL 3666323 (La.App. 2 Cir.), 45,634 (La.App. 2 Cir. 9/22/10)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Slip Copy, 2009 WL 799963 (E.D.La.)
**(Cite as: 2009 WL 799963 (E.D.La.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
Donna CHANCE
v.
DESIGNER WARDROBE TRAILERS, INC., et al.
**Civil Action No. 07-9427.**

March 24, 2009.

West KeySummary
Indemnity 208 ⟜33(3)

208 Indemnity
    208II Contractual Indemnity
        208k33 Particular Cases and Issues
            208k33(3) k. Lease Agreements; Vehicle
Rental Contracts. Most Cited Cases
A lease agreement between an employer and a third party allowed the third party to seek indemnity against the employer for damages arising from an employee's claim against the third party. The lease agreement clearly stated that the employer agreed to indemnify the third party against all liability loss, damage, expense, and costs arising out if or in connection with the third party's performance under the contract. Further, another part of the clause that limited indemnity for loss or damage caused solely by the third party did not eliminate this action as the third party alleged that the claim arose from the negligence of one of the employees. West's Ann.Cal.Civ.Code § 1638.

Joel P. Loeffelholz, Joel P. Loeffelholz, Attorney at Law, New Orleans, LA, for Plaintiff.

Charles R. Capdeville, Law Offices of Robert E. Birtel, Metairie, LA, for Defendant.

**ORDER AND REASONS**

LANCE M. AFRICK, District Judge.

**\*1** Before the Court are two motions for summary judgment filed by third party defendant, Paramount Pictures Corporation ("Paramount"), seeking dismissal of Designer Wardrobe Trailers, Inc.'s ("DWT") third party claims against Paramount on the grounds that the Louisiana Worker's Compensation Act bars DWT's claims against Paramount and that Paramount and DWT do not have a valid, enforceable agreement requiring Paramount to indemnify and defend DWT. [FN1] For the following reasons, the motion with respect to workers' compensation is **DENIED** and the motion with respect to Paramount's obligation to indemnify and defend is **GRANTED IN PART AND DENIED IN PART.**

FN1. Rec. Doc. Nos. 91, 110.

**BACKGROUND**

Plaintiff, Donna Chance ("Chance"), filed this lawsuit in state court, alleging that she was injured while working as a costumer during the filming of the motion picture, "The Curious Case of Benjamin Button," in New Orleans, Louisiana.[FN2] According to plaintiff's petition, she was rolling a garment rack of costumes onto a lift gate of a wardrobe trailer when the gate rose and her right foot became crushed between the gate and an open door of a storage compartment.[FN3] Plaintiff's petition alleges that DWT "was the designer/co-designer/manufacturer and operator" of the tractor trailer [FN4] and that the accident was caused by DWT's negligent design and manufacture of the trailer's lift gate area.[FN5]

FN2. Rec. Doc. No. 1-2, paras 3-5.

FN3. *Id.*

FN4. *Id.* at paras. 1-2. Plaintiff also named Wabash National Corporation ("Wabash")as "the designer/co-designer/manufacturer and operator" of the tractor trailer, but Wabash was voluntarily dismissed on March 24, 2008. Rec. Doc. No. 20.

FN5. *Id.* at para. 6.

On December 10, 2007, plaintiff's lawsuit was removed to this Court based on diversity jurisdiction pursuant to 28 U.S.C. § 1332.[FN6] DWT filed its answer

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 799963 (E.D.La.)
**(Cite as: 2009 WL 799963 (E.D.La.))**

in April, 2008, and incorporated a third party demand against Paramount, alleging that DWT leased the wardrobe trailer to Paramount and that the lease agreement required Paramount to indemnify DWT and to obtain insurance to fulfill its obligation to defend and indemnify DWT.[FN7]

> FN6. Rec. Doc. No. 1.

> FN7. Rec. Doc. No. 25, paras. III-V. DWT also named Travelers as a third party defendant based on its belief that Paramount secured Travelers as an insurer for DWT. However, this Court recently dismissed Travelers pursuant to Travelers' motion to dismiss, finding that DWT did not come within the definition of additional insured under the Travelers' policy.

DWT amended its third party complaint in July, 2008, alleging that an employee of Paramount [FN8] negligently raised the lift gate of the trailer while the exterior doors remained open. DWT alleges that the employee's negligence is imputable to Paramount.[FN9]

> FN8. DWT's initial third party complaint named Paramount Pictures Corporation, and DWT's amended third party complaint named Paramount Pictures Corporation/Viacom.

> FN9. Rec. Doc. No. 42, paras. 4-5.

Paramount filed two motions for summary judgment. In its first motion, Paramount argues that as plaintiff's employer, it is immune from all tort liability for injuries arising out of the course and scope of plaintiff's employment pursuant to the Louisiana Workers' Compensation Act. Paramount's second motion seeks dismissal of DWT's claim on the basis that the lease agreement between Paramount and DWT does not obligate Paramount to indemnify and defend DWT.

### *LAW AND ANALYSIS*

### I. *STANDARD OF LAW*

Summary judgment is proper when, after reviewing "the pleadings, the discovery and disclosure materials on file, and any affidavits," the court determines there

is no genuine issue of material fact. Fed.R.Civ.P. 56(c). The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 266, 274 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553, 91 L.Ed.2d at 274; *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1195 (5th Cir.1986).

**\*2** Once the party seeking summary judgment carries its burden pursuant to Rule 56(c), the other party must come forward with specific facts showing that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp. .,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986). The showing of a genuine issue is not satisfied by creating " 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211-12 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. *Id.* The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255, 106 S.Ct. at 2513, 91 L.Ed.2d at 216; *see Hunt v. Cromartie,* 526 U.S. 541, 552, 119 S.Ct. 1545, 1551-52, 143 L.Ed.2d 731, 741 (1999).

### II. *DISCUSSION*

### A. *Louisiana Worker's Compensation Act*

Paramount argues that in light of DWT's allegations that plaintiff's injury resulted from another Paramount employee's negligence in operating the trailer's lift gate, Paramount's liability is limited by the Louisiana Workers' Compensation Act ("LWCA"). Accordingly, Paramount contends that DWT's claim against

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 799963 (E.D.La.)
**(Cite as: 2009 WL 799963 (E.D.La.))**

Paramount must be dismissed because "Paramount is protected by the LWCA, which shields employers like Paramount from tort liability 'arising out of and in the course and scope of employment.' " [FN10]

> FN10. Rec. Doc. No. 91-2, p. 3.

The LWCA provides that if an employee "receives personal injury by accident arising out of and in the course of his employment," the employer is obligated to pay compensation to the employee. La.Rev.Stat. Ann. § 23:1031(A)(1998). Paramount is correct that the LWCA provides the "exclusive remedy" against employers. La.Rev.Stat. Ann. § 23:1032(A). Indeed, the LWCA provides in pertinent part:

> (1)(a) Except for intentional acts provided for in Subsection B, the rights and remedies herein granted to an employee or his dependent on account of injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights, remedies, and claims for damages, including but not limited to punitive or exemplary damages, unless such rights, remedies, and damages are created by a statute....

> (b) This exclusive remedy is exclusive of all claims, including any claims that might arise against his employer, or any principal or officer, director, stockholder, partner, or employee of such employer....

**\*3** *Id.* The law is clear that, pursuant to the LWCA, "an employee may not sue his employer in tort for non-intentional injuries sustained during the course and scope of employment." *Brown v. Conn. Gen. Life Ins.,* 793 So.2d 211, 213 (La.Ct.App. 4th Cir.2001). With respect to an employer and employee, the LWCA creates an exchange, where an employee is entitled to compensation for an on-the-job injury while an employer receives immunity from any other liability arising out of the injury unless resulting from intentional acts. *Id.*

Notwithstanding, an employer may be subject to "indirect liability" for its employee's injuries if the employer has contracted to indemnify a third party. *Norfleet v. Jackson Brewing Market, Inc.,* 748 So.2d 525, 526-27 (La.Ct.App. 4th Cir.1999); *Brown,* 793 So.2d at 214; *Jarreau v. City of Baton Rouge,* 602

So.2d 1124, 1126-27 (La.Ct.App. 1st Cir.1992) ("The fact that an employer is statutorily immune from tort liability does not limit its ability to agree contractually that it will hold a third party harmless from damages to an employee attributable to the employer's negligence."). For instance, in *Norfleet,* where a plaintiff sued her employer's lessor for injuries arising out of the course and scope of her employment, a Louisiana appellate court held that "the exclusive remedy provision" did not apply to a third party demand against the employer in light of the employer's lease agreement to indemnify its lessor. *Id.* at 526. In a similar case, the court concluded that an employer "cannot relinquish [its indemnity] obligation solely because [the plaintiff] happened to be [its] employee." *Brown,* 793 So.2d at 214. Likewise, if a valid indemnity agreement exists in the instant case, the LWCA does not provide Paramount a means of escaping its indemnity obligation merely because plaintiff's injuries allegedly arose out of the course and scope of her employment.[FN11]

> FN11. The Court notes that the only case that Paramount cites in support of its argument for immunity is not relevant to the instant case as there is no discussion of an indemnity agreement. *See Ballard v. Exxon Corp.,* No. 86-422, 1987 WL 194049 (E.D.La.1987).

**B. *Obligation to Indemnify and Defend***

Paramount contends that the lease agreement that it executed with DWT does not obligate Paramount to indemnify and defend DWT. The lease [FN12] provides:

> FN12. Rec. Doc. No. 110-4, para. 2.

All risk of loss or damage of said equipment from whatever cause during this agreement or before redelivery to Lessor, shall be assumed by lessee. During the term of this lease, Lessee agrees to indemnify Lessor, its officers, employees and agents, and hold them harmless for all claims, action suits, proceedings, posts, expenses, damages and liabilities, including reasonable attorneys fees, arising out of, or in connection with or resulting from equipment or materials including, but not limited to its ownership, use parking, storage, maintenance and/or operation of said equipment, unless arising out of the sole negligence of Lessor.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 799963 (E.D.La.)
**(Cite as: 2009 WL 799963 (E.D.La.))**

The lease agreement further provides that any legal dispute arising from the agreement shall be governed by California law. Because the Court has diversity jurisdiction over this matter, the Court applies the choice of law principles of the forum state, in this case Louisiana. *Abraham v. State Farm Mutual Automobile Ins. Co.,* 465 F.3d 609, 610 (5th Cir.2006)(citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). Louisiana law generally "allows parties to select the law that will determine the outcome of disputes arising from a contract." *Verdine v. Ensco Offshore Co.,* 255 F.3d 246, 250 (5th Cir.2001)(citing La. Civ.Code Ann. art. 3540).[FN13]

> FN13. Article 3540 provides: "All other issues of conventional obligations are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537."

> Neither party disputes the validity of the lease agreement's choice of law provision, nor does either party contend that the application of California law would contravene public policy.

**\*4** Under California law, an indemnity agreement is interpreted in accordance with the same rules governing other contracts. *Ralph M. Parsons Co. v. Combustion Equip. Assocs.,* 172 Cal.App.3d 211, 220, 218 Cal.Rptr. 170 (Cal.Ct.App.1985). If it is "clear and explicit, and does not involve an absurdity," the language of a contract must govern its interpretation. Cal. Civ.Code § 1638; *see Comedy Club, Inc. v. Improv West Assocs.,* 553 F.3d 1277, 1285 (9th Cir.2009). "When the contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." Cal. Civ.Code § 1639; *see Comedy Club,* 553 F.3d at 1285. " '[I]f reasonably practicable,' a contract must be interpreted as a whole, 'so as to give effect to every part, ... each clause helping to interpret the other.' " *Comedy Club,* 553 F.3d at 1285 (quoting Cal. Civ.Code. § 1641). Accordingly, "one phrase of a contract should not be interpreted so as to render another phrase of the contract meaningless." *Id.* (quoting *In re Affordable Hous. Dev. Corp.,* 175 B.R. 324, 329 (9th Cir.BAP1994)). However, if a contract is susceptible to two reasonable

interpretations, it is ambiguous. *Id.* In the event of ambiguity or uncertainty, "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." Cal. Civ.Code § 1654.

**1. *Enforceability of Agreement***

Paramount contends that due to the "sheer number of typographical errors," the lease agreement is not enforceable.[FN14] Although the clause at issue appears to be inartfully drafted due to poor word choice and grammatical errors such as comma placement, the Court is not persuaded that the agreement is unenforceable or ambiguous.[FN15]

> FN14. Rec. Doc. No. 110-2, p. 4.

> FN15. DWT's owner testified in a deposition that he did not retain an attorney to draft the lease agreement. Rec. Doc. No. 109-2, pp. 2-3.

The clause clearly indicates the parties' intention that Paramount indemnify DWT for all claims and liability arising out of or in connection with or resulting from Paramount's use or operation of the leased equipment, unless such liability arises solely out of DWT's negligence. Notwithstanding careless drafting errors, the Court has no difficulty understanding that this clause may obligate Paramount to indemnify DWT.[FN16]

> FN16. California law defines indemnity as "a contract by which one engages to save another from a legal consequence of the conduct of one of the parties...." Cal. Civ.Code § 2772.

The Court, however, finds no reference to any duty to defend in the lease agreement and DWT has not directed the Court to any particular clause with respect to a defense obligation. Nor does DWT make any argument with respect to Paramount's duty to defend in its opposition memorandum. Accordingly, DWT's claim for defense is **DISMISSED WITH PREJUDICE.**

**2. *Indemnification Against DWT's Negligence***

Paramount further contends that the indemnity

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 799963 (E.D.La.)
(Cite as: 2009 WL 799963 (E.D.La.))

agreement does not clearly and explicitly obligate Paramount to indemnify DWT against DWT's own negligence. California courts have recognized contracts providing "for indemnification against an indemnitee's own negligence." *Rossmoor Sanitation, Inc. v. Pylon, Inc.,* 13 Cal.3d 622, 628, 119 Cal.Rptr. 449, 532 P.2d 97(Cal.1975).[FN17] Such agreements "must be clear and explicit and [are] strictly construed against the indemnitee." *Id.; Edmondson Prop. Mgmt. v. Kwock,* 156 Cal.App.4th 197, 67 Cal.Rptr.3d 243, 251-52 (Cal.Ct.App.2007)("Language imposing this liability must be express and unequivocal so that the contracting party is advised fully in definite terms that it has agreed to indemnify the active negligence of the other party.").

> FN17. As previously stated, California law is applicable to this Court's interpretation of the indemnity agreement. Paramount relies upon California law. Rec. Doc. No. 110-2, p. 4. Accordingly, *Moore v. Kenilworth/Kailas Properties* is not dispositive of this case. *See Moore,* 978 So.2d 475 (La.Ct.App. 4th Cir.2008).

*5 On the other hand, California courts have traditionally held that a general indemnity agreement "that does not address and is silent with respect to the issue of the indemnitee's negligence" does not obligate a party to indemnify against an indemnitee's active negligence. *Parsons,* 172 Cal.App.3d at 220, 218 Cal.Rptr. 170; *Rossmoor,* 13 Cal.3d at 628, 629-33, 119 Cal.Rptr. 449, 532 P.2d 97; *Edmonson,* 67 Cal.Rptr.3d at 251; *Rooz v. Kimmel,* 55 Cal.App.4th 573, 64 Cal.Rptr.2d 177, 183 (Cal.Ct.App.1997). Instead, such an agreement only requires indemnification against an indemnitee's passive negligence.[FN18] *Id.* In clarifying this general rule, the California Supreme Court stated that "the question whether an indemnity agreement covers a given case turns primarily on contractual interpretation, and it is the intent of the parties as expressed in the agreement that should control." *Id.* at 633, 64 Cal.Rptr.2d 177.

> FN18. The California Supreme Court described passive negligence as "mere nonfeasance, such as the failure to discover a dangerous condition or to perform a duty imposed by law." The court stated that "active negligence ... is found if an indemnitee has personally participated in an affirmative

act of negligence, was connected with negligent acts or omissions by knowledge or acquiescence, or has failed to perform a precise duty which the indemnitee has agreed to perform." *Rossmoor,* 13 Cal.3d at 629, 119 Cal.Rptr. 449, 532 P.2d 97.

Paramount argues that the lease agreement not only lacks "clear and explicit language" obligating Paramount to indemnify DWT against DWT's own negligence, but the agreement specifically excludes such indemnity through the phrase "unless arising out of the sole negligence of the Lessor." [FN19] However, California courts have interpreted such language differently, finding that a specific exclusion for the indemnitee's sole negligence indicates an intent to indemnify against the indemnitee's own negligence when it is concurrent or combined with the negligence of the indemnitor or other parties. *See, e.g., Parsons,* 172 Cal.App.3d at 220-21, 218 Cal.Rptr. 170; *see Edmondson,* 67 Cal.Rptr.3d at 252.

> FN19. Rec. Doc. No. 110-2, p. 8.

In *Parsons,* a California appellate court considered an indemnity contract containing similar, albeit better drafted, language whereby a subcontractor agreed to hold the contractor and owner harmless and

> indemnify them against all liability, loss, damage, expense, costs (including without limitation costs and fees of litigation) ... arising out of or in connection with Subcontractor's performance of Work hereunder or its failure to comply with any of its obligations contained in the Agreement, *except such loss or damage which was caused solely by the negligence of Contractor or of Owner.* (Emphasis added)

172 Cal.App.3d at 219, 218 Cal.Rptr. 170. The court rejected the subcontractor's argument that the language created a general indemnity agreement that did not obligate the subcontractor to indemnify the contractor against its own negligence. *Id.* at 220, 218 Cal.Rptr. 170. Due to the language excluding indemnification for the contractor's sole negligence, the court found that the indemnity agreement was not silent as to the indemnitee's negligence. *Id.* The court explained that "[s]ince only loss or damage caused solely by [the contractor's] or [owner's] negligence was excluded, loss or damage resulting from the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 799963 (E.D.La.)
**(Cite as: 2009 WL 799963 (E.D.La.))**

combined negligence of [subcontractor/indemnitor] and [contactor/indemnitee] was necessarily included." *Id.* Further, the court explained that such exclusionary language "clearly and explicitly" addressed the issue of the indemnitee's negligence. *Id.* at 221, 218 Cal.Rptr. 170. [FN20]

> FN20. The court specifically stated:
>
> > Here, we believe, as did the trial court, that the indemnity agreement between Parsons and Combustion clearly and explicitly addresses the issue of Parson's negligence. It provides that Combustion shall indemnify Parsons for all liability in connection with the work unless it was caused solely by the negligence of Parsons or Kerr-McGee. It follows necessarily that all other liability, whether resulting from the negligence of Combustion or the concurrent negligence of Combustion and Parsons and without regard to whether the negligence of the parties was "active" or "passive," was intended to be the responsibility of Combustion. Good legal draftsmanship dictates that coverage be expressed by all-inclusive terms such as "all" ... and that exclusions be specifically enumerated. *Id.*

*6 The lease agreement executed by Paramount and DWT obligates Paramount to indemnify DWT "for all claims" arising out of or in connection with the use of the trailer equipment "unless arising out of the sole negligence" of DWT. In light of this language, the Court is convinced that the indemnity agreement specifically addresses the issue of DWT's own negligence and that Paramount has agreed to indemnify DWT against its own negligence so long as DWT's negligence is concurrent with the negligence of Paramount or another party. Although plaintiff's petition only alleges the negligence of DWT in designing and manufacturing the trailer, DWT's third party demand alleges the negligence of a Paramount employee in operating the trailer's lift gate. Further, nothing prevents the jury from allocating fault to parties other than DWT. In the event that the jury finds that plaintiff's injuries were caused not solely by DWT's fault, but also by the combined fault of Paramount or any other party, the lease agreement obligates Paramount to indemnify DWT.

*CONCLUSION*

For the foregoing reasons,

**IT IS ORDERED** that Paramount's motion for summary judgment with respect to the LWCA [FN21] is **DENIED.**

> FN21. Rec. Doc. No. 91.

**IT IS FURTHER ORDERED** that Paramount's motion for summary [FN22] is **DENIED** with respect to plaintiff's claim for indemnity and **GRANTED** with respect to plaintiff's claim for defense.

> FN22. Rec. Doc. No. 110.

E.D.La.,2009.
Chance v. Designer Wardrobe Trailers, Inc.
Slip Copy, 2009 WL 799963 (E.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2003 WL 21276385 (E.D.La.)
**(Cite as: 2003 WL 21276385 (E.D.La.))**

**H**Only the Westlaw citation is currently available.

United States District Court,
E.D. Louisiana.
Judy HUDSON, et al.
v.
FOREST OIL CORPORATION, et al.
**No. Civ.A. 02-2225.**

June 2, 2003.

*ORDER AND REASONS*

BARBIER, J.

**\*1** Before the Court is Intervenor Ace American Indemnity Insurance Company d/b/a Montlake Casualty Company's ("Ace") Motion for Summary Judgment (Rec.Doc. 37) on the merits of its intervention claim asserted against Forest Oil Corporation ("Forest Oil") and its insurer Zurich American Insurance Company ("Zurich"). The motion was set for a hearing on the briefs on April 30, 2003. Forest Oil and Zurich have filed an opposition memorandum (Rec.Doc. 38) and a reply memorandum (Rec.Doc. 46). Ace also filed a reply memorandum (Rec.Doc. 41). Upon consideration of the briefs submitted by counsel, the summary judgment evidence, the record, and the applicable law, the Court concludes that Ace's motion should be DENIED. Furthermore, Ace's intervention claim against Forest Oil and Zurich should be DISMISSED WITH PREJUDICE.

*Background*

Ace's intervention claim is the only remaining claim in the above-captioned matter. The lawsuit was originally filed by Terry Hudson ("Hudson") and his wife Judy against Forest Oil and Zurich to recover damages that resulted from an accident aboard Forest Oil's fixed platform the SATURDAY ISLAND in Barataria Bay, Louisiana. Hudson was formally employed as an operator by Coastal Production Services ("Coastal"). However, through a labor supply agreement between Coastal and Forest Oil, Hudson worked exclusively for Forest Oil aboard the SATURDAY ISLAND. On August 11, 2001, Hudson was injured while attempt-

ing to repair the saltwater disposal well motor aboard the SATURDAY ISLAND.

Subsequent to the accident, Hudson received workers' compensation benefits through Coastal and its insurer, Ace, until May 2002. Hudson's benefits were paid pursuant to the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901-950. Hudson and his wife then filed suit against Forest Oil on July 22, 2002. Forest Oil's liability insurer, Zurich, was joined as a defendant on August 27, 2002. On September 13, 2002, Ace filed its intervention claim against Forest Oil and Zurich, seeking to be reimbursed for the workers' compensation benefits it had paid to and on behalf of Hudson.

On March 7, 2003, Forest Oil and Zurich filed a motion for summary judgment seeking the dismissal of Hudson's claims against them. Forest Oil and Zurich's motion argued that Forest Oil was the "borrowing employer" of Hudson and thus entitled to immunity from tort liability under the LHWCA. Under the "borrowed employee" doctrine, Hudson's exclusive remedy for the injuries he suffered while aboard the SATURDAY ISLAND were the LHWCA workers' compensation benefits paid to him by Coastal and Ace. On April 28, 2003, the Court granted the summary judgment motion on the grounds that Forest Oil was the "borrowing employer" of Hudson and thus entitled to tort immunity. Hudson and his wife's claims against Forest Oil and Zurich were dismissed with prejudice.

Thus, only Ace's intervention claim against Forest Oil and Zurich remains. In the instant summary judgment motion, Ace contends that it is entitled to judgment as a matter of law under the principles set out by the United States Fifth Circuit Court of Appeals in *Total Marine Servs., Inc. v. Director, Office of Workers' Compensation Programs, U.S. Dep't of Labor,* 87 F.3d 774 (5th Cir.1996). Ace argues that *Total Marine* stands for the proposition that as a matter of law, Forest Oil, as Hudson's "borrowing employer" is required to reimburse Ace, the insurer of Hudson's "formal employer", for Hudson's LHWCA workers' compensation benefits. In opposition, Forest Oil and Zurich argue that indemnification and waiver of subrogation clauses contained in contracts between the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 21276385 (E.D.La.)
**(Cite as: 2003 WL 21276385 (E.D.La.))**

parties serve to except them from the reimbursement requirement spelled out in *Total Marine.* Ace replies by arguing that the indemnification and waiver of subrogation clauses are invalid and unenforceable under the Louisiana Oilfield Anti-Indemnity Act ("LOAIA"), La. R.S. § 9:2780. Alternatively, Ace contends that the Court should not apply these clauses under the theory that Forest Oil, in the execution of its agreement with Coastal, modified the core terms of such agreement. As such, Ace contends that this modification renders the other provisions of the agreement, and the collateral insurance policy, inapplicable to the instant case. Ace requests that this Court enter judgment as a matter of law in its favor and against Forest Oil and Zurich on the intervention claim.

*Discussion*

I. *Standard of Review*

**\*2** Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (citing FED. R. CIV. PROC. 56(c)). The moving party bears the initial burden of demonstrating to the court that there is an absence of genuine factual issues. *Topalian v. Ehrmann,* 954 F.2d 1125, 1132 (5th Cir.1992). Once the movant meets that burden, the non-moving party must provide evidence sufficient to establish that there is a genuine issue of material fact in dispute. *Id.* Accordingly, a factual controversy exists when both parties have submitted evidence of contradictory facts. *Little,* 37 F.3d at 1075. On summary judgment, factual controversies are resolved in favor of the non-moving party. *Id.*

II. *Ace's Motion for Summary Judgment*

Ace first contends that it paid Hudson's workers' compensation benefits pursuant to the LHWCA. Thus, under *Total Marine,* Forest Oil and Zurich are required to reimburse Ace for the benefits it paid to and on behalf of Hudson. In *Total Marine,* the Fifth Circuit held that a "borrowing employer" under the LHWCA is liable for the employee's workers' compensation benefits under 33 U.S.C. § 904(a). 87 F.3d at 779.

Where the "formal employer" has already paid such benefits, it is entitled to reimbursement from the "borrowing employer". *Id.* However, the Fifth Circuit conditioned its holding on the fact that no valid and enforceable indemnification agreement existed between the parties in *Total Marine. Id.* Where such an agreement exists, the "formal employer" is not entitled to reimbursement from the "borrowing employer". *Id.*

In the instant case, it is clear from the summary judgment evidence that Ace paid Hudson's benefits pursuant to the LHWCA. *See Rec. Doc. 41, exhibits I-III.* Therefore, *Total Marine* is applicable. Since Ace, as the insurer of Hudson's "formal employer", paid the workers' compensation benefits, it is entitled to reimbursement from Forest Oil and Zurich, absent a valid and enforceable indemnification agreement between the parties. The Court must thus address whether such a valid and enforceable agreement exists in this matter.

In the contract between Coastal and Forest Oil ("the master contract"), Coastal agreed to

indemnify, defend, and save harmless [Forest Oil] ... from and against any and all claims, demands, judgments, defense costs, or suits (including, but not limited to, claims, demands, judgments, or suits for ... bodily injury ... or for loss of services, or wages or for loss of consortium) by ... any [employee of Coastal] ... in any way, directly or indirectly, arising out of or related to the performance of [the master contract] or the use by [Coastal] or its employees of, or their presence on, any premises owned, operated, chartered or controlled by [Forest Oil] ... expressly including any claims, demands, judgments or suits actually or allegedly caused by the ... sole, concurrent or partial negligence ..., fault or strict liability of [Forest Oil].

**\*3** *See Rec. Doc. 37, exhibit D, paragraph 4.1.* Coastal additionally agreed to indemnify Forest Oil from and against other claims brought by any other person or entity against Forest Oil arising out of the performance of the master contract or the use by or presence of a Coastal employee on any premises owned and operated by Forest Oil, with the exception of claims attributable solely and exclusively to the negligence of Forest Oil. *See id., paragraph 4.2.* The master contract also included an insurance provision whereby Coastal was required to procure and maintain insurance policies in favor of Forest Oil. *See id., paragraph 3.1.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 21276385 (E.D.La.)
(Cite as: 2003 WL 21276385 (E.D.La.))

Each policy was to name Forest Oil as an additional insured (with the exception of workers' compensation policies) and waive subrogation against Forest Oil and its insurers. *See id.* Furthermore, the workers' compensation liability insurance policy issued to Coastal by Ace ("the Ace policy") included a waiver of subrogation clause whereby Ace agreed to waive its subrogation rights in exchange for an extra premium paid by Coastal. *See Rec. Doc. 38, exhibit A.*

Generally, indemnification and waivers of subrogation clauses in maritime contracts are enforceable under federal maritime law. 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 7-14 at 476 (3d ed.2001). However, Ace contends that the indemnification and waiver of subrogation clauses either 1) have been rendered inapplicable by Forest Oil's actions in executing the master contract, and, or, 2) are invalid and unenforceable under the LOAIA.

Ace first argues that the clauses have been rendered inapplicable to the instant case because of the Court's prior holding that Forest Oil is Hudson's "borrowing employer" under the LHWCA. *See Rec. Doc. 43.* Under the master contract, the parties "expressly understood that [Coastal] is an independent contractor and that neither [Coastal] nor [its] ... employees ... are servants, agents, or employees of Forest [Oil]." *See Rec. Doc. 37, exhibit D, paragraph 2.1.* Ace thus argues that the parties to the master contract intended to only "bear the risk of loss for its own employees, because the terms contemplated that each would be controlling of its own employees." *See id., at 5.* However, this Court has previously held that due to the actual circumstances underlying the execution of the master contract, Forest Oil exercised sufficient control over Hudson to be considered his "borrowing employer". Ace thus argues that because the Court essentially considered the independent contractor provisions of the master contract to be inapplicable, the indemnification and waiver of subrogation clauses should also be rendered inapplicable. This is so because the parties did not allegedly intend to bear the risk of loss for the other party's employees.

However, as Forest Oil and Zurich argue, independent contractor provisions in oil services contracts are given little weight in the "borrowed employer" context. *See Melancon v. Amoco Prod. Co., 834 F.2d 1238, 1245 (5th Cir.1988).* In *Melancon,* the Fifth

Circuit, in the context of a substantially similar independent contract provision, held that "[t]he reality at the worksite and the parties' actions in carrying out a contract, however, can impliedly modify, alter, or waive express contract provisions." *Id.* The court went on to invoke the "borrowed employee" doctrine and then upheld the indemnification clause contained in the contract between the "borrowing" and "formal" employers. *Id.* at 1247-48.

*4 Thus, the inapplicability of the independent contractor clause in the master contract between Coastal and Forest Oil does not require the Court to also conclude that the indemnification and waiver of subrogation clauses must also be inapplicable. Furthermore, Ace cites no authority on point for its contractual interpretation argument. Ace cites *Hiern v. St. Paul-Mercury Indemnity Co., 262 F.2d 526, 528 (5th Cir.1959)* for the rule that an indemnitee's false misrepresentations of material fact vitiate any liability owed by an indemnitor under an indemnity agreement. Ace also contends that under *Hiern,* "any act on the part of an indemnitee which materially increases the risk, or prejudices the rights, of the indemnitor, will discharge the indemnitor under the contract of indemnity." *Id.* at 529. Ace's problem is that there is no evidence that Forest Oil made any misrepresentations of material fact regarding Hudson's employee status, or acted in any way which caused an increase in the risk, or prejudiced the rights of Coastal and Ace, as indemnitors.

Additionally, it is difficult for Ace to make these legal arguments in light of the express waiver of subrogation clause it included in the Ace policy. Finally, Ace cannot reasonably argue that the parties fully intended Coastal and its employees to be independent contractors in light of paragraph 2.2 of the master contract. In paragraph 2.2, for purposes of Louisiana workers' compensation law, the parties agreed that "Forest [Oil] is the statutory employer of [Coastal's] employees ... and that Forest [Oil] shall be entitled to the protections that are afforded a statutory employer under Louisiana law." *See Rec. Doc. 38, exhibit D.* Coastal also agreed to indemnify Forest Oil pursuant to paragraphs 4 .1 and 4.2 of the master contract even where an employee of Coastal is also held to be an employee of Forest Oil, whether statutory, special, or "borrowed". *See id.* Thus, in entering into the master contract, Coastal clearly envisioned a "borrowed employee" relationship between its employees and Forest

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 21276385 (E.D.La.)
**(Cite as: 2003 WL 21276385 (E.D.La.))**

Oil.

Ace next argues that the indemnification and waiver of subrogation clauses are invalid and unenforceable. Generally, indemnity and waiver of subrogation clauses in maritime contracts are enforceable under federal maritime law. 1 SCHOENBAUM at 476. However, Ace contends that the Court must apply Louisiana law in resolving the validity and enforceability of the clauses in question. Specifically, Ace maintains that the clauses are invalid and unenforceable under the LOAIA, LA. R.S. § 9:2780. Forest Oil and Zurich agree with Ace that the Court must apply Louisiana law to resolve this issue. However, Forest Oil and Zurich contend that under *Fontenot v. Chevron U.S.A., Inc.,* 676 So.2d 557 (La.1996), the LOAIA does not apply to the clauses in the instant matter. Since both Louisiana and federal maritime law generally allow indemnification and waiver of subrogation provisions, the clauses contained in the master contract and the Ace policy must be upheld.[FN1]

> FN1. Forest Oil and Zurich make additional arguments as to the enforceability of the clauses. However, if the *Fontenot* case is on point and the LOAIA is not applicable, the clauses are valid and enforceable. Therefore, the additional arguments made by Forest Oil and Zurich will not need to be addressed.

**\*5** The LOAIA was passed in response to the Louisiana legislature's finding that "an inequity is foisted on certain contractors and their employees by the defense or indemnity provisions, either or both, contained in some agreements pertaining to wells for oil ... to the extent those provisions apply to death or bodily injury to persons." LA. R.S. § 9:2780(A). The legislature's intent behind the passage of the LOAIA was to "declare null and void and against public policy of the state of Louisiana any provision in any agreement which requires defense and/or indemnification, for ... bodily injury to persons, where there is negligence or fault (strict liability) on the part of the indemnitee, or an agent or employee of the indemnitee, or an independent contractor who is directly responsible to the indemnitee." *Id.* As the Louisiana Supreme Court stated in *Fontenot,* the LOAIA "arose out of a concern about the unequal bargaining power of oil companies and contractors and was an attempt to avoid adhesionary contracts under which contractors would have no choice but to agree to indemnify the oil

company, lest they risk losing the contract." 676 So.2d at 563.

Subsection B of the LOAIA provides that

[a]ny provision contained in, collateral to, or affecting an agreement pertaining to a well for oil ... is void and unenforceable to the extent that it purports to or does provide for defense or indemnity, or either, to the indemnitee against loss or liability for damages arising out of or resulting from death or bodily injury to persons, which is caused by or results from the sole or concurrent negligence or fault (strict liability) of the indemnitee, or an agent, employee, or an independent contractor who is directly responsible to the indemnitee.

LA. R.S. § 9:2780(B). Subsection G, which expands upon subsection B and specifically addresses waiver of subrogation provisions, additionally provides that [a]ny provision in any agreement arising out of the operations, services, or activities listed in Subsection C ... which requires waivers of subrogation, additional named insured endorsements, or any other form of insurance protection which would frustrate or circumvent the prohibitions of this Section, shall be null and void and of no force and effect.

§ 9:2780(G). Lastly, Subsection I expands the coverage of the LOAIA to "certain provisions contained in, collateral to or affecting agreements" covered by the LOAIA. § 9:2780(I).

The *Fontenot* court set out a two-part test to determine the applicability of the LOAIA. 676 So.2d at 564. There must be (1) an agreement that "pertains to" an oil, gas, or water well, and (2) that agreement "must be related to exploration, development, production, or transportation of oil, gas, or water. *Id.* An insurance contract that is ancillary to an agreement such as the master contract satisfies the *Fontenot* test. *Id.* Neither side disputes that the master contract and the Ace policy satisfy this two-part test.

**\*6** In *Fontenot,* the Louisiana Supreme Court was presented the issue of whether a waiver of subrogation clause contained in a workers' compensation insurance contract fell within the scope of the LOAIA, and if so, whether the purposes of the LOAIA would be promoted by the invalidation of such waiver. *Id.* The facts of *Fontenot* are very similar to those underlying the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 21276385 (E.D.La.)
**(Cite as: 2003 WL 21276385 (E.D.La.))**

instant case. Fontenot was employed by Hercules Offshore Drilling Company ("Hercules"). *Id.* at 559. Hercules entered into a workover contract with Chevron, USA, Inc. ("Chevron") to perform remedial well services on Chevron platforms located in the Gulf of Mexico. *Id.* Hercules, like Coastal, agreed to provide LHWCA insurance for its employees and to waive any subrogation rights it might have. *Id.* Hercules contracted with Aetna Casualty and Surety Company ("Aetna") to purchase workers' compensation insurance. *Id.* In the insurance policy, Aetna agreed to waive its subrogation rights in exchange for an increased premium paid by Hercules. *Id.*

Fontenot was injured in the course and scope of his employment with Hercules while being transferred from a Chevron platform to a transport vessel owned by a third party. *Id.* at 560. Aetna paid Fontenot's workers' compensation benefits and then intervened in his state court lawsuit against Chevron and two other defendants. *Id.* at 569. Aetna sought reimbursement from Fontenot for the benefits it had paid. *Id.* Fontenot settled his claims against the defendants and then filed a motion for summary judgment against Aetna, arguing that Aetna was not entitled to reimbursement because it had waived its right to subrogation under the workers' compensation insurance policy it issued to Hercules. *Id.* Aetna filed a cross motion arguing that its waiver of subrogation was invalid and unenforceable under the LOAIA. *Id.* The Louisiana Supreme Court rejected Aetna's argument and held that the LOAIA was inapplicable to the circumstances underlying that case. *Id.* at 560.

The court in *Fontenot* began by stating that the LOAIA only invalidates waivers of subrogation "which would frustrate or circumvent the prohibitions of [the act]." *Id.* at 564. The court concluded that the waiver in question did not frustrate the prohibitions of the LOAIA. *Id.* The court reasoned that "the [LOAIA's] prohibition of a waiver of subrogation clause only benefits the oil company, or indemnitee, when it is applied in conjunction with an indemnification clause." *Id.* In that type of case, the oil company, or indemnitee, is relieved from both tort and workers' compensation liability by the contractor and its insurer. *Id.* "Instead of being liable for either tort damages or workers compensation, the [contractor is] liable for both." *Id .* This type of set up flies in the face of the purpose behind the LOAIA-which is to "avoid adhesionary contracts under which contractors would

have no choice but to agree to indemnify the oil company, lest they risk losing the contract." *Id.* at 563. However, when used alone, a waiver of subrogation clause does not create this problem. *Id.* at 565. Thus, "voiding a waiver of subrogation clause only achieves the purpose of the [LOAIA] when such a clause is sought to be enforced in conjunction with the enforcement of an indemnification clause." *Id.*

**\*7** The court then concluded that Chevron never made an attempt to claim indemnification from Hercules. *Id.* While an indemnity agreement did exist between the two parties, Chevron never attempted to enforce it. *Id.* Therefore, the Court held that Aetna's waiver of subrogation clause did not frustrate the prohibitions of the LOAIA. *Id.* Furthermore, the court noted that Chevron was never adjudicated at fault because it settled Fontenot's claims. *Id.* Chevron would thus not be liable in any way for the payment of Fontenot's damages or reimbursement to Hercules or Aetna for the workers' compensation benefits. *Id.* There was no shifting of liability under an indemnification clause from Chevron to Hercules and thus no frustration of the purposes behind the LOAIA. *Id.*

While *Fontenot* did not involve a "borrowed employee" scenario, it appears that the case is applicable to the instant matter. Both cases involve indemnification agreements between an oil company and a contractor, as well as a waiver of subrogation clause included in a workers' compensation insurance policy. Like in *Fontenot,* Ace agreed to waive its subrogation rights for reimbursement in exchange for an increased premium paid by Coastal.[FN2] Ace argues that *Fontenot* is factually dissimilar because Forest Oil actually made a claim for indemnification from Coastal, where Chevron did not. It is clear that Forest Oil did originally seek indemnification from Coastal for and against Hudson's tort claim. However, Coastal rejected Forest Oil's demand and Forest Oil proceeded to defend the claim on its own. No third-party demand was ever filed against Coastal by Forest Oil. As stated earlier, Hudson's claim against Forest Oil was dismissed with prejudice. Like in *Fontenot,* Forest Oil was never adjudicated at fault. As a result, there was no shifting of liability under the indemnification clause and Coastal thus was never on the hook for any tort damages suffered by Hudson.

> FN2. In *Fontenot,* the court stressed the fact that Aetna received extra compensation from

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2003 WL 21276385 (E.D.La.)
**(Cite as: 2003 WL 21276385 (E.D.La.))**

Hercules in exchange for its waiver of sub-rogation rights. *Id.* at 565-66. The court stated that "the [LOAIA's] purposes are not served by giving the benefit of the waiver of subrogation to Aetna which was paid for its waiver." *Id .* at 566.

As in *Fontenot,* the waiver of subrogation clause in the Ace policy does not appear to frustrate the purposes behind the LOAIA. Therefore, the LOAIA is inapplicable to the instant case. Since Louisiana law and federal maritime law generally uphold indemnification and waiver of subrogation clauses, the clauses at issue in the instant matter must be upheld absent any other grounds for invalidation.

Lastly, Ace argues that under the principles of equitable subrogation it is entitled to be reimbursed by Forest Oil and Zurich. Ace frames the general rule of subrogation as "any person who, pursuant to a legal obligation to do so, has paid directly or even indirectly for a loss or injury resulting from the wrong or default of another, will be subrogated to the rights of the creditor or injured person against the wrongdoer or defaulter." *See Rec. Doc. 37, at 8.* The problem for Ace is that it cites no cases which support its argument that it can recover under equitable subrogation where it has expressly waived its subrogation rights in exchange for compensation. Thus, Ace's final argument for subrogation also fails.

*Conclusion*

**\*8** The indemnification and waiver of subrogation clauses contained in the master contract and the Ace policy are valid and enforceable. Thus, even though Forest Oil was held to be Hudson's "borrowing employer", Ace, as insurer for Hudson's "formal employer" Coastal, is not entitled to reimbursement from Forest Oil and Zurich for the workers' compensation benefits paid to and on behalf of Hudson. Accordingly, Ace's Motion for Summary Judgment should be denied and its intervention claim dismissed with prejudice.

Therefore;

It is HEREBY ORDERED that Intervenor Ace's Motion for Summary Judgment (Rec.Doc. 37) is DENIED.

It is FURTHER ORDERED that Ace's intervention claim against Forest Oil and Zurich is DISMISSED WITH PREJUDICE.

E.D.La.,2003.
Hudson v. Forest Oil Corp.
Not Reported in F.Supp.2d, 2003 WL 21276385 (E.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 1999 WL 674332 (E.D.Pa.), 39 UCC Rep.Serv.2d 713
**(Cite as: 1999 WL 674332 (E.D.Pa.))**

▷

United States District Court, E.D. Pennsylvania.
**NORTHEASTERN POWER** COMPANY, d/b/a
Nepco Services Co., Plaintiff,
v.
BALCKE-DURR, INC., d/b/a Balcke-Durr Heat Ex-
changer Div., Bdag Balcke-Durr AG, and
Balcke-Durr GmbH, Defendants.
**No. 97-CV-4836.**

Aug. 23, 1999.

<u>Thomas J. Maloney</u>, Maloney, Danyi, Davis & Danyi,
Bethlehem, PA, <u>Jill G. Okun</u>, <u>George M. Von Mehren</u>,
Squires, Sanders and Dempsey, LLP, Cleveland, OH,
for Northeastern Power Company d/b/a Nepco Ser-
vices Co., Plaintiff.

<u>Walter Weir, Jr.</u>, Weir & Partners, Philadelphia, PA,
<u>John C. Mc Intyre, Jr.</u>, Hart and Mc Intyre, Atlanta,
GA, <u>Timothy N. Toler</u>, Richelo, Morrissey & Toler,
P.C., Atlanta, GA, for Balcke-Durr, Inc. d/b/a
Balcke-Durr Heat Exchange Div., Defendant.

*MEMORANDUM & ORDER*

VAN ANTWERPEN, J.

## I. INTRODUCTION

*1 Plaintiff, Northeastern Power Company ("NEP-
CO"), filed this action against Defendants,
Balcke-Durr, Inc. ("BDI"), BDAG Balcke-Durr AG
("BDAG") and Balcke-Durr BD GmbH ("BD
GmbH"), for various claims under contract and tort
law relating to the purchase of a malfunctioning air
preheater. Am. Compl. at ¶¶ 32-83.[FN1] We have ju-
risdiction over this diversity action pursuant to <u>28
U.S.C. § 1332(a)</u>.

> FN1. Plaintiff's Amended Complaint filed on
> June 5, 1998 will hereinafter be referred to as
> "Am. Compl." at ¶ _."

There has been an opportunity for discovery in this
case. On April 30, 1999, BDAG was dismissed from

this action because this court lacked in personam
jurisdiction over BDAG. Presently, the following
papers are before the court:

> 1. Defendant Balcke-Durr, Inc.'s Motion and Brief
> for Partial Summary Judgment and Exhibits at-
> tached thereto filed on May 5, 1999 ("BDI's Br.");

> 2. Defendant's Balcke-Durr GmbH's Motion and
> Brief to Dismiss, or, in the Alternative, Motion for
> Summary Judgment filed on June 3, 1999 ("BD
> GmbH's Br.");

> 3. Northeastern Power Company's Memorandum in
> Opposition to Defendant Balcke-Durr, Inc.'s Motion
> for Partial Summary Judgment and Exhibits at-
> tached thereto filed on June 11, 1999 ("Pl.'s Mem.
> I");

> 4. Reply Brief of Balcke-Durr, Inc. in Support of
> Motion for Partial Summary Judgment filed on June
> 29, 1999 ("BDI's Reply");

> 5. Northeastern Power Company's Memorandum in
> Opposition to Defendant Balcke-Durr GmbH's
> Motion to Dismiss, or, in the Alternative Motion for
> Summary Judgment and Exhibits attached thereto
> filed on June 30, 1999 ("Pl.'s Mem. II");

> 6. Reply Brief of Defendant Balcke-Durr GmbH in
> Support of Motion to Dismiss, or, in the Alternative,
> Motion for Summary Judgment filed on July 21,
> 1999 ("BD GmbH's Reply");

The remaining Defendants, BDI and BD GmbH, have
moved for summary judgment. In the alternative, BDI
has filed a Motion to Dismiss pursuant to <u>Fed.R.Civ.P.
12(b)(2)</u>. After reviewing the record, we grant sum-
mary judgment on some of the claims alleged against
BDI and all of the claims alleged against BD GmbH.

## II. FACTS

NEPCO owns and operates a small electric cogenera-
tion facility in McAdoo, Pennsylvania, which pro-
duces power and steam. *See* Am. Compl. at ¶ 1. In
1995, NEPCO requested bids for the replacement of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 674332 (E.D.Pa.), 39 UCC Rep.Serv.2d 713
**(Cite as: 1999 WL 674332 (E.D.Pa.))**

their air preheater. *See* Aff. Missal 6/7/99 at ¶ 2. On or about June 15, 1995, NEPCO awarded BDI a contract for replacement of their air preheater. The purchase order agreement was subsequently entered into by both NEPCO and BDI with the understanding of how BDI was to design, manufacture and install a replacement air preheater. *See* BDI's Br., Ex. 1 ("Contract"); Am. Compl. at ¶ 11.

The purchase agreement contract included a one year express warranty "from first use, but in no event longer than eighteen months from the completion of installation" and an extended 60 month warranty against corrosion. *Id.* Clarifications & Exceptions § I.A.1. The contract otherwise disclaimed any other express or implied warranties. *Id.* Furthermore, the contract limited the damages in several ways: (1) deeming the exclusive remedy to be repair or replacement, *see id.* § I.A.1; (2) capping total damages, *see id.* § I.E.1.21; and (3) barring the recovery of consequential damages, *see id.*

*2 Upon receipt of NEPCO's Purchase Order, BDI contracted with BD GmbH, a German manufacturer, for the "plate packs" portion of the preheater. Dep. Brasseur at 181, 183. The NEPCO plate packs were manufactured by BD GmbH in response to a purchase order received from BDI dated July 11, 1995. *Id.* BD GmbH is wholly owned by BDAG. NEPCO added both BD GmBH and BDAG as Defendants when it filed an Amended Complaint on June 5, 1998. BDAG has since been dismissed from this action.

After entering into the purchasing order agreement, NEPCO learned of the complete failure of a similar air preheater at another power plant. Dep. Missal 245-48; Dep. Hawkins 20-22. Concerned about the potential for erosion or corrosion of the BDI preheater, NEPCO's Operations Manger Ed Missal telephoned BDI's General Manager, Dave Hawkins, and advised Mr. Hawkins of the severe erosion problem at the other plant. *See* Dep. Missal at 248-51 Dep. Hawkins at 21-23. On September 2, 1995, Mr. Hawkins responded by letter to NEPCO's concerns, which included the statement: "[w]e will of course monitor the exchanger over the first year for erosion and corrosion, not only for your benefit, but for our own." Pl.'s.' Mem. I, Ex. 9. Neither Mr. Missal nor Mr. Hawkins followed up on what was exactly meant by this last sentence. *See* Dep. Hawkins at 254.

Since the parties' contract provided that BDI was responsible for manufacturing and installing the preheater, BDI employee, Mark Perry, had primary responsibility for overseeing the manufacture and installation at NEPCO's facility. *See* Dep. Perry at 21-23; Dep. Cunningham at 31. The installation was set for NEPCO's annual outage in November 1995. Dep. Missal at 54. When the installation fell behind schedule, BDI requested and received assistance in completing the installation in November 1995. Dep. Perry 77-81. Since the preheater leaked from the outset, Mr. Perry made a map of leakage areas, known as a "punchlist," so that they could be fixed at the next outage scheduled for October 1996. *See id.* at 81-86, 126-27; Dep. Missal at 62-65, BDI's Br., Ex. 5.

During 1996, NEPCO noted a rise in the air leakage. After roughly two months of use, an independent air flow test performed by NEPCO indicated a leakage rate as high as 8.1%. *See* Pl.s' Mem. I, Exs. 18-19. It is unclear, however, how much of this information was communicated to BDI. In September 1996, Mr. Missal had reported to BDI that the air leakage rates had gone up, but did not send actual data supporting such observations. *See* Dep. Missal at 102, 126-29; Dep. Cunningham at 65-66. During that conversation, Mr. Cunningham responded by attributing such leakage to the missed welds during the initial installation process. Aff. Missal 6/7/99 at ¶ 31; Dep. Cunningham at 64-66. NEPCO had apparently reported increased air leakages to BDI more than several times since installation, but often without quantifying such increases. *See* Dep. Sanductch at 73-74.

*3 During the next scheduled outage in October 1996, the punchlist items, including the missed seal welds, were completed under the supervision of Mr. Cunningham. *See* Dep. Cunningham at 44-45; Dep. Missal at 128-130; Pl.'s Mem. I, Exs. 19 & 21. Moreover, Mr. Cunningham of BDI arranged for Dr. Brasseur of BD GmbH to visit the plant and inspect the air preheater. *See* Dep. Cunningham at 46. Dr. Brasseur conducted a visual inspection of the preheater and discussed his observations at the site with NEPCO personnel, including Mr. Missal, stating that "the air preheater is in good shape." *See* Dep. Brasseur at 44. Dr. Brasseur then issued a follow-up report in February 1997. Pl.'s Mem. II, Ex. 19. In that report, Dr. Brasseur reiterated that the air preheater was in good shape and that any air leakage was caused by missing welds. *Id.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 674332 (E.D.Pa.), 39 UCC Rep.Serv.2d 713
**(Cite as: 1999 WL 674332 (E.D.Pa.))**

By March 1997, NEPCO determined that the air leakage rate had skyrocketed to 24%. Am. Compl. at ¶ 23. NEPCO retained the services of Catalyst Air Management, Inc. to examine the problem of air leakage. *Id.* at ¶ 24. During this time, NEPCO was communicating these results of the examination to BDI. *See id.;* BDI's Br. at 12.

On April 22, 1997, NEPCO shut down the plant to conduct further inspections relating the air leakage of the air preheater. Am. Compl. at ¶ 25. At that time, Mr. Hawkins of BDI and Bernd Pfeiffer of GmbH came to assist in the inspection of the air preheater. *See* Dep. Hawkins at 3-4, 16-17; Aff. Pfeiffer 8/13/98 at ¶¶ 6-7. By using a "pixie dust" (florescent due) test, the presence of pinhole leaks were found in the bottom of the plates inside the air preheater. *See* Dep. Pfeiffer at 66. Based on the examination of the air leakage data available to NEPCO, it appears highly probable that some smaller holes existed in the preheater plates as early as August 1996. *See* Dep. Hawkins at 18; Dep. Brasseur at 106. NEPCO then filed this instant action on July 28, 1997.

### III. SUMMARY JUDGMENT

In their Complaint, NEPCO has alleged the following claims against the Defendants: (1) breach of contract against BDI (Count I); (2) breach of express warranty against BDI (Count II); (3) breach of implied warranty of merchantability against BDI (Count III); (4) breach of implied warranty of fitness for a particular purpose against BDI (Count IV); (5) revocation of acceptance against BDI (Count V); (6) negligence against BDI and BD GmbH (Count VI); (7) promissory estoppel against BDI (Count VII); and (8) fraud against BDI and BD GmbH (Count VIII). *See* Am. Compl. at ¶¶ 32-83. Presently, BDI moves for partial summary judgment on Count II and requests summary judgment on Counts III-IV and VI-VIII. In addition, BD GmbH moves for summary judgment on Counts VI & VIII. We will examine each argument in turn.

### A. Standard of Review

The court shall render summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is

"genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Id.* at 248. All inferences must be drawn and all doubts resolved in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985).

**\*4** On motion for summary judgment, the moving party bears the initial burden of identifying those portions of the record that it believes demonstrate the absence of material fact. *Celotex Corp. v.. Catrett,* 477 U.S. 317, 323 (1986). To defeat summary judgment, the non-moving party must respond with facts in the record that contradict the facts identified by the movant and may not rest on mere denials. *Id.* at 321 n. 3 (quoting Fed.R.Civ.P. 56(e)); *see also First Nat'l Bank of Pennsylvania v. Lincoln Nat'l Life Ins. Co.,* 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson,* 477 U.S. at 249.

### B. Express Warranty

BDI requests summary judgment on Plaintiff's claim of a breach of express warranty because the air preheater suffered detrimental defects, including severe air leakage, erosion and corrosion. *See* Am. Compl. at ¶ 37-42. BDI's express warranty in the purchasing-agreement contract is as follows:

> The Seller warrants to the original purchaser its design, materials and workmanship against detrimental defects. The warranty duration shall be one year from the first use, but in no event longer than 18 months from completion of installation....

> In the event of a detrimental defect in materials or workmanship, the Seller's sole liability and Purchaser's exclusive remedy for breach of said warranty or for other claims arising under this warranty for any cause whatsoever including negligence or strict liability, irrespective of whether such defects or claims are discoverable or latent shall be, at the Seller's option, to repair or provide and install replacement parts.....

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 674332 (E.D.Pa.), 39 UCC Rep.Serv.2d 713
**(Cite as: 1999 WL 674332 (E.D.Pa.))**

This warranty is conditioned upon prompt notice of the particular detrimental defects within ten days of discovery, proper use and maintenance of the equipment, reasonable access allowed to the Seller to inspect the equipment and no further damage to the equipment from acts of Purchaser or third parties after discovery of the defect.

In addition to our normal warranties included in our proposal we will provide an extended warranty for the Corten plates which form the exchanger heating surfaces, against failure resulting from cold end corrosion, for a period of 60 months from the date of start up. In this instance, corrosive failure would be classified as sufficient material loss to cause an increase in air leakage (excluding air bypass system) across the exchanger exceeding 5% of the normal air flow (measurement to be based on Oxygen and carbon dioxide content of the flue gas stream)....

Should failure occur due to corrosion as defined above, during the 60 month period, Balcke-Durr Inc. will supply replacement Corten plate packs FOB your plant. During the first 24 month of the warranty, Balcke-Durr will install the replacement plates. After 24 months installation would be by others without cost to Balcke-Durr Inc.

**\*5** *See* Contract, Clarifications & Exceptions § I.A.1. BDI provides for a one-year warranty from the first use of the air preheater for its general "design, materials and workmanship." *Id.* In addition, BDI extended the warranty period to five years for any defects resulting from "cold end corrosion." *Id.*

BDI does not seek summary judgment on Plaintiff's claim that BDI breached its express warranty with respect to corrosion of the air preheater. *See* BDI's Br. at 4, 61. BDI concedes that there exists outstanding issues of material fact as to whether the defective holes and perforations to the preheater plates resulted from erosion or corrosion. *See id.* at 62.

It also appears undisputed that the date on which BDI's one-year express warranty expired was December 1, 1996. Both parties vehemently disagree, however, on whether the appearance of defective holes and perforations in the preheater plates are covered by the one-year warranty. BDI argues that since the actual holes and perforations were first discovered on April 22, 1997, the one-year warranty does not extend to

their repair. *See id.* at 62-63. In contrast, NEPCO argues that BDI was notified of air leakage defects within the one-year period, which should have indicated the existence of such defective holes and perforations. *See* Pl.'s Mem. I at 26-27.

The Third Circuit has held that a defect which is not discovered until after the expiration of the express warranty period is not actionable under Pennsylvania law. *See Duquesne Light Co. v. Westinghouse Electric Corp.,* 66 F.3d 604, 616 (3d Cir.1995) (citing *Abraham v. Volkswagen of America, Inc.,* 795 F.2d 238, 250 (2d Cir.1986)). The case law almost uniformly holds that time-limited warranties do not protect buyers against hidden defects which are typically not discovered until after the expiration of the warranty period. *Id.* (citing *Canal Electric Co. v. Westinghouse Electric Co.,* 973 F.2d 988, 993 (1st Cir.1992)); *see also Walsh v. Ford Motor Co.,* 588 F.Supp. 1513, 1536 (1984); *Tokar v. Crestwood Imports, Inc.,* 532 N.E.2d 382, 388 (Ill.App.Ct.1988); *but see Lidstrand v. Silvercrest Industries,* 623 P.2d 710, 714 (Wash.Ct.App.1981).

A limited number of cases in other jurisdictions have addressed whether a time-limited warranty extends to a defect which is manifest and apparent during the warranty period, but remains undiscovered, not at the fault of the buyer. The First Circuit concluded that "a defect 'appears' during the warranty period if *either* 1) it is in fact perceived during that period, *or* 2) it would have been perceived during the course of an inspection that a reasonable user would *normally* have made during that period." *Canal Electric,* 973 F.2d at 992 (emphasis added).[FN2] Furthermore, the First Circuit emphasized that the inspection must be one that is normally made during the time period:

> FN2. Such a conclusion was based on the language of the warranty which stated: "[s]hould any failure to conform to this warranty *appear* within the warranty period." *Id.* at 991 (emphasis added).

In respect to [sic] a one-year warranty, a large crack in an engine block, plainly visible as soon as one lifts the car's hood, would "appear," within the year, even if the car's owner did not, in fact, lift the hood and see the crack. One normally (and reasonably) will lift the car's hood many times each year. But, tiny unseen cracks, inside a car's engine block,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 674332 (E.D.Pa.), 39 UCC Rep.Serv.2d 713
**(Cite as: 1999 WL 674332 (E.D.Pa.))**

would not "appear."
*6 *Id.* at 994.[FN3] In *Alberti v. General Motors Corp.,* the court found that the defect of a braking system was actionable although for many class plaintiffs, the defect did not arise until after the expiration of the express warranty period. The *Alberti* court based its finding on the fact that the seller knew that the braking systems of its cars were faulty when they were manufactured, rendering such defects patent rather than latent. *See* 600 F.Supp. 1026, 1028 (D.D.C.1984).

> FN3. Ultimately, the court found that the defect was not one that would be discovered upon a normal inspection. *See id.*

There is no language in the express warranty offered by BDI which would preclude us from following the analysis of *Canal Electric* or *Alberti.* BDI's warranty does not contain any language which explicitly specifies that the defect must be "found" or "discovered" during the one-year period. *Cf. Canal Electric,* 973 F.2d at 993. In fact, BDI's warranty merely states that its duration is one year and that "[i]n the event of a detrimental defect [,]" the seller will repair or provide replacement parts. *See* Contract, Clarifications & Exceptions § I .A.1. We find that a reasonable interpretation of BDI's express warranty's language would allow for coverage of manifest but undiscovered defects due to the fault of the seller.

Here, we find that there are outstanding issues of material fact as to whether the defective holes and perforations in the preheater plate manifested themselves during the express warranty period. It is vehemently contested whether the evidence of continued air leakages during that period meant that the holes and perforations were reasonably discoverable. BDI argues that air leakages which occurred from the date of installation through 1996 were entirely because of missing seal welds and not because of the holes and perforations which developed in the preheater plate. *See* BDI's Br. at 62; BDI's Reply Br. at 2-3. NEPCO refutes that BDI erroneously assured them that all air leakage was due to missing welds delaying the eventual discovery of the defective holes and perforations which had substantially contributed to the air leakage problems. *See* Pl.'s Mem. I at 28.

In general, an increase in air leakage can be attributed to missed seal welds as well as holes and perforations

in the preheater plates. *See* Dep. Hawkins at 18-19; Dep. Brasseur at 100, 106. Here, it is highly probable that some smaller holes existed in the preheater plates as early as August 1996, based on evidence made available to Defendants in April 1997. *See* Dep. Hawkins at 18; Dep. Brasseur at 106. What is unclear, however, is how much evidence was brought to the attention of BDI in late-1996 that potential defects existed in the preheater plates. It appears that NEPCO had noted and reported to BDI air leakage problems from the time of installation up through the latter half of 1996. *See* Dep. Missal 62, 102, 126-29. In September 1996, for example, NEPCO reported to BDI that the air leakage rates had gone up, but failed to send any actual data verifying their observations. *See, e.g., id.* at 102, 126-29; Dep. Cunningham at 65-66. Mr. Missal of NEPCO explained that he did not forward such data because he knew that BDI had planned a visit to repair various items in October 1996. *See* Dep. Missal at 129. Apparently, NEPCO had reported increased air leakages to BDI some fifteen to twenty times over the one and a half year period since installation, but often without providing exact quantification. *See* Dep. Sandutch at 73-74.

*7 During this period, BDI responded to NEPCO's concerns by attributing the problem of air leakage to missed seal welds. *See* Dep. Perry at 83-85, 192-96; Dep. Missal at 63-66, 131. Such missed seal welds were fixed by BDI in November 1995 and again in October 1996. *See* BDI's Br., Ex. 6. Moreover, while there appears to have been several methods available to detect whether holes are present in the preheater plates, BDI did not perform any such tests in response to NEPCO's air leakage complaints. *See* Dep. Brasseur at 73-74, 98-99. While NEPCO's reporting of air leakages may have been imprecise, we find that, at minimum, outstanding issues of material fact exist as to whether such reported leakages during the latter half of 1996 were sufficient to indicate the existence of defective holes and perforations in the preheater plates.[FN4]

> FN4. It appears that if NEPCO can establish that excessive air leakages occurred and were communicated to BDI, NEPCO may not even have to prove that such holes and perforations were the cause of the excessive air leakages in order to show a breach of express warranty. "The existence of a malfunction alone establishes a 'defective condition,' and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 674332 (E.D.Pa.), 39 UCC Rep.Serv.2d 713
**(Cite as: 1999 WL 674332 (E.D.Pa.))**

it is not necessary for the buyer to establish a specific defect or the reason why the goods did not properly perform in order to succeed in a breach of warranty claim." *See* *In re Repco Products Corp.,* 100 B.R. 184, 194 (E.D.Pa.1989).

In the alternative, BDI argues that even if the defective holes and perforations should have been discerned during the one-year warranty period because of excessive air leakages, NEPCO failed to provide prompt notice to BDI of such leakages in accordance with the express warranty requirements. BDI's Br. at 66-68. BDI's warranty provision states: "[t]his warranty is conditioned upon prompt notice of the particular detrimental defects within ten days of discovery." *See* Contract, Clarifications & Exceptions § I.A.1. We do not believe that the notification language of the express warranty requires NEPCO to have notified BDI of the holes and perforations which existed in the preheater plates. In fact, BDI does not even suggest that NEPCO had the expertise to have discovered such defects in the preheater plates. *See* BDI's Br. 67-68. Rather, we interpret the notification language of the express warranty to require NEPCO to have timely notified BDI of the excess air leakages which manifested detrimental defects to such preheater plates. Moreover, since the plain language of the express warranty does not specify in what form notification must occur, NEPCO only needs to have communicated such information of air leakages to BDI to fulfill the notice provision.

In that vein, NEPCO had reported, albeit informally, that the air leakage rates of the air preheater had gone up in late-1996. *See, e.g.,* Dep. Missal at 102, 126-29, 138, 221-24; Dep. Cunningham 65-66; Dep. Sandutch at 73-74. As discussed above, NEPCO had reported increased air leakages to BDI numerous times, although without providing specific data. *See id.* As we presume all disputed facts in favor of NEPCO, we still find that there are outstanding issues of material fact as to whether NEPCO complied with the ten-day notice requirement in notifying BDI of excess air leakage. Thus, we deny partial summary judgment for BDI on NEPCO's breach of express warranty claim.

C. Implied Warranty

Plaintiff claims that BDI breached the implied warranty of merchantability because the air preheater

failed to perform its ordinary purpose. *See* Am. Compl. at ¶¶ 44-47. Furthermore, BDI allegedly breached the implied warranty of fitness because the air preheater was not fit and adequate for the intended use specified by the Plaintiff. *Id.* at ¶¶ 48-52. BDI has moved for summary judgment on these claims, *see* BDI's Br. at 16-20, and Plaintiff has not opposed this portion of BDI's Motion. *See* BDI's Reply Br. at 42-43.

*\*8* In particular, BDI argues that the contract between BDI and Plaintiff provides for the exclusion of these implied warranties. *Id.* The contract states:

> FURTHER IT IS AGREED THAT THE SELLER MAKES NO OTHER WARRANTY, EXPRESS OR IMPLIED. THIS WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES INCLUDING THE WARRANTY OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

*See* Contract, Clarifications & Exceptions § I.A.1. Since the contract unambiguously excludes such warranties with conspicuous capital letters, *see* 13 Pa.C.S.A. § 2316; *Hornberger v. General Motors Corp.,* 929 F.Supp. 844, 889 (E.D.Pa.1996), we will grant summary judgment in favor of BDI on these claims.

D. Negligence

Both BDI and BD GmbH move for summary judgment on NEPCO's claim of negligence (Count VI). *See* BDI's Br. at 20-27; BD GmbH's Br. at 27-31. NEPCO alleges that the Defendants failed to exercise ordinary and reasonable care in inspecting, repairing and monitoring the preheater. *See* Am. Compl. at ¶¶ 62-66. Both BDI and BD GmbH argue that NEPCO's negligence claim is barred under Pennsylvania law.

In particular, Defendants argue that NEPCO's negligence claim is barred under the gist of the action test which prohibits a tort claim if the "gist" of the claim sounds in contract, not tort. In order to maintain a tort claim, the gist of the action test requires that "the wrong ascribed to the defendant must be the gist of the action with the contract being collateral." *Redevelopment Authority of Cambria v. Int'l Insurance Co.,* 685 A.2d 581, 590 (Pa.Super.Ct.1996); *see also* *Wood & Locker, Inc. v. Doran & Associates,* 708 F.Supp.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 674332 (E.D.Pa.), 39 UCC Rep.Serv.2d 713
**(Cite as: 1999 WL 674332 (E.D.Pa.))**

684, 689 (W.D.Pa.1989). In turn, NEPCO vehemently asserts that Pennsylvania has not yet adopted the gist of the action test and that decisions by the lower courts of Pennsylvania have alternatively applied the misfeasance/nonfeasance test. *See* Pl.'s Mem. I at 48-50. The misfeasance/nonfeasance test allows a cause of action in tort growing out of a breach of contract if "there was an improper performance of a contractual obligation (misfeasance) rather than the mere failure to perform (nonfeasance)." *Hirsch v. Mount Carmel Dist. Indus. Fund, Inc.,* 526 A.2d 422, 423 (Pa.Super.Ct.1987) (quoting *Raab v. Keystone Insurance Co.,* 412 A.2d 638, 639 (Pa.Super.Ct.1979).

NEPCO is correct in stating that the Pennsylvania Supreme Court has not yet addressed whether the gist of the action test applies. However, several courts in this District have chosen to adopt the gist of the action test in recent decisions. *See, e.g., Factory Market, Inc. v. Schuller Int'l Inc.,* 987 F.Supp. 387, 392-94 (E.D.Pa.1997); *Allied Fire & Safety Equipment Co., Inc. v. Dick Enterprises, Inc.,* 972 F.Supp. 922, 937 (E.D.Pa.1997); *New Chemic (U.S.), Inc. v. Fine Grinding Corp.,* 948 F.Supp. 17, 19-20 (E.D.Pa.1996); *Lex & Smith Professional Associates, Ltd. v. Wilmington Professional Associates, Inc.,* Civ. No. 98-6422, 1999 U.S. Dist. LEXIS 7181, at *3 (E.D.Pa. May 18, 1999). We find these decisions to be persuasive. First, these decisions rely on the fact that recent decisions by the Superior Court of Pennsylvania, *see e.g.,* (quoting *Phico Insurance Co. v. Presbyterian Medical Services Corp.,* 663 A.2d at 753, 757 (Pa.Super.Ct.1995); *Cambria,* 685 A.2d 590, have signified disapproval of the misfeasance/nonfeasance line of reasoning. *See Factory Market,* 987 F.Supp. at 394; *Allied Fire & Safety Equipment,* 972 F.Supp. at 937; *but see Tenos v. State Farm Insurance Co.,* 716 A.2d 626, 631 (Pa.Super.Ct.1998) (applying misfeasance/nonfeasance test without discussion of gist of the action test). Moreover, we find the following analysis in *Factory Market* to be convincing:

> *9 If the misfeasance/nonfeasance rule applied, one of the parties to a contract could defeat the reasonable expectations of the parties, who may have specifically contracted to limit their liability, by bringing suit in tort to recover damages beyond that which was negotiated and agreed upon by the parties. The gist of the action test allows courts to review the actual dispute in question to determine whether, under the facts of that particular case, the

claim should sound in tort or contract. Under this test, a party cannot disrupt the expectations of the parties by supplanting their agreement with a tort action that claims that the party misperformed the agreement in question.

*Factory Market,* 987 F.Supp. at 394. We follow, therefore, the majority of cases which have applied the gist of the action test in the context of contracts negotiated by sophisticated parties. *See Allied Fire & Safety Equipment,* 972 F.Supp. at 937.

As discussed above, "to be construed as a tort action, the wrong ascribed to the defendant must be the gist of the action with the contract being collateral." *Phico,* 663 A.2d at 757. Under the gist of the action test, "a contract action may not be converted into a tort action simply by alleging that the conduct was done wantonly." *Id.* It is significant for a court to consider the difference between contract and tort actions because a tort claim stems from the breach of duties imposed as a matter of social policy, while a contract claim involves the breach of duties imposed by mutual consensus. *See Cambria,* 685 A.2d at 590; *Factory Market,* 987 F.Supp. at 394.

Here, NEPCO's negligence claims sound primarily in contract, not in tort. All of NEPCO's assertions of negligence essentially amount to the Defendants' failure to keep the air preheater free from defects. *See* Am. Compl. at ¶¶ 62-66. These claims which specifically include the failure to monitor, inspect and repair the preheater and subsequently discover defects, stem from the duty owed to NEPCO by contract (e.g., purchasing-agreement contract and letter from BDI). *See id.; see also* Contract; Pl.'s Mem. I, Ex. 9. Certainly NEPCO cannot now claim that the purchasing-agreement contract and the letter from BDI are the collateral part of their negligence claim. *See Phico,* 663 A.2d at 757.

Although NEPCO tries to phrase such claims in a negligence-like manner in that they did not "exercise ordinary and reasonable care" in handling the air preheater, we are mindful that conduct done "wantonly" does not convert this claim into a negligence claim. Nor does any of the complained of conduct amount to more than a "breach of duties imposed by mutual consensus." *See Cambria,* 685 A.2d at 590. If we allowed this negligence claim to go forward, especially in light of the sophistication of all parties, we

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 674332 (E.D.Pa.), 39 UCC Rep.Serv.2d 713
**(Cite as: 1999 WL 674332 (E.D.Pa.))**

would be unfairly allowing a means of recovering damages beyond that which was negotiated and agreed upon by the parties. *See* BDI's Br. at 26-27.

**\*10** Both BDI and BD GmbH also argue that NEPCO is barred from recovering in tort for merely economic losses stemming from a breach of contract. *See* BDI's Br. at 23-27; BD GmbH's Br. at 29-30. We need not address this argument presently because NEPCO's negligence claim is barred under the gist of the action test. Thus, we grant summary judgment in favor of the Defendants on this claim.

E. Promissory Estoppel

BDI moves for summary judgment on NEPCO's claim of promissory estoppel (Count VII). NEPCO alleges that BDI made a promise on September 22, 1995 that it would monitor the condition and performance of the air preheater in a letter from Mr. Hawkins to Mr. Missal: "[w]e will of course monitor the exchanger over the first year for erosion and corrosion, not only for your benefit, but for our own." *See* Am. Compl. at ¶ 69; Pl.'s Mem. I, Ex. 9. Not only did such a promise allegedly induce NEPCO to complete the purchase of the air preheater, but it also caused NEPCO to refrain from monitoring the air preheater themselves. *See* Am. Compl. at ¶¶ 69-72. In turn, BDI argues for summary judgment on the grounds that: (1) NEPCO cannot claim promissory estoppel and also attempt to enforce the original purchasing agreement as a valid contract, *see* BDI's Br. at 28-29; (2) subsequent agreements are barred by the purchasing-agreement contract's integration clause, *see id.* at 31-32; and (3) no clear and definite promise was made by BDI, *see* BDI's Reply at 32-33.

We agree with NEPCO that the existence of the purchasing-agreement contract between BDI and NEPCO does not bar NEPCO's claim of promissory estoppel. *See* Pl.'s Mem. I at 54-55. NEPCO is alleging that the statement made by BDI in the letter by Mr. Hawkins is separate from the original contract. *Id.; see also* Pl.'s Mem. I, Ex. 9. Thus, the cases cited by BDI holding that the valid existence of a contract and promissory estoppel are mutually exclusive are presently inapposite to their argument. *See, e.g., Carlson v. Arnot-Ogden Memorial Hosp.,* 918 F.2d 411, 416 (3d Cir.1990); *Atlantic Paper Box Co. v. Whitman's Chocolates,* 844 F.Supp. 1038, 1042 (E.D.Pa.1994); *Iversen Baking Co., Inc. v. Weston Foods, Ltd.,* 874

F.Supp. 96, 102 (E.D.Pa.1995).[FN5]

> FN5. However, since we accept Plaintiff's position that the letter by Mr. Hawkins constitutes an allegedly valid and independent promise from the original purchasing-agreement, Plaintiff cannot now claim that such a letter induced them to move forward with the purchase of the air preheater. *See* Pl.'s Mem. I at 57; Am. Compl. at ¶¶ 70-71. Doing so would suggest that the statement by Mr. Hawkins is a modification of the original purchasing contract, which NEPCO has adamantly denied. *See* Pl.'s Mem. I at 58; Dep. Hawkins at 37; Dep. Missal at 259-60. Besides, it is irrefutable that BDI and NEPCO had already entered into a binding contract for this project by September 22, 1995. *See* BDI's Reply at 10; Am. Compl. at ¶ 11. Thus, the induced detrimental reliance which NEPCO can show under this promissory estoppel claim is limited to the failure of NEPCO to monitor or hire anyone else to monitor the air preheater based on BDI's statements.

In addressing BDI's second argument, we find that the language of the integration clause contained within the original contract does not prohibit a subsequent agreement between the parties. The integration clause states: "The purchase order contains the entire understanding between the parties. It shall supersede *all prior and contemporaneous* agreements, understandings, inducements and conditions express or implied, oral or written." Contract § 1 (emphasis added). While such language is considered controlling, *see, e.g., Fuller Co. v. Brown Minneapolis Tank & Fabricating Co.,* 678 F.Supp. 506, 511 (E.D.Pa.1987), it only prohibits the use of any prior or contemporaneous negotiations to contradict the purchasing-agreement contract, but does not apply to any agreements reached subsequent to that contract.

**\*11** Finally, we must examine whether as a matter of law, Plaintiffs have sufficiently shown that outstanding issues of material fact exist with respect to their promissory estoppel claim. A court may enforce a promise made without consideration under the doctrine of promissory estoppel when: "(1) the promisor makes a promise that he reasonably expects to induce action or forbearance by the promisee, (2) the promise

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 674332 (E.D.Pa.), 39 UCC Rep.Serv.2d 713
**(Cite as: 1999 WL 674332 (E.D.Pa.))**

does induce action or forbearance by the promisee, (3) and injustice can only be avoided by enforcing the promise." _Carlson,_ 918 F.2d at 415 (citing _Cardmone v. University of Pittsburgh,_ 384 A.2d 1228, 1233 (Pa.Super.Ct.1978)). While several federal courts applying Pennsylvania law have held that the appropriate burden of proof for a plaintiff's promissory estoppel claim is clear and convincing evidence, _see, e.g., Jersey Const., Inc. v. Pennoni Assoc., Inc.,_ No. Civ. A. 91-7331, 1993 WL 29999 (E.D.Pa. Feb. 4, 1993), _aff'd,_ 8 F.3d 811 (3d Cir.1993); _Josephs v. Pizza Hut of America, Inc.,_ 733 F.Supp. 222, 223-24 (W.D.Pa.1989), _aff'd,_ 899 F.2d 1217 (3d Cir.1990), such an approach somewhat conflicts with the approaches towards promissory and equitable estoppel taken by the Pennsylvania courts, _see, e.g., Thatcher's Drug Store of West Goshen, Inc. v. Consolidated Supermarkets, Inc.,_ 636 A.2d 156, 159-60 (1994); _Straup v. Times Herald,_ 423 A.2d 713, 719-20 (1980). _City of Rome v. Glanton,_ 958 F.Supp. 1026, 1037 n. 7 (E.D.Pa.), _aff'd,_ 133 F.3d 909 (3d Cir.1997). While we do not adopt the clear and convincing evidence requirement, we will be exacting in our analysis of whether Plaintiff has sufficiently shown that the elements of promissory estoppel may be satisfied.

As we presume disputes of material facts in favor of the non-movant, we cannot say that NEPCO's claim of promissory estoppel must fail as a matter of law. While it is true that actions for detrimental reliance may not be based on broad and vague implied promises, _see, e.g., C & K Petroleum Products, Inc. v. Equibank,_ 839 F.2d 188, 192 (3d Cir.1988), we believe a genuine issue of material fact remains as to whether the statement by Mr. Hawkins-"[w]e will of course monitor the exchanger over the first year for erosion and corrosion"-was one that reasonably induced reliance on the part of NEPCO. Pl.'s Mem. I, Ex. 9. Despite Mr. Hawkins testimony as to the statement that the sentence meant "we're going to stay in touch," _see_ Dep. Hawkins at 38, the language of the letter could reasonably interpreted as a promise. Such an interpretation is supported by the context because the letter by Mr. Hawkins' was responding to an inquiry made by Mr. Missal out of concern regarding a severe erosion problem which occurred to a similar air preheater at another power plant. _See_ Pl.'s Mem. I, Ex. 8.

We also find that the issue of whether BDI's promise induced NEPCO to refrain from instituting any other

monitoring procedure or protocol is disputed. BDI argues that NEPCO's claims to this effect are false because Mr. Missal testified that he never had conversations with Mr. Hawkins as to what "monitoring" a preheater might entail. _See_ Dep. Missal at 254. However, NEPCO has also provided this court with an affidavit by Mr. Missal which unequivocally states that NEPCO detrimentally relied on BDI's promise and subsequently failed to monitor the air preheater. _See_ Aff. Missal at ¶¶ 15-16. [FN6] Thus, while we note that NEPCO is skating on fairly thin ice with this argument, at this juncture, we must deny summary judgment because we find there are outstanding issues of material fact as to this claim. [FN7]

> FN6. Moreover, BDI argues that NEPCO did engage in monitoring the air preheater based on evidence of a report done by outside consultants. _See_ BDI's Br., Ex.8. However, we are not convinced that this report is exactly smoldering evidence against Mr. Missal's affidavit. To this court, the outside consultants seemed to have focused on the overall conditions at NEPCO (which includes an analysis of the air preheater _de facto_ ), rather than focused on monitoring the air preheater as characterized by BDI.

> FN7. Since this court is allowing NEPCO's claim of promissory estoppel to go forward, we do so on the basis of our finding that no consideration exists for the alleged promise made in the letter by Mr. Hawkins. _See_ Pl.'s Mem. I, Ex. 9. "Only when the formal requirements of consideration have not been met may a party attempt to invoke the doctrine [of promissory estoppel]." _Atlantic Paper Box Co.,_ 844 F.Supp. at 1043. While a plaintiff is initially allowed to alternatively plead promissory estoppel and breach of contract, we now reject NEPCO's position that this letter constitutes a valid contract. _See_ Pl.'s Mem. I at 55 n. 20.

### F. Fraud

*12 NEPCO specifically alleges three instances of fraudulent conduct by the Defendants: (1) Mr. Hawkins of BDI fraudulently promised to monitor the air preheater during the first year of operation, _see_ Am. Compl. at ¶¶ 75-78; Pl.s' Mem., Ex. 9; (2) Mr. Cun-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 674332 (E.D.Pa.), 39 UCC Rep.Serv.2d 713
**(Cite as: 1999 WL 674332 (E.D.Pa.))**

ningham of BDI fraudulently represented that the increasing air leakage was caused by missing welds and that the repairs to such welds were adequate to address the problem, *see* Am. Compl. at ¶¶ 79-82; BD GmbH's Br., Ex. 10; and (3) Dr. Brasseur of BD GmbH fraudulently represented that the air preheater was in good shape and that air leakage was due to missing welds, *see id.*[FN8] In turn, BDI argues that NEPCO's claims are barred under the gist of the action test. *See* BDI's Br. at 41-43. In the alternative, Defendants argue that NEPCO's claims of fraud cannot be established as a matter of law. *See id.* at 32-43; BD GmbH's Br. at 19-26.

> FN8. We note that NEPCO has not only failed to specify their allegations of fraud against Mr. Pfeiffer, an employee of BD GmbH, but also failed to refute Mr. Pfeiffer's statements that he never made misrepresentations with the intent to deceive and defraud NEPCO. *See* BD GmbH's Br., Ex. 10; Aff. Pfeiffer 8/13/98 at ¶ 9; BD GmbH's Reply at 17-18.

### 1. *Gist of the Action Test*

As discussed more extensively above, we choose to apply the gist of the action test as have the majority of recent decisions applying Pennsylvania law. *See, e.g., Factory Market,* 987 F.Supp. at 392-94; *Allied Fire & Safety Equipment Co.,* 972 F.Supp. at 937. Thus, in order for a tort claim to actionable, "the wrong ascribed to the defendant must be the gist of the action with the contract being collateral." *Phico,* 663 A.2d at 757. Under the gist of the action test, "a contract action may not be converted into a tort action simply by alleging that the conduct was done wantonly." *Id.*

Applying the gist of the action test here, we find that the evidence before us weighs more heavily towards considering the "gist" of NEPCO's claims of fraud as sounding in tort. In *Factory Market,* for example, the court found that the fraud claim was merely another way of stating a breach of guarantees contained in the contract. *See* 987 F.Supp. at 395. Here, NEPCO's claims of fraud go beyond the mere failure of the air preheater to operate properly-they include specific promises and representations that were allegedly made knowingly and/or recklessly with the intent to deceive and defraud NEPCO. At the same time, the claims of fraud do center around the failure of the air preheater

to be free from defects as expressly warranted in the contract drafted by the Defendants. Regardless, we will give NEPCO the benefit of the doubt in holding that their claims of fraud are not barred by the gist of the action test. As discussed below, however, NEPCO's claims ultimately fail as a matter of law.

### 2. *Fraudulent Misrepresentation*

In Pennsylvania, a plaintiff can establish a prima facie case of fraud by showing the following elements: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *See Gibbs v. Ernst,* 647 A.2d 882, 889 (Pa.1994). "Pennsylvania law requires 'the trial judge [to] decide as a matter of law before he submits a case to the jury whether plaintiffs' evidence attempting to prove fraud is sufficiently clear, precise, and convincing to make out a prima facie case.'" ' *Mellon Bank v. First Union Real Estate Equity & Mortgage Investments,* 951 F.2d 1399, 1409 (3d Cir.1991) (quoting *Beardshall v. Minuteman Press Int'l, Inc.,* 664 F.2d 23, 26 (3d Cir.1981)). Thus, clear and convincing evidence of fraud must exist. *See Tunis Brothers Co., Inc. v. Ford Motor Co.,* 952 F.2d 715, 731 (3d Cir.1991).

#### a. *Fraudulent Promise to Monitor*

**\*13** NEPCO alleges that Mr. Hawkins of BDI fraudulently promised to monitor the air preheater during the first year of operation. *See* Am. Compl. at ¶¶ 75-78; Pl.'s Mem. I, Ex. 9. Mr. Missal had several communications with Mr. Hawkins out of concern from an erosion problem in a similar air preheater in the Colmac plant. *See* Dep. Missal at 249-53. On September 22, 1995, Mr. Hawkins responded to such concerns in a written letter outlining the differences between NEPCO's air preheater and the one used in the Colmac facility. *See* Pl.'s Mem. I, Ex. 9. In the last line of this letter, Mr. Hawkins wrote: "[w]e will of course monitor the exchanger over the first year for erosion and corrosion, not only for your benefit, but for our own." *Id.* For the purposes of this analysis, we will presume that Mr. Hawkins' statement was a promise.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 674332 (E.D.Pa.), 39 UCC Rep.Serv.2d 713
**(Cite as: 1999 WL 674332 (E.D.Pa.))**

NEPCO first argues that Mr. Hawkins' promise constituted a material representation because such assurances were crucial to NEPCO's willingness to continue with the transaction to purchase an air preheater from BDI. It is clear from the record, however, that BDI and NEPCO had already entered into a "binding" contract for the air preheater as of June 15, 1995. *See* BDI's Reply at 10; Am. Compl. at ¶ 11. Although Mr. Missal states that without the assurances provided by Mr. Hawkins, NEPCO would have terminated the parties agreement, *see* Aff. Missal 6/7/99 at ¶¶ 13-14, we cannot find any clause in the purchasing-agreement which would have allowed for NEPCO to terminate the contract. *See* Contract. There was no way for NEPCO to terminate the contract without breaching it. We must conclude, therefore, that Mr. Hawkins' representation was not material to the transaction between NEPCO and BDI.

Next, NEPCO argues that Mr. Hawkins made such a promise to monitor with knowledge of its falsity or at least with a reckless disregard as to its truth. "[I]f one states an intention to take future action which does not actually comport with one's true state of mind at the time, it is a misrepresentation of an existing fact." *See Phoenix Technologies, Inc. v. TRW, Inc.,* 834 F.Supp. 148, 152 (E.D.Pa.1993); *see also Mellon Bank,* 951 F.2d at 1410; *Precision Printing Co., Inc. v. Unisource Worldwide, Inc.,* 993 F.Supp. 338, 356 (W.D.Pa.1998).[FN9] We find that this claim is similarly unsupported by the record because there is no evidence that Mr. Hawkins' intention was different from what he had promised in his September 22, 1995 letter. *See* Dep. Hawkins at 46. In fact, it appears that Mr. Hawkins' believed that the promise to monitor meant the following:

> FN9. We note that "promises to do future acts do not constitute a valid fraud claim" if the promisor merely fails to keep the promise. *See, e.g., Mellon,* 951 F.2d at 1399; *Precision Printing,* 993 F.Supp. at 356.

[W]e were saying once the equipment is installed, we're not just walking away and saying good-bye; we're going to stay in touch. When we have the opportunity on scheduled downtime, we will inspect the equipment and that's where, if you would like, not only for their benefit, for our own because we want to know how that equipment is performing.

*14 We would also review information that they would give us and respond to any inquiries that they had, any concerns. That's what that sentence meant.

*Id.* at 38-39.[FN10] There is nothing to contradict Mr. Hawkins' intentions with respect to monitoring, especially since Mr. Missal never followed up to find out what Mr. Hawkins exactly meant: "we didn't have any conversations about what he meant by that [statement]." Dep. Missal at 254. When Mr. Missal was asked to clarify what he thought BDI's promise to monitor included, he stated:

> FN10. In fact, BDI argues that it did from time to time monitor the air preheater in response to problems, by not only addressing the accumulation of slag and initial air leakage, but by also making various visits to the NEPCO facility. *See* Dep. Hawkins at 42-44, 51-58; Aff. Missal 6/7/99 at ¶ 27.

I felt that they were going to ... be involved with the unit throughout the first year, monitoring, you know, asking for stuff, either, you know, stopping by and looking at things or asking for us to send data to them, which never really happened.
*Id.* at 254-55. At most, it appears that NEPCO and Mr. Hawkins had different understandings of what monitoring meant.

Moreover, NEPCO alleges that circumstantial evidence exists which indicates Mr. Hawkins' fraudulent intent. *See* Pl.'s Mem. I at 38-39. While we agree that circumstantial evidence may be used to determine fraudulent conduct, *see, e.g., Leonard A. Feinberg, Inc. v. Central Asia Capital Corp.,* 974 F.Supp. 822, 843 (E.D.Pa.1997), we find the circumstantial evidence presented by NEPCO to be tenuous. NEPCO claims that because no monitoring protocol was set in place and other employees at BDI were not notified about this promise to monitor, "[t]he logical and reasonable inference from these facts is that Hawkins had no intention of monitoring the preheater at the time he made his promise." Pl.'s Mem. I at 39. Again, it appears that the failure of BDI to institute a protocol of monitoring or involve other BDI employees can easily be explained by the fact that Mr. Hawkins meant something different by his promise to monitor NEPCO's air preheater. *See* Dep. Hawkins at 38-39. From this misunderstanding between NEPCO and BDI, however, we cannot glean that Mr. Hawkins

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 674332 (E.D.Pa.), 39 UCC Rep.Serv.2d 713
**(Cite as: 1999 WL 674332 (E.D.Pa.))**

made a false promise to monitor the air preheater. We find, therefore, that there is insufficient evidence in the record to show that the representation to monitor was made with only fraudulent intent.

Even assuming that NEPCO can satisfy the last three elements of a prima facie case of fraud under *Gibbs,* we find that the fraud claim must still fail as a matter of law. 647 A.2d at 889. NEPCO has failed to show by clear and convincing evidence that Mr. Hawkins' representation was material to the transaction at hand. Even more importantly, NEPCO has failed to show that Mr. Hawkins made the statement falsely, with knowledge of its falsity. Thus, NEPCO has failed to establish a prima facie case of fraud with respect to Mr. Hawkins' statement.

### b. Fraudulent Representation that Air Leakage Was Caused by Missed Welds

NEPCO next argues that Mr. Cunningham of BDI committed fraud by representing that the increasing air leakage was caused by missing welds and that the repairs to such welds were adequate to address the problem of air leakage. *See* Am. Compl. at ¶¶ 79-82; BD GmbH's Br., Ex. 10.[FN11] In particular, Mr. Missal expressed concern about such increased air leakage in a telephone call to Mr. Cunningham in September 1996. *See* Dep. Missal at 127-131. In that telephone call, NEPCO claims that Mr. Cunningham at BDI fraudulently responded to such concerns by stating that such leakage could only have come from missed welds during the initial installation process. *See* Pl.'s Mem. I at 41; Aff. Missal 6/7/99 at ¶ 31; Dep. Cunningham at 64-66.

> FN11. We note that NEPCO also specifically alleged that Mr. Cunningham had falsely stated that the air preheater was in good shape in October 1996, but has not bothered to substantiate or elaborate on this allegation in their papers. *See generally* Pl.'s Mem. I at 41-48.

**\*15** We find that this claim of fraud alleged by NEPCO is not substantiated by clear and convincing evidence. In order to establish a prima facie case of fraud, a false representation must be made knowingly, in conscious ignorance of the truth, or with reckless disregard of the truth or falsity of the statement. *See Delahanty v. First Pennsylvania Bank,* 464 A.2d

1243, 1252 (Pa.Super.Ct.1993). While we agree that fraud can be perpetrated by less than intentional conduct, there is no evidence that Mr. Cunningham's deduction was reckless or made in "conscious ignorance" based on the information available in September 1996. In fact, an increase in air leakage can be attributed to either missed seal welds or to holes and perforations in the preheater plates. *See* Dep. Hawkins at 18-19; Dep. Brasseur at 100, 106. Moreover, NEPCO never sent any actual data verifying or quantifying their observations of increased air leakages which Mr. Missal spoke of in September 1996. *See* Dep. Missal at 102, 126-29; Dep. Cunningham 65-66; Dep. Sandutch at 73-74. We find it unreasonable for NEPCO to suggest that Mr. Cunningham was reckless to the falsity or truth of his statements because after "briefly" speaking with Mr. Missal about the minor increase in air leakage, *see* Dep. Missal, Ex. D, Mr. Cunningham failed to ask for preheater experts to review the situation or to ask NEPCO for any of their operational data. We find, therefore, that NEPCO has failed to establish by clear and convincing evidence that Mr. Cunningham's representations in September 1996 amounted to fraudulent conduct.[FN12]

> FN12. At best, we find that there are outstanding issues of material fact as to whether the air leakages reported by NEPCO in September 1996 might have reasonably indicated damage beyond missing seal welds for express warranty purposes. *See supra* Section III.B. A defect can be said to have arisen during the express warranty period if it could have been found during the course of an inspection that a reasonable user would normally have made during that period. *See Canal Electric,* 973 F.2d at 992. Such an analysis for express warranty purposes is quite distinct from the clear and convincing evidence required to establish a prima facie case of fraud by showing that the failure to find damage beyond missed seal welds resulted from "conscious ignorance." *See Delahanty,* 464 A.2d at 1252.

### c. Fraudulent Representation that Air Preheater Was in Good Shape

NEPCO alleges that Dr. Brasseur of BD GmbH also fraudulently represented that the air preheater was in good shape and that air leakage was due to missed

Not Reported in F.Supp.2d, 1999 WL 674332 (E.D.Pa.), 39 UCC Rep.Serv.2d 713
**(Cite as: 1999 WL 674332 (E.D.Pa.))**

welds after his visit to the NEPCO facility in October 1996. *See* Am. Compl. at ¶¶ 79-82; BD GmbH's Br., Ex. 10; Pl.'s Mem. II at 17-27. Dr. Brasseur, an expert on the design of plate-type preheaters, visited the NEPCO facility during the October 1996 outage to observe the air preheater. *See* Dep. Brasseur at 159. NEPCO specifically claims that during this visit, Dr. Brasseur falsely pronounced the air preheater to be in good shape and reiterated this finding in a report issued in February 1997. *See id.* at 41-45; Dep. Missal at 188; Pl.'s Mem. II at 17-18, Ex. 19. In that same report, NEPCO also claims that Dr. Brasseur had fraudulently represented that the air leakage was caused by the missing welds. *See* Pl.'s Mem. II at 23-24.

We find that NEPCO has once again failed to substantiate by clear and convincing evidence any evidence of fraud. As stated above, a false representation must be made knowingly, in conscious ignorance of the truth, or with reckless disregard of the truth or falsity of the statement. *See Delahanty,* 464 A.2d at 1252. The evidence which NEPCO dredges up to support the claim that Dr. Brasseur made false statements boils down into two basic categories. First, since the discovery of the pinhole leaks in April 1997 revealed that they most probably existed in late-1996, *see* Dep. Hawkins at 18; Dep. Brasseur at 106, NEPCO infers that Dr. Brasseur must have recklessly disregarded the true state of the air preheater during his October 1996 visit. Pl.'s Mem. II at 20. NEPCO, however, fails to present any evidence that Dr. Brasseur was aware or even suspected erosion, corrosion and or pinhole leaks during his October 1996 visit. *See* Dep. Brasseur at 137. Not only was the information about air leakage never communicated to Dr. Brasseur, *see id.* at 45-48; Pl.'s Mem. II at 20, 25, but there is also no evidence that Dr. Brasseur had any more information when he issued written conclusions in his February 1997 report. *See* Pl.'s Mem. II at 17-18, 23-24, Ex. 19. We believe that Dr. Brasseur's representations were made honestly and given the same circumstances again, he would have reached the same conclusion. *See* Dep. Brasseur at 137.

**\*16** Second, NEPCO claims that Dr. Brasseur made such statements recklessly because he based them solely on a visual inspection of the preheater and without obtaining "basic and necessary information." Pl.'s Mem. II at 19-21, 25. Dr. Brasseur's visit, however, was not connected with the official repair visit carried out by BDI, but rather to visually inspect the

preheater as a sub-contractor of the plate packs. *See* Dep. Cunningham at 46, 54, 90-91. Probably for that very reason, information regarding air leakage had been communicated only to Mr. Cunningham of BDI. Dep. Brasseur at 45-48; Dep. Cunningham at 65. All that NEPCO has successfully shown is that if all of the information NEPCO had was communicated to Dr. Brasseur, *see, e.g.,* Dep. Grett at 114-122, then a question could be raised as to whether Dr. Brasseur had been reckless about his statements. Reviewing the facts before us, we cannot say that Dr. Brasseur had any duty to either be in possession of such information, or to have obtained such information. We find, therefore, that NEPCO has failed to establish by clear and convincing evidence that Dr. Brasseur's various representations amounted to fraudulent conduct.

### IV. DAMAGES

There are several provisions which limit the damages that NEPCO is allowed to recover in the contract. The exclusive remedy of repair or replacement is set forth as follows:

> In the event of a detrimental defect in materials or workmanship, the Seller's sole liability and Purchaser's exclusive remedy for breach of said warranty or for other claims arising under this warranty for any cause whatsoever including negligence or strict liability, irrespective of whether such defects or claims are discoverable or latent shall be, at the Seller's option, to repair or provide and install replacement parts.

*See* Contract, Clarifications & Exceptions § I.A.1. Furthermore, the contract includes a limitation of liability provision which caps total compensatory damages and bars any consequential damages:

> Seller's liability on all claims of any kind (excluding death or bodily injury), whether based on contract, indemnity, warranty, tort (including negligence), strict liability or otherwise, for all losses or damages arising out of, connected with, or resulting from this order, or from the performance of breach thereof, or from any equipment or services covered by or furnished under this order or any extension or expansion thereof (including remedial warranty efforts), *shall in no case exceed the purchase order price.* Except as to title all such liability shall terminate upon the expiration of the warranty period.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 674332 (E.D.Pa.), 39 UCC Rep.Serv.2d 713
**(Cite as: 1999 WL 674332 (E.D.Pa.))**

In no event, whether based on contract, indemnity, warranty, tort (including negligence), strict liability or otherwise, shall Seller, its employees, subcontractors and suppliers be *liable for incidental, indirect, exemplary or consequential damages* including, but not limited to, loss of use of the equipment or any associated equipment, cost of capital, cost of purchased or replacement power, cost of substitute equipment, facilities or services, loss of anticipated profit or revenue, downtime costs, costs of refuse disposal, fines or penalties imposed by governmental authorities or claims of customers of Purchaser for such damages, and Purchaser will indemnify Seller, its employees, subcontractors and suppliers against any such claims.

*17 *See id.* § I.E.1.21 (emphasis added).[FN13] Defendants argue that this court should bar the availability of any consequential damages and limit total compensatory damages in accordance with the contract.

> FN13. Assuming that a jury finds that NEPCO's claim of promissory estoppel is valid, damages stemming from such a claim are not limited by the provisions contained within the contract. *See* Pl.s' Mem. I at 72. In fact, if NEPCO succeeds on their promissory estoppel claim, it may recover damages beyond the price of the air preheater as well as consequential damages.

NEPCO vehemently argues that because BDI failed to repair or replace the air preheater in compliance with the exclusive remedy provision, *see id.* § I.A.1, the exclusive remedy has failed its essential purpose, giving rise to full remedies allowable under Pennsylvania law. This argument raised by NEPCO turns on the interpretation of the Pennsylvania Commercial Code which addresses the limitation of remedies:

(a) General rule.-Subject to the provisions of subsections (b) and (c) and of section 2718 (relating to liquidation or limitation of damages; deposits):

(1) The agreement may provide for remedies in addition to or in substitution for those provided in this division and may limit or alter the measure of damages recoverable under this division, as by limiting the remedies of the buyer to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts.

(2) Resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

(b) Exclusive remedy failing in purpose.-Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title.

(c) Limitation of consequential damages.-Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

13 Pa.C.S.A. § 2719. Some courts have interpreted the failure of an exclusive remedy as being linked "to the availability of consequential damages, reasoning that because consequential damages are among those remedies 'provided in this title,' they may be awarded when 2-719(b) is activated by the failure of an exclusive remedy." *Otobai, Inc. v. Auto Tell Services, Inc.,* Civ. A. No. 93-2855, 1994 WL 249766, at *11 (E.D.Pa. Jun. 1, 1994). The other interpretation, followed by many courts, is that sections 2-719(b) and 2-719(c) are construed "as operating independently, so that regardless of the failure of an exclusive remedy, the enforceability of a limitation on consequential damages is measured only be the conscionability standard." *Id.*

While the Pennsylvania Supreme Court has not yet decided this issue, *see* Pl.s' Mem. I at 65; *New York State Electric & Gas Corp. v. Westinghouse Electric Corp.,* 564 A.2d 919, 929 n. 7 (Pa.Super.Ct.1989), we find the authority favoring an independent reading of sections 2-719(b) and 2-719(c) to be more persuasive. This approach has been favored by courts in this District. *See, e.g., Otobai,* 1994 WL 249766, at *11; *Factory Market,* 987 F.Supp. at 399 (non-U.C.C.case). The Third Circuit in *Chatlos Systems, Inc. v. National Cash Register Corp.,* 635 F.2d 1081, 1087 (3d Cir.1980), concluded that "[i]t appears to us that the better reasoned approach is to treat the consequential damage disclaimer as an independent provision, valid unless unconscionable." [FN14] Other jurisdictions have agreed with the *Chatlos* decision by finding that the failure of the limited remedy provided

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 674332 (E.D.Pa.), 39 UCC Rep.Serv.2d 713
**(Cite as: 1999 WL 674332 (E.D.Pa.))**

in the contract does not result in invalidating a wholly distinct term in the agreement excluding consequential damages, unless factual circumstances of unconscionability or unequal bargaining power exist. *See, e.g., Fiorito Bros., Inc. v. Fruehauf Corp., 747 F.2d 1309, 1314-15 (9th Cir.1984); Smith v. Navistar Int'l Transportation Corp., 957 F.2d 1439, 1443-44 (7th Cir.1992); cf. McNally Wellman Co. v. New York Electric & Gas Corp., 63 F.3d 1188, 1197-98 (2d Cir.1995).* NEPCO does not argue that unequal bargaining power or a lack of meaningful choice made the limitations unconscionable because it is evident that both NEPCO and BDI are sophisticated commercial parties. Thus, although NEPCO may be able to show that BDI failed to repair or replace the air preheater in compliance with the exclusive remedy in the contract, we find that NEPCO is still subject to the damages limitations in the contract.

> FN14. The Third Circuit decided the issue under New Jersey law. *See id.* at 1086-87. The provisions of the New Jersey Uniform Commercial Code which were at issue are identical to the provisions contained in the Pennsylvania's version of the Commercial Code. *See Factory Market,* 987 F.Supp. at 399 n. 10.

*18 Moreover, we realize that the Uniform Commercial Code favors that "at least minimum adequate remedies be available." *See* U.C.C. § 2-719 cmt. 1. In the case at bar, NEPCO may, upon proving that BDI breached the contract and warranty provision, still request general damages up to the amount of the purchase price of the air preheater. *See* Contract, Clarifications & Exceptions § I.E.1.21; *see also* BDI's Reply at 39-40. Despite being limited from requesting consequential or incidental damages, we conclude that NEPCO still has "adequate remedies" available.

Furthermore, NEPCO argues that the limitation of consequential damages and inclusion of a damages cap are unconscionable since the agreement was vitiated by fraud. Pl.'s Mem. I at 70-72; *see Kruger v. Subaru of America, Inc.,* 996 F.Supp. 451, 458 (E.D.Pa.1998); *Hornberger v. General Motors Corporation,* 929 F.Supp. 884, 891 (E.D.Pa.1996). We note, however, that we have granted summary judgment in favor of Defendants on all fraud claims in this case. [FN15] Thus, even assuming that NEPCO's recitation of the law is correct, absent a showing of fraud,

NEPCO cannot recover damages beyond the limitations placed in the contract.[FN16]

> FN15. Even if the contractual limitations were to stand, NEPCO's argument that such limitations could not apply to their claim for fraud is now inapposite. *See* Pl.'s Mem. I at 71-72.

> FN16. Moreover, NEPCO is also barred from recovering any punitive damages which may only be recovered for valid tort claims. *See Factory Market,* 987 F.Supp. at 400; Pl.'s Mem. I at 72. It necessarily follows that since only tort claims were alleged against BD GmbH, no damages of any kind may be recovered against BD GmbH. *See* Am. Compl. at ¶¶ 62-68, 75-83.

## V. MOTION TO DISMISS

In the alternative, BD GmbH has moved for dismissal pursuant to Fed.R.Civ.P. 12(b)(2). BD GmbH not only argues that their company lacks the requisite minimum contacts with the Commonwealth of Pennsylvania, but that this court's exercise of personal jurisdiction over BD GmbH would also offend traditional notions of fair play and substantial justice. *See* BD GmbH's Br. at 5-19. We find, however, that the question of in personam jurisdiction need not be reached in this case. As a consequence of granting summary judgment in favor of BD GmbH, there are no remaining claims against BD GmbH.

## VI. CONCLUSION

For the foregoing reasons, we hold that the only issues that remain are Counts I-II, V and VII against BDI. We have granted summary judgment on all other claims. An appropriate order follows.

### ORDER

AND NOW, this 20th day of August, 1999, upon consideration of Defendant Balcke-Durr, Inc.'s Motion and Brief for Partial Summary Judgment and Exhibits attached thereto filed on May 5, 1999, Defendant's Balcke-Durr GmbH's Motion and Brief to Dismiss, or in the Alternative, Motion for Summary Judgment filed on June 3, 1999, Northeastern Power

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 674332 (E.D.Pa.), 39 UCC Rep.Serv.2d 713
**(Cite as: 1999 WL 674332 (E.D.Pa.))**

Company's Memorandum in Opposition to Defendant Balcke-Durr, Inc.'s Motion for Partial Summary Judgment and Exhibits attached thereto filed on June 11, 1999, Reply Brief of Balcke-Durr, Inc. in Support of Motion for Partial Summary Judgment filed on June 29, 1999, Northeastern Power Company's Memorandum in Opposition to Defendant Balcke-Durr GmbH's Motion to Dismiss, or, in the Alternative Motion for Summary Judgment and Exhibits attached thereto filed on June 30, 1999 and Reply Brief of Defendant Balcke-Durr GmbH in Support of Motion to Dismiss, or in the Alternative, Motion for Summary Judgment filed on July 21, 1999, it is hereby ORDERED that:

**\*19** (1) BDI is GRANTED summary judgment on the following claims: breach of implied warranty of merchantability (Count III); breach of implied warranty of fitness for a particular purpose (Count IV); negligence (Count VI); and fraud (Count VIII);

(2) BDI is DENIED summary judgment on the breach of express warranty claim (Count II) and the promissory estoppel claim (Count VII); [FN17] and

> FN17. We note that NEPCO is barred from requesting consequential damages and monetary damages which exceed the purchase price of the air preheater for all claims except Count VII. *See supra,* Section IV.

(3) BD GmbH is GRANTED summary judgment on the negligence claim (Count VI) and the fraud claim (Count VIII). BD GmbH is hereby dismissed from this action.

E.D.Pa.,1999.
Northeastern Power Co. v. Balcke-Durr, Inc.
Not Reported in F.Supp.2d, 1999 WL 674332 (E.D.Pa.), 39 UCC Rep.Serv.2d 713

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 43637 (E.D.La.)
**(Cite as: 1993 WL 43637 (E.D.La.))**

C Only the Westlaw citation is currently available.

United States District Court, E.D. Louisiana.
Lois L. SHELTON, wife of/and Timothy P. Maher
v.
CONGRESS STREET PROPERTIES, INC.
**Civ. A. No. 92-1084.**

Feb. 16, 1993.

*FINDINGS AND CONCLUSIONS*

LIVAUDAIS, District Judge.

**\*1** Plaintiffs Lois L. Shelton and Timothy P. Maher ("plaintiffs") filed a Petition for Rescission in the 22nd Judicial District Court, Parish of St. Tammany, State of Louisiana on March 11, 1992. Defendant Congress Street Properties, Inc. ("defendant") removed the case to this Court on March 27, 1992. A non-jury trial was held in this case on December 10, 1992. The Court heard testimony and oral argument. Considering the testimony, the arguments, and the exhibits presented, the Court makes the factual findings and conclusions of law set forth below.

I. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Diversity of citizenship exists as plaintiffs are Louisiana residents and the defendant is a Delaware corporation domiciled in Mississippi. The matter in controversy exceeds $50,000 exclusive of interest and costs. This Court is the proper venue pursuant to 28 U.S.C. § 1391(a) because the subject immovable property is located in St. Tammany Parish, within the Eastern District of Louisiana.

II. Findings of Fact

A. Purchase of Property and Payments

On August 12, 1987, defendant conveyed to plaintiffs a parcel of undeveloped land designated as Lot F (see plaintiffs' exhibit "C"), Section 44, Township 8 South, Range 11 East, St. Helena Meridien, St. Tammany

Parish, Louisiana ("Lot F"). The sales price of the property was $50,000. Plaintiffs made a down payment of $5,000 and executed a promissory note (defendant's exhibit "A") for the $45,000 balance, bearing annual interest at the rate of 9.5%, and payable in 59 monthly installments of $582.29, and then a 60th and final installment of $28,307.80. Defendant is the holder and owner of the note, which was secured by an Act of Credit Sale (plaintiffs' exhibit "A"; defendant's exhibit "B"). Pursuant to the terms of the note and credit sale, plaintiffs paid all monthly installments due through September of 1991.

As of October 1, 1991, the outstanding principal balance that plaintiffs owed was $31,533.08 (defendant's exhibit "D"). That balance is still outstanding today, and defendant has asserted a counterclaim for the recovery of that amount plus interest accrued. Jann James, an employee of defendant, testified that as of the date of trial, December 10, 1992, the interest on the principal was $2,995.64, and that plaintiffs therefore owed a total of $34,528.72 at that time. Ms. James testified that with the current interest rate, the total payment is increasing by about $8.32 per day.

B. The Dispute Over Nonpayment

Plaintiffs stopped paying the monthly installments due on the note because at some time between May and September of 1991, they learned that a substantial portion" of Lot F had been designated as "Federal wetlands" by the U.S. Army Corps of Engineers ("Army Corps"). Plaintiff Timothy Maher testified that he learned of the wetlands classification through a letter dated May 23, 1991 that the Army Corps sent to a Mr. Richard Hollins of Security Homestead. The letter clearly states that the wetlands classification is based on a field inspection of the property that was completed on January 29, 1991.

**\*2** Plaintiffs certainly could not have known about the 1991 "Federal wetlands" classification when they purchased Lot F in 1987. Plaintiff Timothy Maher testified that had he and his wife known the land was classified as wetlands, they never would have purchased it; they bought the lot in order to construct a single-family residence and they mentioned this to Mr. Gerald Pfister, the real estate agent who negotiated the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 43637 (E.D.La.)
**(Cite as: 1993 WL 43637 (E.D.La.))**

sale between plaintiffs and defendant. The testimony of both Timothy Maher and Gerald Pfister indicated that Pfister never told plaintiffs that their property was classified as Wetlands. The Court finds that Pfister failed to provide such information because, like plaintiffs, he could not have known in 1987 that Lot F and the surrounding area would be designated as wetlands some four years later.

The plaintiffs were aware, however, that they would have to obtain the necessary state and federal permits in order to improve their land. Timothy Maher testified that prior to purchasing Lot F, he either reviewed an April 8, 1987 letter from J.J. Krebs & Sons, Inc. to Mr. Pfister (defendant's exhibit "F") or a very similar document. That letter specifically states that "[a]ny filling, pumping, protection, etc., of this property will require environmental approval from the State and Federal Governments." Mr. Pfister testified that he provided to the plaintiffs, prior to the sale, an appraisal of nearby Lot D and the addenda attached to the appraisal (plaintiffs' exhibit "B"; defendant's exhibit "C"). The addenda states that the value of the property is subject to "obtaining the necessary state and federal permits to fill the subject site(s) ..." In contrast to Mr. Pfister's testimony, Mr. Maher testified that he never saw the appraisal, and only spoke to Mr. Pfister about the "numbers" contained within it.

Finally, plaintiffs' offered the rebuttal testimony of Eric Orgeron, who purchased nearby Lot B in June of 1987. Mr. Pfister was the agent who negotiated the sale. Mr. Orgeron testified that he asked Mr. Pfister if the area had been classified as wetlands, and that Mr. Pfister told him the lots were not wetlands under the Army Corps' definition. Mr. Pfister testified that he never told the plaintiffs that their property was not classified as wetlands.

III. Conclusions of Law

A federal court sitting in diversity must look to state substantive law in deciding the merits of the case. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78 (1938). Since the immediate cause of action arose in Louisiana, this Court looks to Louisiana state law in passing on the questions presently before it.

Plaintiffs have petitioned for rescission of their agreement with defendant to purchase Lot F. They assert that their consent to the agreement has been vitiated by error; they would not have purchased the property had they known it was federal wetlands. Louisiana law recognizes that error may vitiate consent. LSA-C.C. Art. 1948. "Error vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party." LSA-C.C. Art. 1949.

*3 The cause of the plaintiffs' obligation in this case was their plan to build a single-family residence on Lot F. The plaintiffs have stated that they would not have incurred the obligation if they had known that they could not construct a home on the property. Furthermore, defendant knew the reason why plaintiffs purchased the land. While these facts technically satisfy the language of LSA-C.C. Art. 1949, case law instructs the Court to look to the nature of the error before determining whether or not it vitiates consent.

The court in *Hanover Petroleum Corp. v. Tenneco Inc.,* 521 So.2d 1234 (La.App. 3 Cir.1988) examined the nature of an alleged error behind a gas purchase contract. Some time after the contract was signed, the natural gas market collapsed and the government restructured the industry. The defendant justified its breach of the contract by essentially arguing that it would never have agreed to the obligation had it anticipated the collapse and restructuring, and therefore the contract was the result of error. *Id.* at 1240. The court rejected that argument, and determined that a claim of error could not be based on conditions that arose after the contract was in effect. *Id.; see also Caddo Parish School Board v. Cotton Baking Company,* 342 So.2d 1196 (La.App. 3 Cir.1977).

The alleged error in this case is based upon the classification of the land purchased by plaintiffs. Plaintiffs believed that they were purchasing a piece of land on which they would be able to erect a residence after obtaining the requisite permits. They claim the error arises from the fact that a federal wetlands classification probably prohibits them from building upon the property at all. However, the only evidence before this Court indicates that the property in question was not classified as federal wetlands until 1991, four years after plaintiffs purchased the property. As in the *Hanover* case, no error could have existed at the time the parties entered into the obligation. In 1987, each party believed that a single family residence could have been constructed upon the land. There is no evidence

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 43637 (E.D.La.)
**(Cite as: 1993 WL 43637 (E.D.La.))**

before this Court to suggest otherwise. As the *Hanover* court announced, a claim of error cannot be based on the fact that a party would never have entered into a contract had it anticipated a future event. In order for plaintiffs to prevail in this case, they would at least have to show by a preponderance of the evidence that Lot F was classified as federal wetlands at the time of the sale, or that defendant should have known that the property would be classified as such. *See* LSA-C.C. Art. 1831. Plaintiffs have not met this burden. The unfortunate consequence for them is that they have validly purchased a piece of land that most likely has limited use.

Finally, plaintiffs cite two Louisiana cases where courts rescinded contracts involving the purchase of immovable property. The Court finds neither case instructive as both are distinguishable upon their facts. In *Creppel v. Von Hoene,* 575 So.2d 514 (La.App. 5 Cir.1991), the land that plaintiffs purchased was classified as federal wetlands at the time of the sale. Furthermore, although the defendant vendor was aware of this fact, he failed to inform the plaintiffs about it. The court in *Gisclair v. Matmoor, Inc.,* 537 So.2d 876 (La.App. 5 Cir.1989) was persuaded not only by the fact that the property in question had been classified as wetlands at the time of the purchase, but also by a written guarantee from the vendor that the property had not been classified as such. These facts are clearly different from the instant facts, and therefore *Creppel* and *Gisclair* have no application here.

IV. Remedy for Defendant

*4 Jann James testified, and defendant's exhibit "D" shows, that the outstanding principal balance due on the note is $31,533.08. Plaintiffs shall pay that amount, plus interest accrued until paid.

Judgment shall be rendered accordingly.

E.D.La.,1993.
Shelton v. Congress Street Properties, Inc.
Not Reported in F.Supp., 1993 WL 43637 (E.D.La.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.